THE HON. BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON at TACOMA

| | |
|---|---|
| DARIUS KHALEGHI | ) |
| Plaintiff, | ) Cause No.: 3:10-cv-05360-BHS |
| | ) |
| vs. | ) **DECLARATION OF DARIUS** |
| | ) **KHALEGHI IN OPPOSITION TO** |
| | ) **DEFENDANTS' MOTION FOR** |
| THE STATE OF WASHINGTON; | ) **SUMMARY JUDGMENT** |
| DEPARTMENT OF SOCIAL AND HEALTH | ) |
| SERVICES (DSHS), and its employees TROY | ) |
| HUTSON, LEO RIBAS, DAVID STILLMAN | ) |
| and ALDOLPHO CAPISTANTI | ) |
| | ) |
| Defendants. | ) |

Comes now, Darius Khaleghi, Plaintiff herein, and makes the following Declaration based upon his own personal knowledge.

1.  I am the Plaintiff in the above entitled matter.

2.  I formerly worked as the Interim Director of the Washington State Human Rights Commission and the Deputy Director of the Washington State Human Rights Commission. I was an executive member of the Governor's Committee on Affirmative Action. I was a member of the Thurston County Commission for Human Rights and Diversity. Issues impacting discrimination in employment are very important to me.

**DECLARATION OF DARIUSH KHALEGHI IN**
**OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

Page 1

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

3. I have a Bachelors Degree in Business Administration with a minor in Psychology from the University of Washington; a Master of Science in Industrial and Organizational Psychology, *cum laude* from Portland State University; a Masters of Business Administration, *cum laude* from Pacific Lutheran University and I had completed 54 credit hours and was beginning my doctoral dissertation toward my Ph.D. in Organizational Leadership when I was terminated. I also teach human resource management and leadership courses. One of the topics I teach is titled, "Organizational Justice."

4. I worked at the Department of Veterans Affairs as chief of Human Resources, Information Technology, Strategic Planning and G-MAP performance and quality manager. In 2007, I was honored with Washington State Governor's Leadership In Management Award.

5. I have always earned outstanding performance evaluations and recognition for my contributions to organizations I have worked with in my career. I worked for the Intel company earning several promotions before I left to join the Human Rights Commission as its Deputy Director to repay the debt I felt I owed to this Country for accepting my sister and me as a refugees from religious persecution in Iran.

6. I joined Department of Social and Health Services (DSHS) as the Operations Services Director of the Economic Services Administration on July 16, 2008. A major piece of my employment at DSHS involved Human Resources.

7. Mr. Hutson never told me he had any concerns with my performance. In November 2008 shortly before I was fired, he told me I might not be a "good fit." However, when I asked him if there were any concerns with my performance or conduct in any

**DECLARATION OF DARIUSH KHALEGHI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Page 2

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

way, he could not identify any. To the contrary, he was complimentary of my accomplishments.

8. Mr. Hutson did not have a meeting with me and a representative of Human Resources telling me I was fired before I notified him I was seeking EEOC review of his conduct. He indicated to me he was thinking about my future in the organization and suggested I was not a good fit. However, he could not articulate the basis for that opinion or identify any performance issue. To the contrary, he was highly complementary of all I had accomplished in the short time I had been at ESA. Later that evening I received a draft of an e-mail stating that I had decided to voluntarily leave ESA. I had made no such decision and Mr. Hutson had not told me I was terminated. I was not going to accept the suggestion that I leave the ESA and I believed Mr. Hutson's actions toward me were discriminatory. I filed an EEOC complaint and notified Mr. Hutson of that fact early on November 19, 2008.

9. I was fired by Mr. Hutson, OSD Director on November 19, 2008 only hours after I informed him I had filed an Equal Employment Opportunity Complaint against him for discrimination and retaliation. I was told not to touch my computer and that I had a short period of time to clear out my office. Accompanying him was Mike Hart, a manager directly reporting to Mr. Ribas. He noted that Mr. Hart would be watching me and escorting me to my car. Mr. Hart escorted me to my car and escorted me to turn in my State Identification and Access Card at the reception desk.

10. I was replaced by Barbara Bucsko who was a member of my management team. She is not an Iranian and to my knowledge she had made no complaints regarding discrimination nor had she participated in any investigation of discrimination.

**DECLARATION OF DARIUSH KHALEGHI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Page 3

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

11. Throughout discovery Mr. Hutson refused to provide an explanation for his
reasoning behind his action of firing me.  Finally, in reply to the Summary Judgment
Motion that I filed, Mr. Hutson submitted a Declaration opposing my Motion for
Summary Judgment.  In his Declaration, Mr. Hutson makes a number of statements of
fact that I dispute as being untrue.

12. Mr. Hutson alleges in ¶17 that I sent my two weeks notice on June 17, 2008 before he
had officially offered me the job.  However, **Exhibit 1** (Mr. Hutson's e-mail dated
June 17, 2008) which we received from Defendants in discovery establishes that he
had offered me the position on June 17, 2008.  **Exhibit 2** includes Mr. Aldolfo
Capestany's June 18, 2008 reaction of "FUBAR!!!!!" to the announcement of my
appointment to the Director of the Operations Support Division of the E.  This
sequence in contrary to the sequence claimed by Mr. Hutson that Aldolfo Capestany's
comment regarding me caused Mr. Hutson to put my offer on hold before he had
extended me an offer of employment.  Mr. Capestany expresses surprise about my
appointment: "WTF. He is coming to our area!!!!!"  Mr. Capestany's own
declaration states it was not until June 19, 2008 that he spoke to Shannon Wallace
about my hiring and not until the June 20, 2008 that he spoke with Mr. Hutson about
me and met with Mr. Hutson on June 23, 2008.  Capestany Dec. ¶¶ 18-21.

13. Mr. Capestany's own declaration filed in opposition to my motion for summary
judgment acknowledges that he began making calls to me in the summer of 2007.  He
has no explanation for these calls, except to deny he made them because of my
Iranian Ancestry.  He had met me and knew I was Iranian.  He had read about me in
the paper.  While I do not know which article he read about me, many of the articles
about me have recounted my history fleeing from religious oppression in Iran.  He

**DECLARATION OF DARIUSH KHALEGHI IN
OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Page 4

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

1    claims that he stopped the calls in Sept. 2007, but Attached hereto as **Exhibit 3** are

2    copies of my phone records from DVA in November 2007 reflecting that the calls

3    were still coming in November 2007.  My recollection is that the calls from Mr.

4    Capestany continued for a period of several months.

5    14. Mr. Hutson revealed for the first time in his deposition that at pg. 11, lns 12-23 that

6    John Lee the Director of the Department of Veterans' Affairs had told Mr. Hutson I

7    would sue him if he did not follow through with his offer of employment to me and

8    that Mr. Hutson considered that a threat to him.  This provides additional support for

9    my claim that I believe that I was retaliated against for opposing what I reasonably

10    believed to be discriminatory conduct against me personally.

11    15. One of the first assignments I was given even before I began at ESA was to find a

12    replacement for the fiscal chief who had given her notice of resignation.  Attached as

13    **Exhibit 4** is a copy of the e-mail from Mr. Hutson tasking me with this assignment as

14    being critical to all our success.  I was able to persuade the departing fiscal chief,

15    Babs Roberts to stay on at ESA, she is currently the Director of Community Services

16    Division having replaced Mr. Leo Ribas who was demoted to a position in the Child

17    Support Division reporting to Mr. David Stillman and then went on a leave of

18    absence to work for a consulting firm that had been providing services to the

19    Community Services Division while he was the Director.

20    16. Shortly after my arrival on July 31, 2008 I announced that the all Personnel

21    Investigations in ESA will be consolidated into the Human Resources Office under

22    HR Manager, Kandy Pierson.  I also tasked managers with key issues, including

23    Ethics.  A copy of those memoranda are attached as **Exhibit 5.**

24

25

**DECLARATION OF DARIUSH KHALEGHI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Page 5

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

17. On August 5, 2008 I reminded staff of the importance of having a process to manage hiring requests and making offers effectively and equitably. **Exhibit 6.**

18. On August 25, 2008 I commented to Mr. Hutson in an e-mail regarding the impact of employee grievances on productivity and the cost savings that can flow from having effective processes in place and good labor – management relations.  I again urged Mr. Hutson to use Ms. Pierson as the "single point of contact for all labor and HR issues." A copy of that email is attached as **Exhibit 7.**

19. I believe it is important to have a strong central human resources department within an organization.  This is particularly true regarding claims of discrimination and investigations of misconduct.  If varied people are engaged in the review and investigation of misconduct or discrimination, patterns of discriminatory behavior are very easy to overlook.  This is further true if the documentation on investigations is not centralized, poorly prepared or non-existent.

20. The failure to document investigations into issues of misconduct and in particular discrimination, even if determined to be unfounded is very troublesome.   If accurate records are not maintained you have wildly different disciplinary actions for employees on the same types of misconduct.  This in turn can promote discrimination in an organization as the sanction turns not on the behavior but on who committed it or who was handing out the discipline.  It can allow discriminatory behavior to go unreported or unaddressed because no record of questionable conduct exists, even if the behavior was not confirmed or the results were inconclusive.

21. Having a reliable investigatory process, with trained investigators has many benefits.  First, employees are reluctant to use a process they perceive of as being biased or ineffective.  Secondly, a well documented process allows appropriate action to take

DECLARATION OF DARIUSH KHALEGHI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

1    place and establishes documented and measurable criteria for an agency's

2    performance.  If employees do not perceive the process as unbiased and effective,

3    employees are very fearful and reluctant to come forward with pertinent information.

4    This problem is compounded if there is a perception that retaliation will occur to

5    those persons coming forward with information or taking a stand against

6    discriminatory behavior. In addition to my formal education and experience

7    managing Human Resources functions, I have participated in twenty hours of specific

8    State of Washington training for Personnel Investigations in 2007.

9    22. In early September Robert Gutierrez raised some issues regarding a report on his

10   allegations of discrimination.  A copy of his e-mail and my inquiry to Mr. Hutson is

11   attached as **Exhibit 8.**  Mr. Hutson had indicated that Mr. Gutierrez may be moved

12   from Community Services into OSD.

13   23.  In Mr. Guitieriz's case, however, he had already been transferred to my organization.

14   In a meeting where I attended with Mr. Guitieriz, he had obtained an attorney and

15   alleging discrimination and retaliation.  I believed that not taking the actions that were

16   taken against Mr. Guitieriz, I would not be the manager best serving this employee

17   and that Mr. Ribas and his organizations should have engaged in an interactive

18   process to address his allegations.  By transferring Mr. Guitieriz to my organization,

19   Mr. Ribas had avoided interacting, addressing, and resolving employee's allegations.

20   As a result, I took the action of transferring Mr. Guitieriz back to Community

21   Services Division.    There after I was removed from the process.

22   24. After I questioned the appropriateness of that action, Mr. Hutson removed me from

23   having any further dealings with this issue.  I found this unusual but did not dwell

24   upon it owing to the work I was involved in and my understanding that the issue was

25

**DECLARATION OF DARIUSH KHALEGHI IN
OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Page 7

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

1  being addressed by Mr. Christopherson who was the head of Human Resources for

2  DSHS and the underlying issue arise prior to my arrival at ESA. At that point I had

3  not seen the pattern of conduct developing at ESA.

4  25. Around the same time, my confidential assistant, Diana Harder was removed from my

5  staff and assigned as Mr. Ribas' confidential assistant. I was not consulted on this

6  change in staff. I simply arrived at work one day and asked where Diana was since

7  her desk was empty and was told she works for Mr. Ribas now.  This was very

8  surprising since Mr. Hutson had told me how important a confidential assistant was in

9  getting my work done and then she was taken away. A copy of my e-mail to Mr.

10  Hutson about this issue is attached as **Exhibit 9**.

11  26. This left me without a confidential assistant and I had to rely upon a variety of

12  personnel to provide my administrative support. I was not offered the opportunity of

13  using Jenifer Martinez as a confidential secretary although Mr. Hutson, Mr. Ribas,

14  Mike Hart and Roxie Schalliol were trying to place Ms. Martinez in a Developmental

15  Job Assignment (DJA) in the OSD's IT division because of a conflict that she had

16  with Mr. Ribas. I had not met Ms. Martinez and did not realize that she had been Mr.

17  Ribas confidential secretary, that she was a highly skilled administrative assistant and

18  was available to assume the role of my confidential assistant. I did not realize that

19  this DJA placement for Ms. Martinez was being sought at the time Ms. Harder was

20  reassigned from my staff by Mr. Hutson and Mr. Ribas.

21  27. The crux of my retaliation complaint is that an employee, Deanna Scott approached

22  me because she was very concerned about her employment and had come forward

23  with concerns about an inappropriate relationship between Mr. Leo Ribas and Diana

24  Harder an employee who reported to Mr. Ribas. I had also took actions regarding

25

**DECLARATION OF DARIUSH KHALEGHI IN
OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Page 8

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

two other allegations of discrimination that are discussed in detail below. I believe that Mr. Hutson retaliated against me by firing me and having me escorted from the premises after I informed him I had filed my own EEOC complaint against him.

28. I now believe that Mr. Hutson's retaliatory motives also included his perception of being purportedly threatened with suit by me if my employment offer was withdrawn as a result of the actions of Mr. Capestany, the individual who had been making harassing phone calls to me over a period of months in 2007.

29. Mrs. Scott was concerned about the relationship between Mr. Ribas and Ms. Harder who was now in a position to impact Mrs. Scott's employment opportunities.

30. Mrs. Scott was concerned that because of a close relationship between Ms. Harder and Mr. Ribas her employment prospects were diminished. She shared that Ms. Harder spoken of having a bed for Mr. Ribas at her home and the close nature of the relationship between Ms. Harder and Mr. Ribas she was very concerned. She was physically distressed and upset when she related this to me. I did tell Mrs. Scott that I would follow up. Ms. Scott was very afraid for her job and was visibly shaking.

31. I was concerned that Mr. Ribas was allowing inappropriate relationships with staff to influence hiring decisions, which may result in unlawful discrimination and could have a liability exposure for the State and reduce staff moral. If Mr. Ribas was influenced by inappropriate relationships to influence hiring and promotion decisions, it could be a form of *quid pro quo* sexual harassment. Further, the use of a sexual relationship to influence hiring and personnel decision has an adverse impact upon employees who do not engage in such behavior either because they refuse or they are passed over because Mr. Ribas was not considering them for advancement or continued employment because he did not find them desirable prospects for a

**DECLARATION OF DARIUSH KHALEGHI IN**
**OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

Page 9

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

personal relationship notwithstanding their qualifications for employment or because he found them sexually unappealing or believed they would rebuff any attempt to advance their job prospects by means other than through competent job performance.

32. Although I had no personal evidence that Mr. Ribas was engaging in such behavior of *quid pro quo* sexual harassment, Mrs. Scott's concerns were sufficient to give rise to a belief that sexual harassment may be occurring thereby triggering an obligation to look into Mrs. Scott's concerns regarding Mr. Ribas' relationships with staff.   Based upon my training and experience I had a good faith belief that this situation suggested there may be problems needing further investigation to confirm or dispel possible discrimination.

33. I provided information to my Director, Troy Hutson that Ms. Scott's concerns trigger an EEOC concern and should be properly investigated.  Mr. Hutson, the Director of ESA objected and said that Mr. Ribas could investigate the allegations against him on his own.  This made no sense to have Mr. Ribas investigate himself.  This was a marked departure from our decision barely a month previously to consolidate personnel investigations in the HR Department under Ms. Pierson.

34. I pointed out to Mr. Hutson that it would not be appropriate for Mr. Ribas to look into allegations in which he played a central role.  Mr. Hutson was focused upon the fact that the employee in question did not use the words "sexual harassment" or "discrimination" and therefore the issue was not of concern.  I disagreed with Mr. Hutson.  Mr. Hutson then directed me to turn the matter over to Mr. Ribas, the subject of the complaint.  Over my objection, Mr. Hutson instructed me to stay out of the issue.  I believed that it would be unethical and inappropriate for Mr. Ribas to direct

**DECLARATION OF DARIUSH KHALEGHI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Page 10

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

1    the investigation into his own behavior.  Mr. Hutson told me to call Mr. Ribas and

2    turn the matter over to him.

3    35. When I called Mr. Ribas and informed him that this issue needed to be looked into, he

4        yelled at me for suggesting the allegations against him should be looked into

5        independently.  He screamed at me, "This is not working for me" and hung up the

6        phone on me.  I related this behavior to Mr. Hutson and he took no action on it.  See

7        Hutson Dep. pg. 30, lns.14-22.  Even though Human Resources was part of my role at

8        ESA, I was removed from any further involvement in this issue and have no first hand

9        knowledge the issue was ever investigated.  While I was the Director of OSD, neither

10       Ms. Pierson or Ms. Schalliol ever reported back to me that the matter had been looked

11       into by them.

12   36. That same day, I consulted with Glen Christopherson the head of Human Resources

13       at DSHS and Julia Lance, the HR Manager at DVA who worked in HR with the

14       DSHS, she concurred with my concerns that these allegations should be looked into

15       properly.  They concurred that my assessment that this matter should be looked into

16       was correct and it was not appropriate for Mr. Ribas to investigate the claims against

17       himself.  Attached as **Exhibit 10** is a copy of an e-mail I received from the Human

18       Resources manager at DVA on this issue. To make sure that I clear my position with

19       Mr. Huston on this issue, I forwarded information from the Equal Employment

20       Opportunity Commission regarding this issue to Mr. Hutson.  A copy of that e-mail is

21       attached as **Exhibit 11.**

22   37. In my e-mail to Mr. Hutson, I pointed out that the "management cannot expect an

23       employee who may be suffering or is concerned about suffering from retaliation) **to**

24       **always use the correct terminology or form.**  If a reasonable person believes that

25

**DECLARATION OF DARIUSH KHALEGHI IN
OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Page 11

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

1   the statements warrant further investigations then DSHS has a duty to move forward

2   to dispel or confirm." (emphasis in original).

3   38. Mr. Hutson did not respond to my e-mail. He did acknowledge in his deposition that

4   he was surprised to receive my e-mail. Hutson Dep. pg. 24, ln. 20 – pg. 25, ln. 25.

5   39. I wanted to make sure we had effective complaint procedures to enforce our

6   published non-discrimination policies. I was concerned that the lack of an effective

7   investigatory process exposed the State to potential liability and could undermine the

8   safe harbor carved out for employers under the U.S. Supreme Court Decisions in

9   *Ellerth* and *Faragher* for employers who have established anti-harassment and anti-

10   discrimination policies coupled with meaningful and effective investigatory

11   processes. This was true even though Mr. Ribas as one of the three Directors of ESA

12   created immediate exposure because of his position of substantial authority. By

13   sending the e-mail I wanted to make sure that Mr. Hutson was aware of the jeopardy

14   created by an ineffective investigation. Further, for a complaint process to be

15   effective the employees have to have confidence in the integrity of the process. If the

16   employees perceive that the process is subject to manipulation they are less confident

17   in the process and therefore less likely to use the process.

18   40. I am aware that there have been other concerns raised about Mr. Ribas and possibly

19   others at ESA regarding their adherence to the laws against discrimination. I took

20   action on these incidents. I have learned that these concerns occurred both before and

21   after my firing from ESA. Further, I have been informed there were at least three

22   other sexual harassment allegations against Mr. Ribas. I was also informed that at

23   least one investigator was pressured to have a finding against an ESA manager

24   changed to reflect no discrimination when there was an initial finding of

25

**DECLARATION OF DARIUSH KHALEGHI IN**
**OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

Page 12

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

1    discrimination.   I believe that investigations were removed from my area of

2    responsibility at ESA because I would not condone discrimination and could not be

3    relied upon to turn a blind eye to discriminatory practices.

4    41. Attached as **Exhibit 12** is a copy of an investigation into Mr. Ribas' behavior that

5    occurred after my departure, but addressed the concern I had raised.  Specifically, the

6    report notes at page 20 of 29, document number 02070020 that "A temporary position

7    was found for Martinez in Economic Services in the Operation Support Division but

8    the new Director in that unit "put the kibosh" on it and Martinez was not transferred;

9    she has since been working in a different area of the administration."

10   42. In his deposition, Mr. Hutson Mr. Hutson acknowledges that he reviewed this report

11   and took no action on the report.  Mr. Hutson's characterization of the report was that

12   Mr. Ribas did not violate any Department policy in terms of the behavior in the report

13   and that he had no reason to disagree with the analysis in the report.  Hutson Dep. pg.

14   31. ln. 19 – pg. 32, ln. 25.  However, the report itself makes no finding on policy

15   violations committed.  **Exhibit 12,** pg. 38 og 39, document number 02070038.

16   43. I have reviewed this report and it raises massive red flags for the organization from

17   Mr. Ribas' conduct, as well as, the effectiveness of the ESA response to the

18   complaining witness's attempts to have discriminatory behavior addressed.  This

19   report underscores why I forwarded Exhibit 11 to Mr. Hutson in the first instance.  I

20   believe my communications that issues of discrimination are very serious and my

21   unwillingness to accept such conduct as "banter" was the motivating factor in both

22   Mr. Hutson's isolation of me and ultimate termination.  Creating a sexually charged

23   atmosphere in the work place creates a danger for a hostile work environment even if

24   the exchange is not unwelcome to the direct participants in the exchange, but is

25

**DECLARATION OF DARIUSH KHALEGHI IN
OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Page 13

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

1    observed by others in the work place. This creates special problems where workers

2    are unwilling to come forward and voice their concerns because the fear retaliation or

3    that their concerns will be minimized, ridiculed or ignored.

4    44. Mr. Hutson did not exhibit the proper understanding that demeaning comments or

5    comments objectifying women or introducing sexual commentary into the work

6    place, particularly by persons of authority created fertile ground for discrimination.

7    Mr. Hutson joked with Mr. Ribas in a manager's meeting about Mr. Ribas shaving his

8    pubic hair. Mr. Hutson attempted to engage me into a discussion about a woman's

9    body when we were going to a meeting and an attractive woman walked in front of

10   our car and he attempted to engage me in a discussion about women's bodies. It was

11   very uncomfortable after I informed him that I was not interested in such a

12   discussion. Afterward, Mr. Hutson was even more removed from me and

13   purposefully started ignoring me. I believe that this behavior is directly related to my

14   National Origin as Iranian where we have a strong cultural taboo against pornography

15   and objectifying women.

16   45. Ms. Martinez had been Mr. Ribas' principal administrative assistant who claimed she

17   was harassed by Mr. Ribas. Although I was responsible for Human Resources, the

18   substance of Ms. Martinez's complaints had not been shared with me. An effort was

19   undertaken to move her from her administrative assistant position in Mr. Ribas area to

20   a position as an Information Technology Specialist 3 (IT3) in my Department because

21   of her concerns about inappropriate behavior by Mr. Ribas. I was not consulted

22   regarding the decision to move this employee into my Department or the reasons for

23   the move beyond the fact she had difficulty with Mr. Ribas. However, after I was

24   notified that the transfer was in process, I objected and stopped the transfer. I

25

**DECLARATION OF DARIUSH KHALEGHI IN
OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Page 14

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

1    believed that it was not appropriate to move an employee because a supervisor had

2    allegedly acted inappropriately toward that employee, but the issue of the behavior by

3    the supervisor should be dealt with and properly documented for appropriate

4    corrective action.  Simply moving an employee without addressing the underlying

5    concerns is not appropriate and may be interpreted as retaliation.  I expressed that

6    opinion when I would not allow this transfer to go through.  Additionally, this transfer

7    would have been a clear message to other employees who may have had concerns

8    regarding discrimination or the consequences of making a complaint.  It is similar to

9    exiling someone who opposes a regime.  Although the transfer did not go through to

10   my knowledge, I was kept out of the issue after I made my concerns known that

11   simply transferring an employee is not the appropriate way of addressing problems.

12   46. In addition to my concerns about not addressing I felt that moving this employee into

13       an IT3 position from an Admin position was potentially setting her up to fail in that

14       she did not have the necessary skills and competencies to effectively perform IT3

15       duties that are quite complex and different.  It would much easier to terminate

16       someone for failing in their job duties.  I have since learned that after my removal

17       from the position as Director of OSD, Ms. Martinez was moved into the IT3 position

18       as a Developmental Job Assignment and the process was not stopped by my

19       objection.  Mr. Ribas in fact continued with his retaliatory behavior to silence Mr.

20       Martinez and teach others who may have concerns a lesson.

21   47. Contrary to my role as a HR Director, I was never involved in investigation into the

22       allegations of Mr. Martinez or Mr. Guitierz.  I made my opinions clear to Mr. Hutson

23       that I was not going to allow the transfers as a way of failing to deal with the issues.

24

25

**DECLARATION OF DARIUSH KHALEGHI IN**
**OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

Page 15

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

48. Attached hereto as **Exhibit 13** is a journal I prepared documenting my concerns that I was being harassed and frozen out of full participation as one of three Directors of ESA.

49. I felt that I was not being provided access to the necessary information to fully understand the operations of the other Divisions of ESA.  Without an active participation in the business of the other divisions my role was relegated to a reactive role instead of a proactive.  The support functions of the OSD were going to continue as they had without a full opportunity to understand places where value could be added to the ESA mission from OSD.  As a result of my concern, I forwarded an e-mail to Mr. Hutson. **Exhibit 14.**  E-mail string dated October 21, 2008.

50. Mr. Hutson asserts in his Declaration ¶¶ 41-45 that after he received my e-mail **Exhibit 14** noting that I am being frozen out of Director's meetings and communications he actively intervened and that because of his intervention, I was actively included in such meetings and communications to help me perform my duties.  "The Directors and I communicated most frequently by e-mail…Mr. Khaleghi was a part of these e-mail exchanges and was not excluded from these." Hutson Dec. ¶ 43.

51. Mr. Hutson's assertion is directly contradicted by **Exhibit 15,** an e-mail string dated October 23, 2008 between Mr. Ribas, Mr. Hutson, David Stillman and Mike Hart discussing Mr. Ribas' opinion that there were significant Full Time Employee (FTE) reductions available in EBT, one of the Departments that were in my area of responsibility.   Despite the fact that we were looking for Departmental savings, Mr. Hutson did not forward this communication to my attention even though it contained information from someone with a far longer tenure in the organization that would be

**DECLARATION OF DARIUSH KHALEGHI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Page 16

<u>Law Offices of</u>
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

helpful for me to have, particularly where we were looking for cost savings wherever

they could be found.  Neither did Mr. Ribas or Mr. Stillman.

52. Despite Mr. Hutson's assertion that I had not acted on reducing the number of our

FTE's I had informed him that we had identified 18 positions to address both the FTE

overage at OSD and the need for a 5% budget reduction.  A copy of that e-mail is

attached as **Exhibit 16.**  If the purported failure to meet the reduction of FTE's was

an important point of Mr. Hutson's dissatisfaction with my job performance

53. Denying me access to information necessary to perform my duties is a clear example

of an adverse employment action and strongly suggests that Mr. Hutson was simply

marking time to terminate my employment so that it would not fall so closely upon

my protected activities of objecting to Mr. Capestany's attempt to abort my hiring;

pointing out the need for a proper investigation of Ms. Scott's concerns; objecting to

Mr. Hutson's comments about women, blocking the transfer of Ms. Martinez,

questioning the appropriateness of transferring Mr. Gutierez from Mr. Ribas' unit to

my unit following his claims of discrimination at that unit.

54. Mr. Hutson alleges that I disclosed information about an ESA reorganization to my

management team after I was told to keep it confidential.  That did not happen.  Mr.

Hutson never told me to keep such discussions confidential.  It would make no sense

to keep such a discussion confidential as there would be no way for my management

team to evaluate and work on the issues implicated by the proposal.  On the rare

occasions were documents were intended for a limited audience that limitation would

be clearly stated upon their face.  Further, the bulk of my management team was

present at the management meetings where this issue would have come up.

**DECLARATION OF DARIUSH KHALEGHI IN
OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Page 17

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

55. Mr. Hutson states that I presented to my management team that it was Mr. Hutson's idea to eliminate the OSD.  I never made that representation.  In fact, in view of the proposals to move major pieces of the OSD operations such as contracts, facility management, quality control and information services to the other two divisions, I proposed that it might make sense to eliminate the OSD entirely as the bulk of the Divisions work would be taken over by the other two branches and the remaining pieces could be absorbed as well and you would eliminate the administrative overhead of the separate division.

56. Falsely stating that I disclosed confidential information after being told not to also supports the inference that the true motivation of a discriminatory termination.  The prolonged inability to state a non-discriminatory basis for the termination and then when providing an allegedly non-discriminatory reason that is, in fact, false supports the inference that discriminatory motivations prompted Mr. Hutson's actions.

57. Attached hereto as **Exhibit 17** is an outline prepared by Mr. Capestany that was turned over by him in response to discovery.   That document reflects an e-mail exchange between Mr. Hutson and Mr. Capestany on the day of my termination referencing me.  Despite requests and a motion to compel, those e-mails have not been turned over in discovery.  One wonders, what do those emails say?

58. When I arrived at OSD there were no clear goals or objectives established for that organization.  The management at ESA was essentially reactive and not proactive.  Mr. Hutson asserts that I was not meeting his priorities, but that is information that he never shared with me while I worked there.  Attached as **Exhibit 18** is a spread sheet that I prepared for my team to use to bring order to the organization.  It was to consolidate the tasks of the organization into a single program that could be

**DECLARATION OF DARIUSH KHALEGHI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

Page 18

1    monitored by Mr. Hutson and me that outlined tasks under project, the deadlines for

2    tasks, who had ownership of the task and the status of the task.  My staff helped to

3    create the information on this list.  The list is a milestone task list to move us in a

4    strategic direction. It provides an overview of the areas in my zone of responsibility.

5    This document on the intranet would allow persons with authorized access to observe

6    the status of tasks underway and click on the related task to reach the supporting task

7    documents, communications and detailed activity reports to oversee and comment on

8    ongoing tasks.

9    59. I was consistently working on developing measurable performances targets to make

10    an efficient organization.  Attached as **Exhibit 19** is an e-mail addressing the

11    adoption of measurable performances targets and a "Breakthrough Performance

12    System" of which Exhibit 18 is an example.

13

14    60. FURTHER YOUR DECLARANT SAYETH NAUGHT.

15    I declare under the penalty of perjury of the laws of the State of Washington that the

16    foregoing is true and correct to the best of my knowledge and belief.

17    Dated at Tacoma, Washington, this _20_ day of June, 2011.

18

19    DARIUSH KHALEGHI

20

21

22

23

24

25

**DECLARATION OF DARIUSH KHALEGHI IN
OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Page 19

Law Offices of
**Kram & Wooster, P.S.**
1901 SOUTH "I" STREET
TACOMA, WASHINGTON 98405
(253) 572-4161 Tacoma
(253) 272-7929
(253) 572-4167 Facsimile

**EXHIBIT 1**

| | |
|---|---|
| **From:** | Hutson, Troy A (DSHS) |
| **Sent:** | Tuesday, June 17, 2008 1:40 PM |
| **To:** | Stillman, David (DSHS/DCS); Ribas, Leo (DSHS); Hagen, Karen; Shoji, Dori (DSHS); Schalliol, Roxie (DSHS) |
| **Subject:** | Candidates |

After the five final interviews yesterday I decided to make offers to Jim Crabbe and DK. They both accepted today.  Jim can start Aug 1 and DK on Jul 16.

Roxie please work with Kjersten and Kandy to get complete the process.

Troy

1

Khaleghi v. DSHS
02060017

# EXHIBIT 2

From:           Capestany, Adolfo (DSHS/DCS)
Sent:           Wednesday, June 18, 2008 2:46 PM
To:             Stillman, David (DSHS/DCS)
Subject:        Fw: Dariush Khaleghi (DK)


FUBAR!!!!!

---

**From:** Capestany, Adolfo (DSHS/DCS)
**To:** Graham, Randy (DVA)
**Sent:** Wed Jun 18 14:15:58 2008
**Subject:** Re: Dariush Khaleghi (DK)

WTF. He is coming to our area!!!!!

---

**From:** Graham, Randy (DVA)
**To:** Capestany, Adolfo (DSHS/DCS)
**Sent:** Wed Jun 18 14:14:28 2008
**Subject:** FW: Dariush Khaleghi (DK)

Like another hole in the head...

Anyway, Ya-Friggin-hoo!

---

**From:** Clontz, Jon (DVA)
**Sent:** Wednesday, June 18, 2008 1:59 PM
**To:** Lee, John (DVA); DVA DL All DVA Staff
**Subject:** RE: Dariush Khaleghi (DK)

Congratulations DK and all the best. I have enjoyed working with you and we will all miss you......Jon

Jon Clontz

Chief of Operations

Washington State Veterans Homes

Washington State Department of Veterans Affairs

jonc@dva.wa.gov

(360) 731-9002

---

**From:** Lee, John (DVA)
**Sent:** Wednesday, June 18, 2008 1:57 PM
**To:** DVA DL All DVA Staff
**Subject:** Dariush Khaleghi (DK)
**Importance:** High

1

Khaleghi v. DSHS
02060018

30

Yesterday, I learned that Dariush Khaleghi has been awarded the position of Director of Operations Support with the Economic Services Administration of DSHS.  DK will be reporting to his new assignment on July 1st.

While the staff of the Central Office and Veterans Services Division will take an opportunity to more formally thank him at our June 25th Employee Recognition, I am sure you will join me in wishing him the very best in his public service career and thank him for his contributions.

John

2

Khaleghi v. DSHS
02060019

# EXHIBIT 3

Khaleghi v. DSHS
02160001

| ACT_DATE | ACT_TIME | PHONE | CITY | STATE | DURATION | DIR_ID | TYPE | INCOMING | ANSWERED | SWITCH_ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/1/2007 | 12:30 | (360)725-2166 | Olympia | WA | 0:02:06 | TUM 26041 | EI | O | Y | TUM |
| 11/1/2007 | 12:58 | (360)725-2166 | Olympia | WA | 0:00:12 | OB2 45445 | EI | O | Y | OB2 |
| 11/1/2007 | 13:04 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/2/2007 | 8:35 | (360)725-2166 | Olympia | WA | 0:00:54 | OB2 41930 | EI | O | Y | OB2 |
| 11/2/2007 | 8:59 | (360)725-2166 | Olympia | WA | 0:00:24 | OB2 41930 | EI | O | Y | OB2 |
| 11/2/2007 | 10:22 | (360)725-2166 | Olympia | WA | 0:00:18 | OB2 45445 | EI | O | Y | OB2 |
| 11/5/2007 | 8:41 | (360)725-2166 | Olympia | WA | 0:00:30 | OB2 41930 | EI | O | Y | OB2 |
| 11/5/2007 | 9:38 | (360)725-2166 | Olympia | WA | 0:00:30 | OLY 16855 | EI | O | Y | OLY |
| 11/5/2007 | 14:59 | (360)725-2166 | Olympia | WA | 0:00:12 | OB2 45445 | EI | O | Y | OB2 |
| 11/6/2007 | 13:49 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | _ | Y | OB2 |
| 11/6/2007 | 13:51 | (360)725-2166 | Olympia | WA | 0:00:12 | OLY 16998 | EI | O | Y | OLY |
| 11/6/2007 | 13:56 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/6/2007 | 13:57 | (360)725-2166 | Olympia | WA | 0:00:06 | OB2 45445 | EI | _ | Y | OB2 |
| 11/6/2007 | 13:57 | (360)725-2166 | Olympia | WA | 0:00:12 | OB2 45445 | EI | O | Y | OB2 |
| 11/6/2007 | 14:04 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/6/2007 | 14:06 | (360)725-2166 | Olympia | WA | 0:00:06 | OLY 16975 | EI | O | Y | OLY |
| 11/6/2007 | 14:08 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | _ | Y | OB2 |
| 11/6/2007 | 14:21 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/6/2007 | 14:26 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/6/2007 | 14:30 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/7/2007 | 14:42 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/7/2007 | 14:45 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/7/2007 | 8:50 | (360)725-2166 | Olympia | WA | 0:00:30 | OLY 16966 | EI | O | Y | OLY |
| 11/7/2007 | 9:14 | (360)725-2166 | Olympia | WA | 0:00:12 | OLY 16970 | EI | _ | Y | OLY |
| 11/7/2007 | 9:34 | (360)725-2166 | Olympia | WA | 0:00:18 | OB2 45445 | EI | _ | Y | OB2 |
| 11/7/2007 | 9:40 | (360)725-2166 | Olympia | WA | 0:00:54 | OLY 16893 | EI | O | Y | OLY |
| 11/7/2007 | 14:35 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | _ | Y | OB2 |
| 11/8/2007 | 15:05 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/8/2007 | 9:33 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/8/2007 | 13:58 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/8/2007 | 15:09 | (360)725-2166 | Olympia | WA | 0:01:12 | OLY 16900 | EI | _ | Y | OLY |
| 11/9/2007 | 15:24 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/9/2007 | 7:55 | (360)725-2166 | Olympia | WA | 0:00:06 | OB2 45445 | EI | O | Y | OB2 |
| 11/9/2007 | 8:40 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |
| 11/9/2007 | 10:12 | (360)725-2166 | Olympia | WA | 0:00:06 | OB2 45445 | EI | O | Y | OB2 |
| 11/9/2007 | 11:08 | (360)725-2166 | Olympia | WA | 0:00:00 | OB2 45445 | EI | O | Y | OB2 |

Khaleghi v. DSHS
02160002

| Date | Time | Phone | City | State | Duration | | Number | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/9/2007 | 11:45 | (360)725-2166 | Olympia | WA | 0:00:12 | OB2 | 45445 | EI | O | Y | OB2 |
| 11/9/2007 | 14:27 | (360)725-2166 | Olympia | WA | 0:00:12 | OLY | 16905 | EI | — | Y | OLY |
| 11/9/2007 | 14:27 | (360)725-2166 | Olympia | WA | 0:01:48 | OLY | 16935 | EI | — | Y | OLY |
| 11/9/2007 | 14:32 | (360)725-2166 | Olympia | WA | 0:00:30 | OB2 | 45445 | EI | O | Y | OB2 |
| 11/9/2007 | 14:32 | (360)725-2166 | Olympia | WA | 0:00:06 | OLY | 16905 | EI | — | Y | OLY |
| 11/9/2007 | 14:32 | (360)725-2166 | Olympia | WA | 0:00:24 | OLY | 16990 | EI | — | Y | OLY |
| 11/9/2007 | 14:33 | (360)725-2166 | Olympia | WA | 0:00:48 | OLY | 16913 | EI | — | Y | OLY |
| 11/9/2007 | 14:52 | (360)725-2166 | Olympia | WA | 0:00:12 | OLY | 16842 | EI | — | Y | OLY |

# EXHIBIT 4

**From:** Khaleghi, Dariush (DVA)
**Sent:** Tuesday, July 08, 2008 1:57:09 PM
**To:** Hutson, Troy A (DSHS); Schalliol, Roxie (DSHS)
**CC:** Harder, Diana (DSHS)
**Subject:** RE: Checking in

Thanks for the heads up Troy!

Roxie,

Can u send me the job announcements plz?

Will look into it.

thanks, dk

---

**From:** Hutson, Troy A (DSHS)
**Sent:** Tue 7/8/2008 1:16 PM
**To:** Khaleghi, Dariush (DVA); Schalliol, Roxie (DSHS)
**Cc:** Harder, Diana (DSHS)
**Subject:** RE: Checking in

Dariush,

I think you know we are losing our fiscal chief August 1 and our budget manager has just retired.   We have begun the process of replacing both but any thoughts, ideas or leads you might have would be welcome since these would be your first hires and critical to all our success.   (I remember you mentioned a current collegue)

Troy

---

**From:** Khaleghi, Dariush (DVA)
**Sent:** Monday, July 07, 2008 10:38 AM
**To:** Schalliol, Roxie (DSHS); Hutson, Troy A (DSHS)
**Cc:** Harder, Diana (DSHS)
**Subject:** RE: Checking in

Excellent and Thanks Roxie!

I have also been reviewing the website for more details.   Looking forward to get the info to study them.

Please, let me know if I can be of service to any of you.   Excited to work with all of you!

Khaleghi v. State
01020003

| | |
|---|---|
| **From:** | Khaleghi, Dariush (DSHS) |
| **Sent:** | Saturday, July 19, 2008 9:51:42 AM |
| **To:** | Pierson, Kandy (DSHS); Harder, Diana (DSHS) |
| **CC:** | Hutson, Troy A (DSHS); Schalliol, Roxie (DSHS) |
| **Subject:** | RE: Fiscal Service Chief |

Good Morning!


Kandy,


Troy extended his support regarding Fiscal Office Chief's situation and we need to move quick on this.


The issues to close before we can accomlish this task are:


1. **Diana.** please, help set up a quick meeting with David and Leo on Mon.   This is the job 1 priority to address the FTE requirement!
2. **Kandy,** please, complete the ROC and the benchmark analysis of the similar Chief positions and give us your HR recommendation.   Will need this by the end of bizz day on Mon.   (I am meeting with Troy on Tues to report out our status.)


Pending the outcomes of these two key actions, I will need to acomplish other dependencies:


Meet and close with Judy F and communitcate the ouctome.   I am confident that we smooth out the situation and use the opportunity to strength our relationship with the corp office.


Communicate the change to our leadership, key stakeholders and the staff.


Thanks for all your great support!

Khaleghi v. State
01020006

**EXHIBIT 5**

**Bucsko, Barbara (DSHS)**

| | |
|---|---|
| **From:** | Harder, Diana (DSHS) on behalf of Khaleghi, Dariush (DSHS) |
| **Sent:** | Friday, August 01, 2008 9:52 AM |
| **To:** | Beck, Greg (DSHS); Bucsko, Barbara (DSHS); D'Onofrio, Deann M (DSHS); Dooley, William (DSHS); Emmett, Glenda (DSHS/DCS); Hagen, Karen; Harder, Diana (DSHS); Hutson, Troy A (DSHS); Khaleghi, Dariush (DSHS); Martinez, Jennifer L (DSHS); Medina, Tom (DSHS); Montgomery, Brice (DSHS/DCS); Ojard, Julia; Olson, Marijo A; Peterson, Jennifer F (DSHS); Pierson, Kandy (DSHS); Price, Marquita J; Rendon, David (DSHS); Ribas, Leo (DSHS); Roberts, Babette (DSHS); Schalliol, Roxie (DSHS); Schumacher, Hope; Shoji, Dori (DSHS); Sotomish, Sarah (DSHS); Stillman, David (DSHS/DCS); Vang, Ko C (DSHS); Wallace, Shannon; Welch, Carol; Willis, Jeff (DSHS) |
| **Subject:** | Changes in Operations Support |
| **Attachments:** | document2008-08-01-094156.pdf |

Please see that attached memo from Dariush regarding changes in Operations Support.

Thank you

1

Khaleghi v. State
01070147



**STATE OF WASHINGTON**
**DEPARTMENT OF SOCIAL AND HEALTH SERVICES**
Economic Services Administration

July 31, 2008

**TO:**        ESA Leadership Team

**FROM:**      Dariush Khaleghi, Director
               Operations Support Division

**SUBJECT:**   **CHANGES IN OPERATIONS SUPPORT**

Over the past several weeks, we have been reviewing both FTEs and functional areas within the
Operations Support Division to ensure that our expenditures and allotments are in alignment and that we
are organized in a way that best supports the needs of our customers. While that process will be on-going,
we are implementing a few changes agreed upon with the directors to enhance support to the organization.

Effective August 1, we will implement the following:

- Recognizing the critical issues facing the Administration, I have asked Jeff Willis to focus his attention
  on facilities and facility management. The Work Environment and Enterprise Risk Management unit
  will be restructured, with the following functions moving to the Office of the Deputy Assistant Secretary
  and reporting to Roxie Schalliol:
    - o  Nana Mensah, ESA's Risk Management and Public Disclosure officer
    - o  Val Ivey, Emergency Management coordination
    - o  Audit coordination (Roxie)

  The remainder of the unit will continue to report to Jeff.

- Management of ESA's personnel investigations will be consolidated in ESA's HR Office with Kandy
  Pierson.

We will work with each of the individuals involved to ensure a smooth transition of functions. Maintaining a
commitment to providing quality customer service, we will continue the OSD review process, focusing on
streamlining existing processes and establishing repeatable, reliable processes where needed.

Thank you.

c:  OS Management Team

Khaleghi v. State
01070148

## Bucsko, Barbara (DSHS)

| | |
|---|---|
| **From:** | Khaleghi, Dariush (DSHS) |
| **Sent:** | Tuesday, July 29, 2008 8:53 AM |
| **To:** | Harder, Diana (DSHS); Beck, Greg (DSHS); Bucsko, Barbara (DSHS); Pierson, Kandy (DSHS); Roberts, Babette (DSHS); Schalliol, Roxie (DSHS); Welch, Carol; Willis, Jeff (DSHS) |
| **Cc:** | Hagen, Karen; Hutson, Troy A (DSHS) |
| **Subject:** | Management PDPs -- Brainstorming |
| | |
| **Sensitivity:** | Confidential |

I would like the Chiefs to begin thinking about their Performance Development Plans.  We will be discussing this in our next mgmt meeting.  As we discussed, effective leadership and management is distinct from individual contributor and technical roles.  I would like for us to think about the following six areas and come up with two to three key deliverables under each category.

### Sustainable Service Excellence

1. Customer Service Results (will include simple surveys)
2. Organizational culture and employee motivation Results (satisfaction not equal to motivation)
3. Operational Results
4. Financial Results
5. Ethical Results


For each department, we need to know and share what those results are in terms of numeric and ratios using baselines etc.  I would like to ask Carol to help us develop a simple dashboard indicators for the OS.

I know OS is great!  I am a believer.  We are going to show through data that we are on our path of excellence!!!

Thanks for all your service to the ones whose lives and the quality of their lives depend on you!  Nothing in is more profound than a life lived through service.

dk

Khaleghi v. State
01070149

**EXHIBIT 6**

## Bucsko, Barbara (DSHS)

| | |
|---|---|
| **From:** | Khaleghi, Dariush (DSHS) |
| **Sent:** | Tuesday, August 05, 2008 10:42 AM |
| **To:** | Khaleghi, Dariush (DSHS); Pierson, Kandy (DSHS) |
| **Cc:** | Ribas, Leo (DSHS); Hart, Mike J (DSHS/ESA); Hutson, Troy A (DSHS); Stillman, David (DSHS/DCS); Beck, Greg (DSHS); Bucsko, Barbara (DSHS); ESA Deputy Assistant Secretary; Harder, Diana (DSHS); 'Lichtblau, Kathy (DSHS)'; Roberts, Babette (DSHS); Schalliol, Roxie (DSHS); Schumacher, Hope; Welch, Carol; Willis, Jeff (DSHS); Olson, Marijo A |
| **Subject:** | RE: Clarification Needed |

Kandy,

We need to have a process to manage hiring requests and making offers effectively and equitably.  Moving forward, I would like you, I, and the hiring manager have a conversation before we take them to Troy for final approval. **This is imperative that we stay patient and honor the Governor, Secretary, and Troy's requests.  Appreciate everyone's cooperation!**

Rgds,

dk

---

**From:** Khaleghi, Dariush (DSHS)
**Sent:** Monday, August 04, 2008 3:26 PM
**To:** Olson, Marijo A; Pierson, Kandy (DSHS)
**Cc:** Ribas, Leo (DSHS); Hart, Mike J (DSHS/ESA); Hutson, Troy A (DSHS); Stillman, David (DSHS/DCS); Beck, Greg (DSHS); Bucsko, Barbara (DSHS); Dooley, William (DSHS); ESA Deputy Assistant Secretary; Harder, Diana (DSHS); Khaleghi, Dariush (DSHS); Lichtblau, Kathy (DSHS); Ojard, Julia; Roberts, Babette (DSHS); Schalliol, Roxie (DSHS); Schumacher, Hope; Welch, Carol; Willis, Jeff (DSHS)
**Subject:** RE: Clarification Needed

I guess we are all experiencing the same dilemma!  Troy has offered me his guidance when I took a position to get his approval to hire.  There are more details that are coming out from Robin and her office.  We should wait and explore what the specifics are and how they apply to our situation.  The gate to make any hiring decision seem to be closed till we have more info.

Let's get together and assess the situation after we receive Robin's input!

thanks, dk

---

**From:** Olson, Marijo A
**Sent:** Monday, August 04, 2008 2:46 PM
**To:** Khaleghi, Dariush (DSHS); Pierson, Kandy (DSHS)
**Cc:** Ribas, Leo (DSHS); Hart, Mike J (DSHS/ESA)
**Subject:** Clarification Needed

Hi Team-

Khaleghi v. State
01070140

I am sure you are probably working on this...but I am getting a lot of requests for clarification about the Governor's memo about not filling "new vacancies"
We have a bunch of old or current vacancies that we were in the process of filling....they have been posted, we are interviewing, etc, etc...
so it would be helpful to get a clarification out.  The vaste majority of these in the Financial Service Specialist (FSS) series, but also some social workers and case managers.   Leo had requested that we try to get at least the FSS's exempt from the freeze due to the fact that they provide direct service to the families in poverty who need basic survival resources.
Please let us know as soon as you get more information. Thanks.
Marijo
PS Leo is on vacation this week.  So if you need someone to help make this case or quantify the issue, I would be happy to assist.

2

Khaleghi v. State
01070141

## Bucsko, Barbara (DSHS)

| | |
|---|---|
| **From:** | Khaleghi, Dariush (DSHS) |
| **Sent:** | Tuesday, August 05, 2008 10:29 AM |
| **To:** | Hutson, Troy A (DSHS); Bucsko, Barbara (DSHS) |
| **Cc:** | Harder, Diana (DSHS); Hagen, Karen |
| **Subject:** | RE: Quality Control Specialist ESA/OSD |
| **Attachments:** | image001.gif |

Excellent Barbara!  Thanks for the quick and detailed reply.

dk

**From:** Hutson, Troy A (DSHS)
**Sent:** Tuesday, August 05, 2008 10:26 AM
**To:** Bucsko, Barbara (DSHS)
**Cc:** Khaleghi, Dariush (DSHS); Harder, Diana (DSHS); Hagen, Karen
**Subject:** Re: Quality Control Specialist ESA/OSD

Thanks!

**From:** Bucsko, Barbara (DSHS)
**To:** Hutson, Troy A (DSHS)
**Cc:** Khaleghi, Dariush (DSHS); Harder, Diana (DSHS); Hagen, Karen
**Sent:** Tue Aug 05 10:22:59 2008
**Subject:** Quality Control Specialist ESA/OSD

Troy:  Attached is some background material from past attempts to secure a salary increase for Quality Control Specialists in the Office of Quality Assurance.  All this work took place prior to the new bargaining process.  These documents are not updated.  Recruitment continues to be an issue since our qualified recruitment pool is at a range or two higher than the Quality Control Specialists.  Please let me know if you need more information.  We currently have 10 people with 30+ years of service and more coming close. One with 39 years.

**Quality Control Specialist – Range 49**

WorkFirst Program Supervisor – Range 54

Financial Services Specialist 5 (Supervisor) – Range 50

WorkFirst Program Specialist – Range 49

Financial Services Specialist 4 (Leadworker) – Range 47

Barbara Bucsko, Chief

DSHS/ESA/Office of Quality Assurance

Telephone: 360.725.4540

bucskbj@dshs.wa.gov

1

Khaleghi v. State
01070142

# EXHIBIT 7

**Stillman, David (DSHS/DCS)**

| | |
|---|---|
| **From:** | Khaleghi, Dariush (DSHS) |
| **Sent:** | Monday, August 25, 2008 9:31 AM |
| **To:** | Swogger, Jennifer L (HRD); Pierson, Kandy (DSHS) |
| **Cc:** | Hutson, Troy A (DSHS); Stillman, David (DSHS/DCS); Ribas, Leo (DSHS); Olson, Marijo A |
| **Subject:** | FW: LABOR RELATIONS MONTHLY REPORT - May, June, July - ESA |
| **Attachments:** | May ESA 08.xls; June ESA 08.xls; July ESA 08.xls |

Thanks Troy for sharing this with me! We should analyze the data and set targets for improvements. Labor issues can have significant adverse impact on organizational success.

Jennifer,

Please, add me to your listserv. I would like to work with the team to improve the numbers. Labor issues and litigation have both direct and indirect costs and working them effectively can make a huge difference in decreasing those costs.

I need to work with our divisions to improve the employee and labor outcomes. Please, utilize Kandy as the single point of contact for all labor and HR issues.

I will work with you and Glen and other divisions to improve the results.

Regards. dk

---

**From:** Hutson, Troy A (DSHS)
**Sent:** Friday, August 22, 2008 2:17 PM
**To:** Khaleghi, Dariush (DSHS)
**Subject:** Fw: LABOR RELATIONS MONTHLY REPORT - May, June, July - ESA

---

**From:** Swogger, Jennifer L (HRD)
**To:** Hutson, Troy A (DSHS); Ribas, Leo (DSHS); Peyton, Daniel (DSHS)
**Cc:** Christopherson, Glen (HRD); Henderson, Cindi (HRD); Barnard, Nikki (HRD); Beck, Terri (Theresa) L (HRD); Bourgault, Pamela S (HRD); Pulse, Margaret (Peggy) (HRD); Rupert, Kelly (DSHS/WSH); Withrow, Randy (HRD); Woods, Jody (DSHS/HRD); Carlsen, Gary (HRD)
**Sent:** Wed Aug 20 11:31:26 2008
**Subject:** LABOR RELATIONS MONTHLY REPORT - May, June, July - ESA
Good Afternoon,

I apologize that Labor Relations has not gotten the monthly reports out since May. Attached you will find the at a glance grievance activities in your administration for May 07-May 08, June 07-June 08, and July 07-July 08. Economic Services Administration had:

      17% of the total number of grievances in DSHS between May 07 and May 08
      17% of the total number of grievances in DSHS between June 07 and June 08
      18% of the total number of grievances in DSHS between July 07 and July 08

For all three months this is a median among the administrations.

Some significant events for your administration were:
- In May and July there were less filed grievances in 2008 than there were in 2007.
- There were no new Step 3 grievances since April 2008.
- A Step 3 grievance in the Fife DCS office was settled.

1

Khaleghi v. State
01100093

In reviewing the attached report:
- The second tab brings up the monthly count of filed grievances statewide in ESA.
- The third tab brings up a chart of the proportion of the total grievances filed in all divisions by geographic region during the twelve-month period.
- The fourth tab brings up a chart of the proportion of the total grievances filed in each division during the twelve-month period.

The "D2B" tab gives you information in regards to Notice of Intents and Demand to Bargains.  It reports the status of any notices from ESA to the unions regarding planned changes that are mandatory subjects of bargaining, and of any demands to bargain received from the unions.

The "Step 3 Griev" tab gives more detailed information on grievances moving toward or awaiting arbitration.

The Labor Relations Unit would look forward to any opportunity to make this information even more useful to you.  If you have questions or suggestions, please let me know at the number below.

**Jennifer Swogger, PHR**
**Labor Relations Unit**
**Human Resources Division**
**MS: 45836**
**(360) 725-5825**
**Fax: (360) 586-0504**
**E-Mail:  swoggj1@dshs.wa.gov**

Khaleghi v. State
01100094

**EXHIBIT 8**

**From:** Khaleghi, Dariush (DSHS)
**Sent:** Tuesday, September 09, 2008 11:25:27 AM
**To:** Hutson, Troy A (DSHS); Ribas, Leo (DSHS)
**CC:** Schalliol, Roxie (DSHS); Pierson, Kandy (DSHS)
**Subject:** RE: Exceptions to report from Cheryl Middleton

Troy,

What would like us to do?   Know this is on Glen's radar as well.

thanks, dk

---

**From:** Gutierrez, Robert (DSHS)
**Sent:** Tuesday, September 09, 2008 11:07 AM
**To:** Hutson, Troy A (DSHS); Ribas, Leo (DSHS)
**Cc:** Khaleghi, Dariush (DSHS); Schalliol, Roxie (DSHS)
**Subject:** Exceptions to report from Cheryl Middleton

Assistant Secretary, Troy Huston and Director, Lea Ribas

Attached, please find some exceptions to report completed by Cheryl Middleton, regarding complaint of discrimination and retaliation I filed.

The intent of an investigation such as these, is too show practices used are the same as those used against other employee under similar or same circumstances. Practices must be made too show a program need and not process developed to go after one employee, who has already informed management of discrimination and retaliation. The report does not cover any of those two area,s.

According to David Rendon, the reason I file the complaint was money.Let me assure you that money is not my motivation. I have had my salary reduced, pass over for promotion, station at Yakima Valley School away from the programs of ESA. Legal fees, not too mention health problems. It has nothing to do with money. It has to do with treating staff and clients equal.   Thank you for your time.

Khaleghi v. State

**EXHIBIT 9**

**From:**        Khaleghi, Dariush (DSHS)
**Sent:**        Thursday, September 11, 2008 8:20:03 AM
**To:**          Hutson, Troy A (DSHS)
**Subject:**     Diana

Although I am absolutely ok with Diana leaving, when I left your office I was a bit confused.   The decision was already made and I felt that somehow it was my fault.   Please, include me in the decisions that impact my ops.   I want to maintain my trust and credibility with my people if I want to be an effective leader.

Appreciate you listening as always!

dk

Khaleghi v. State

**EXHIBIT 10**

## Khaleghi, Dariush (DSHS)

**From:**   Khaleghi, Dariush (DSHS)
**Sent:**   Thursday, September 18, 2008 10:26 AM
**To:**   Lance, Julia (DVA)
**Subject:** RE:

thanks a whole lot!

---

**From:** Lance, Julia (DVA)
**Sent:** Thursday, September 18, 2008 10:23 AM
**To:** Khaleghi, Dariush (DSHS)
**Subject:**

Pls check your MSN for explaination of how details of the below apply...

An employee should not necessarily be expected to complain to management immediately after the first or second incident of relatively minor harassment. Workplaces need not become battlegrounds where every minor, unwelcome remark based on race, sex, or another protected category triggers a complaint and investigation. An employee might reasonably ignore a small number of incidents, hoping that the harassment will stop without resort to the complaint process.[85] The employee may directly say to the harasser that s/he wants the misconduct to stop, and then wait to see if that is effective in ending the harassment before complaining to management. If the harassment persists, however, then further delay in complaining might be found unreasonable.

There might be other reasonable explanations for an employee's delay in complaining or entire failure to utilize the employer's complaint process. For example, the employee might have had reason to believe that:[86]

- using the complaint mechanism entailed a risk of retaliation;
- there were obstacles to complaints; and
- the complaint mechanism was not effective.

To establish the second prong of the affirmative defense, the employer must prove that the belief or perception underlying the employee's failure to complain was unreasonable.

### a. Risk of Retaliation

An employer cannot establish that an employee unreasonably failed to use its complaint procedure if that employee reasonably feared retaliation. Surveys have shown that employees who are subjected to harassment frequently do not complain to management due to fear of retaliation.[87] To assure employees that such a fear is unwarranted, the employer must clearly communicate and enforce a policy that no employee will be retaliated against for complaining of harassment.

### b. Obstacles to Complaints

An employee's failure to use the employer's complaint procedure would be reasonable if that failure was based on unnecessary obstacles to complaints. For example, if the process entailed undue expense by the

employee,[88] inaccessible points of contact for making complaints,[89] or unnecessarily intimidating or burdensome requirements, failure to invoke it on such a basis would be reasonable.

An employee's failure to participate in a mandatory mediation or other alternative dispute resolution process also does not does not constitute unreasonable failure to avoid harm. While an employee can be expected to cooperate in the employer's investigation by providing relevant information, an employee can never be required to waive rights, either substantive or procedural, as an element of his or her exercise of reasonable care.[90] Nor must an employee have to try to resolve the matter with the harasser as an element of exercising due care.

#### c. Perception That Complaint Process Was Ineffective

An employer cannot establish the second prong of the defense based on the employee's failure to complain if that failure was based on a reasonable belief that the process was ineffective. For example, an employee would have a reasonable basis to believe that the complaint process is ineffective if the procedure required the employee to complain initially to the harassing supervisor. Such a reasonable basis also would be found if he or she was aware of instances in which co- workers' complaints failed to stop harassment. One way to increase employees' confidence in the efficacy of the complaint process would be for the employer to release general information to employees about corrective and disciplinary measures undertaken to stop harassment.[91]

### 2. Other Efforts to Avoid Harm

Generally, an employer can prove the second prong of the affirmative defense if the employee unreasonably failed to utilize its complaint process. However, such proof will not establish the defense if the employee made other efforts to avoid harm.

For example, a prompt complaint by the employee to the EEOC or a state fair employment practices agency while the harassment is ongoing could qualify as such an effort. A union grievance could also qualify as an effort to avoid harm.[92] Similarly, a staffing firm worker who is harassed at the client's workplace might report the harassment either to the staffing firm or to the client, reasonably expecting that either would act to correct the problem.[93] Thus the worker's failure to complain to one of those entities would not bar him or her from subsequently bringing a claim against it.

With these and any other efforts to avoid harm, the timing of the complaint could affect liability or damages. If the employee could have avoided some of the harm by complaining earlier, then damages would be mitigated accordingly.

# VI. Harassment by "Alter Ego" of Employer

## A. Standard of Liability

An employer is liable for unlawful harassment whenever the harasser is of a sufficiently high rank to fall "within that class . . . who may be treated as the organization's proxy." *Faragher*, 118 S. Ct. at 2284.[94] In such circumstances, the official's unlawful harassment is imputed automatically to the employer.[95] Thus the employer cannot raise the affirmative defense, even if the harassment did not result in a tangible employment action.

DK0143

**EXHIBIT 11**

| | |
|---|---|
| **From:** | Khaleghi, Dariush (DSHS) |
| **Sent:** | Thursday, September 18, 2008 10:30:49 AM |
| **To:** | Hutson, Troy A (DSHS) |
| **Subject:** | A note from EEOC regarding complaints in general |

Below is from the EEOC and I believe applies to the idea that mgt cannot expect an employee who may be suffering or is concerned about suffering from retaliation) **to always use the correct terminology or form**.
If a reasonable person believes that the statements warrant further investigation then DSHS has a duty to move forward to dispell or confirm .


EEOC
An employee should not necessarily be expected to complain to management immediately after the first or second incident of relatively minor harassment. Workplaces need not become battlegrounds where every minor, unwelcome remark based on race, sex, or another protected category triggers a complaint and investigation. An employee might reasonably ignore a small number of incidents, hoping that the harassment will stop without resort to the complaint process.85 The employee may directly say to the harasser that s/he wants the misconduct to stop, and then wait to see if that is effective in ending the harassment before complaining to management. If the harassment persists, however, then further delay in complaining might be found unreasonable.

There might be other reasonable explanations for an employee's delay in complaining or entire failure to utilize the employer's complaint process. For example, the employee might have had reason to believe that:86


using the complaint mechanism entailed a risk of retaliation;
there were obstacles to complaints; and
the complaint mechanism was not effective. To establish the second prong of the affirmative defense, the employer must prove that the belief or perception underlying the employee's failure to complain was unreasonable.

a. Risk of RetaliationAn employer cannot establish that an employee unreasonably failed to use its complaint procedure if that employee reasonably feared retaliation. Surveys have shown that employees who are subjected to harassment frequently do not complain to management due to fear of retaliation.87 To assure employees that such a fear is unwarranted, the employer must clearly communicate and enforce a policy that no employee will be retaliated against for complaining of harassment.

b. Obstacles to ComplaintsAn employee's failure to use the employer's complaint procedure would be reasonable if that failure was based on unnecessary obstacles to complaints. For example, if the process entailed undue expense by the employee,88 inaccessible points of contact for making complaints,89 or unnecessarily intimidating or burdensome requirements, failure to invoke it on such a basis would be reasonable.

An employee's failure to participate in a mandatory mediation or other alternative dispute resolution process also does not constitute unreasonable failure to avoid harm. While an employee can be expected to cooperate in the employer's investigation by providing relevant information, an employee can never be required to waive rights, either substantive or procedural, as an element of his or her exercise of reasonable care.90 Nor must an employee have to try to resolve the matter with the harasser as an element of exercising due care.

c. Perception That Complaint Process Was IneffectiveAn employer cannot establish the second prong of the defense based on the employee's failure to complain if that failure was based on a reasonable belief that the process was ineffective. For example, an employee would have a reasonable basis to believe

that the complaint process is ineffective if the procedure required the employee to complain initially to the harassing supervisor. Such a reasonable basis also would be found if he or she was aware of instances in which co- workers' complaints failed to stop harassment. One way to increase employees' confidence in the efficacy of the complaint process would be for the employer to release general information to employees about corrective and disciplinary measures undertaken to stop harassment.91

2. Other Efforts to Avoid HarmGenerally, an employer can prove the second prong of the affirmative defense if the employee unreasonably failed to utilize its complaint process. However, such proof will not establish the defense if the employee made other efforts to avoid harm.

For example, a prompt complaint by the employee to the EEOC or a state fair employment practices agency while the harassment is ongoing could qualify as such an effort. A union grievance could also qualify as an effort to avoid harm.92 Similarly, a staffing firm worker who is harassed at the client's workplace might report the harassment either to the staffing firm or to the client, reasonably expecting that either would act to correct the problem.93 Thus the worker's failure to complain to one of those entities would not bar him or her from subsequently bringing a claim against it.

With these and any other efforts to avoid harm, the timing of the complaint could affect liability or damages. If the employee could have avoided some of the harm by complaining earlier, then damages would be mitigated accordingly.


# VI. Harassment by "Alter Ego" of Employer

A. Standard of Liability

An employer is liable for unlawful harassment whenever the harasser is of a sufficiently high rank to fall "within that class . . . who may be treated as the organization's proxy." *Faragher*, 118 S. Ct. at 2284.94 In such circumstances, the official's unlawful harassment is imputed automatically to the employer.95 Thus the employer cannot raise the affirmative defense, even if the harassment did not result in a tangible employment action.

B. Officials Who Qualify as "Alter Egos" or "Proxies"

The Court, in *Faragher*, cited the following examples of officials whose harassment could be imputed automatically to the employer:

president96
owner97
partner98
corporate officer *Faragher*, 118 S. Ct. at 2284.


# VII. Conclusion

The Supreme Court's rulings in *Ellerth* and *Faragher* create an incentive for employers to implement and

enforce strong policies prohibiting harassment and effective complaint procedures. The rulings also create an incentive for employees to alert management about harassment before it becomes severe and pervasive. If employers and employees undertake these steps, unlawful harassment can often be prevented, thereby effectuating an important goal of the anti-discrimination statutes.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Psssst...Have you heard the news? There's a new fashion blog, plus the latest fall trends and hair styles at StyleList.com.
(http://www.stylelist.com/trends?ncid=aolsty00050000000014)