# EXHIBIT 12

Case 3:10-cv-05360-BHS   Document 23-2   Filed 02/10/11   Page 6 of 73



**Emphasis Technography**

**EMPHASIS TECHNOGRAPHY, LTD.**
*"Objective Investigation for Effective Decisions"*
P.O. Box 158
Sumner, WA 98390-0030

253-891-0776
253-833-4024
Fax: 253-863-6201
E-mail: info@emphasis-technography.com

## REPORT OF INVESTIGATION

Case ID     ET101678     DSHS Work Order 1034-     Submitted: March 26, 2010
84280; Work Request 0046
Client                   Department of Social and Health Services (ESA)
Dates of Investigation   January 25, 2010 to March 25, 2010
Location of Investigation   Olympia; Seattle; Tacoma, Washington
Respondent    Leo Ribas, Director, Community Services Division

Requestor    Troy Hutson, Assistant Secretary, DSHS/ESA

### SUMMARY

Secretary Susan Dreyfus received an email on July 09, 2009 from an anonymous
sender asserting concerns regarding the management practices of Leo Ribas, Director
of the Community Services Division. Several follow-on email messages were received
by the Secretary and Glen Christopherson, Director of Human Resources, through
December 2009. The follow-on emails expanded to include assertions of Leo Ribas
acting inappropriately with staff members and initiating non-competitive staff promotions
based on a personal relationship.

An additional email was sent to Christopherson on November 12, 2009, by the
pseudonym Shannon Smith stating allegations of sexual harassment on the part of Leo
Ribas. The sender also expresses fear of retaliation. The email messages are
appended herein as Appendix 1.

The Investigations Unit of Human Resources began an investigation into the above
reports. Their investigation developed complaints or concerns from several CSD
employees. The memorandums from the internal investigators are appended herein
as Appendix 2.

An external investigation into the issues and alleged violations described in the emails

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070001

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 2 of 39

and subsequent internal investigation was requested under the authority of Assistant
Secretary Troy Hutson.

Twenty-two current Economic Services Administration employees were interviewed in
this investigation.  Two former employees were identified; one could not be located and
the other was interviewed.  Messages were sent to both email senders requesting
contact with the investigation team.  No response was received.

Collateral inquiry was conducted to research email and internet use by Ribas.

The salary history of an employee identified in the investigation as having received a
non-competitive promotion based on a personal relationship with Ribas was reviewed.

This report presents the findings of the investigation.

**APPLICABLE POLICY**

The Department of Social and Health Services has enacted Administrative Policy
Number 18.66, effective July 01, 2005, titled <u>Discrimination and Harassment
Prevention</u>.

The Department of Social and Health Services has enacted Administrative Policy
Number 18.64, effective July 01, 2005, titled <u>Standards of Ethical Conduct for
Employees</u>.

The complete text of policies 18.66 and 18.64 are included as Appendix 3.

**INVESTIGATION METHODOLOGY**

Employees mentioned in the initiating documents, internal investigation, and
investigators' interviews with the complainants were selected for interview to determine
their relevant knowledge of the assertions contained in the complaint.

All employee witnesses were advised of the general nature of the complaint; however,
the names of the complainants were not disclosed.  The individual knowledge and
training of the witness with regard to DSHS policies 18.66 and 18.64 was established.
An inquiry was presented to the witness as to their personal knowledge or observation
of any behavior in the workplace which they felt was contrary to the stated policy.  The
witnesses were also asked if they had received any complaints from coworkers

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technology, Ltd

Khaleghi v. DSHS
02070002

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 3 of 39

regarding possible behavior contrary to the stated policy.

Witnesses who responded affirmatively to any of the questions were asked additional
probative questions to fully identify their knowledge base of the incident or concern.

Each witness was verbally advised of the responsibilities regarding cooperation and
confidentiality, as contained in the stated policy.

The witnesses were asked to consent to an audio recording of the interview.  When
consensually recorded, a transcript was prepared.  If the witness did not agree to an
audio recording, contemporaneously recorded interview notes were electronically
prepared by the investigative team.

The following witnesses were interviewed within this investigation:

| Name | Interview Date |
| --- | --- |
| Ribas, Leo | 03-04-2010 |
| "WileyCoyote71@gmail.com" | No response |
| "shannons3000@yahoo.com" | No response |
| Breuer, Molly (Former employee) | Unable to locate |
| Bushaw, Stacey | 01-25-2010 |
| Christopherson, Glen | 02-02-2010 |
| Gourley, Sharon | 02-02-2010 |
| Harder, Diana | 01-27-2010 |
| Hart, Mike | 01-26-2010 |
| Hathaway, Betsy | 01-28-2010 |
| Hatley, Tina | 01-25-2010 |
| Henrie, Rebecca | 01-25-2010 |
| Hobbs, Vicki | 01-27-2010 |
| Ketchum, Gerry | 02-04-2010 |
| Low, Brent | 01-25-2010 |
| Mam, Thuch (Former employee) | 03-25-2010 |
| Martinez, Jennifer | 01-25-2010 |
| Milare, Rena | 01-26-2010 |
| Mitchell, Dasha | 01-25-2010 |
| Moss, Bill | 01-27-2010 |

CONFIDENTIAL DOCUMENT
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070003

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 4 of 39

| Olson, Marijo | 01-26-2010 |
| Rendon, David | 01-27-2010 |
| Reyes, Carla | 01-28-2010 |
| Riedel, Kjersten | 01-26-2010 |
| Shanafelt, Allen | 01-26-2010 |
| Shoji, Dori | 01-26-2010 |
| Willingham, Gwen | 01-27-2010 |

## INTERVIEW SUMMARIES

The following interview summaries are presented in the context of the actual interview
format. When recording was permitted, a transcript of the interview was prepared from
the audio recording. The transcript, if any, is appended to this report. All statements
contained within the following interview summaries are those of the witness and
extracted solely from the transcripts of the actual specific witness interview. No opinion
as to the factual accuracy of any witness comment or statement is offered by this
report.

### Dasha Mitchell; acting Workforce Administrator

Mitchell was interviewed on January 25, 2010 by Investigator Sebastian. The interview
was recorded. She has been in her current position since March 2009 and with DSHS
for about eleven years. Mitchell has received training in harassment, discrimination,
and proper workplace behavior policies.

In October 2009, Bushaw shared concerns with Mitchell, her supervisor, that Ribas had
been acting physically and verbally inappropriately towards her for a number of years.
Mitchell took notes during their conversation and had them present with her during this
interview. Ribas was Mitchell's supervisor.

According to Mitchell's notes, Ribas told Bushaw that if she finished an assignment, he
would "lick her ass". This was just one example of many comments he had made to
her. Bushaw said the comments had been going on for years. Ribas had also grabbed
Bushaw and kissed her openly after hours at a bar.

Information contained in this report is solely based on witness statements and documents obtained in this
investigation. All comments are attributed to the specific witness indicated and have not been
independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070004

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 5 of 39

Bushaw also shared with Mitchell that Ribas made promises of promotions and raises but did not say if there were any conditions on those offers.

Mitchell reported Bushaw's concerns to Investigator Art Haro.

Jennifer Martinez also shared her concerns about Ribas with Mitchell. Martinez stated she did not like working for him and that he was inappropriate and hostile toward her, but she did not give specifics. Mitchell did not share Martinez' concerns with anyone as it had already been reported.

Mitchell has not observed any behaviors of a sexual nature from Ribas other than some innuendoes that "could have been taken as passes" but nothing direct. Ribas had been hostile toward Mitchell by swearing and yelling. During a staff meeting in October 2009, Ribas called Mitchell's work a "piece of shit". There were no witnesses to that comment. During a subsequent follow-up conversation, Ribas again degraded Mitchell's work in front of her supervisor, David Rendon.

Hathaway was another coworker who reported directly to Mitchell, but Mitchell was not aware of any issues she had with Ribas. Mitchell discussed Hathaway's performance with Ribas and he said he would take care of it. Mitchell was not given the freedom to discipline Hathaway or discuss her performance issues.

Mitchell explained that Hathaway had attendance issues and was on leave without pay for the majority of her employment in March 2009. Hathaway was never disciplined for her issues.

A complaint was filed by Gourley, one of Mitchell's staff members, concerning Ribas and Hathaway's relationship and the reason Hathaway had been hired. Mitchell asked Ribas about how Hathaway came to headquarters but she stopped him and said, "I don't want to know."

Mitchell learned offhand that Hathaway was friends with Ribas' wife and when she began having personal issues; Ribas "had to find a place for her." Other staff members would report to Mitchell that they had frequent contact with one another at the office and that Hathaway once drove Ribas' car to a meeting in October. Staff also reported

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 — Emphasis Technography, Ltd

Khaleghi v. DSHS
02070005

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 6 of 39

inappropriate conversations between the two of them. Hathaway would often stay
overnight at Ribas' house and according to Bushaw, would sleep in the Ribas' bed with
both him and his wife.

Hathaway applied and interviewed for a position as a financial trainer and was not
qualified for the job. Mitchell was told by individuals on the hiring panel that Hathaway
did not make the top ten but made it to the second round of interviews because the
hiring individual, Hartline, is a good friend of Ribas. Hathaway lacked the qualifications
yet was offered the job. Hartline never contacted Mitchell for a reference check or to
negotiate a start date. She was unaware Hathaway was leaving until Hathaway told
her.

Mitchell contacted Shawn Hartline about this issue. He responded in a voice mail and
was, according to Mitchell, backpedaling and apologizing. He had been told to "get it
done." This is not the normal procedure for when an employee leaves. Mitchell
explained that she conducts reference checks and once the person accepts the job,
she contacts their employer to negotiate a leave and start date. She said this is a
common practice and no one contacted her in regard to Hathaway.

Mitchell voiced concern about retaliation. In October, she was offered permanent
employment for the position she is currently in but a few weeks after she accepted, she
was told that Ribas "changed his mind." Mitchell said that in the weeks following her
acceptance, she had not received her letter of appointment from Ribas. In a meeting
with Rendon, Ribas, and herself concerning the letter, Ribas stated he changed his
mind and would give her the job in an acting capacity only and would need three more
months to decide what he was going to do. He gave no further reasons for his decision
except to say that he wanted to see how she would get through the legislative session.

Mitchell does not know if Ribas' decision was retaliatory or not but she finds it unusual.
Rendon openly disagrees with Ribas' decision not to make Mitchell's position
permanent.

Mitchell describes the whole ordeal as "terrifying." When asked about a solution, she
responded that she did not know and hates being involved at all. She says she is only
involved because she is Bushaw's supervisor.

Information contained in this report is solely based on witness statements and documents obtained in this
investigation. All comments are attributed to the specific witness indicated and have not been
independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

CONFIDENTIAL DOCUMENT
© 2009 – Emphasis Technology, Ltd

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 7 of 39

Mitchell added that she enjoyed working with Ribas and that he is a very smart man.
He does, however, have a tendency to over-socialize and would occasionally meet staff
at a bar after meetings or conferences. Mitchell describes Ribas as a flirtatious person;
however, she did not observe any inappropriate behaviors at these social events.

_Brent Low; Business Analyst_

Low was interviewed on January 25, 2010 by Investigator Sebastian. The interview
was recorded. He has been in his current position for about one and a half years and
with DSHS for 22 years. Low has received training in harassment, discrimination, and
appropriate hiring practices.

During the 2006-2009 time frame, Low was lead administrator for Community Services
Division and responsible for some of the hiring. He was never told by a member of
leadership that he should hire someone based on their physical appearance.

Low hired Bushaw but was not told anything concerning her hiring.

No one has complained to Low or made him aware of any complaints regarding sexual
harassment or inappropriate behaviors.

_Stacey Bushaw; WorkFirst Program Manager_

Bushaw was interviewed on January 25, 2010 by Investigator Sebastian. The interview
was recorded. She has been in her current position for five and a half years and with
DSHS for eleven years. Bushaw has received training in ethics and received copies of
the administrative policies pertaining to sexual harassment, discrimination, and
appropriate workplace behaviors.

Bushaw described inappropriate behaviors that were directed toward her by Ribas. His
comments to her began when she was first hired in 2005 when he told her he thought
she was cute. Ribas had told her supervisor at the time, Low, that he thought she was
cute and should be hired.

Information contained in this report is solely based on witness statements and documents obtained in this
investigation. All comments are attributed to the specific witness indicated and have not been
independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070007

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 8 of 39

Bushaw and Ribas' Confidential Secretary, Breuer, were recipients of Ribas' inappropriate sexual jokes. He would sometimes tell the jokes behind closed doors. These jokes made Breuer and Bushaw uncomfortable but they would just go along with them. Bushaw said they were sexual in nature but not derogatory toward her in particular.

Bushaw said that the conversations between the two of them eventually became more personal over time. He also used profanity and liked to drop the "f-bomb.".

Bushaw explained that from 2005 to about 2008, she did not have much direct contact with Ribas. In 2008, Ribas became Director and she began to receive more assignments from him. This is when the inappropriate behavior really started to go forth.

Ribas gave Bushaw a PTE assignment and told her that if she could get it done, he would "lick her ass." She said that comment was just over the top and she felt really uncomfortable but did not know what to say.

Right around the time of this last comment, Bushaw told Ribas he had to meet her girlfriend, Hathaway, who worked in Belltown. Ribas met with Hathaway and a friendship resulted between Ribas, his wife, and Hathaway.

In July 2008, Ribas invited Bushaw and Hathaway to his home for a Seafair party. He also invited Riedel and Henrie, among others. Bushaw said the party was a good time and there were no issues.

In September 2008, Bushaw accepted an invitation from Hathaway to have drinks with her, Ribas, and his wife. They went to a bar in the Belltown neighborhood, had drinks, danced, and had a good time. After they left the bar, Ribas pulled Bushaw back and began to tongue-kiss her. She did not tell him to stop or "No," but she was uncomfortable. She never said anything to him again at work and they never brought up the issue. She did not talk to Hathaway about the kiss. Bushaw believed the bar was on Second Avenue between Blanchard and Bell.

In October 2008, Hathaway again invited Bushaw to join her, Ribas, and Ribas' wife for drinks. There were no issues with Ribas during this outing.

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technology, Ltd

Khaleghi v. DSHS
02070008

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 9 of 39

Ribas' sexual jokes continued. He would stop by Bushaw's cubicle, pinch her sides, and say, "Hi." He pinched her on about ten different occasions. She said this made her uncomfortable because she has "love handles." He would talk quietly when he was inappropriate. Bushaw believes that her supervisor at one point, Reyes, heard Ribas being inappropriate to her.

Bushaw said that she and Ribas had forged a sort of friendship. In the summer of 2009, after a meeting in Seattle, Ribas stayed behind with Bushaw and they talked. He would ask her about her love-life and "always seemed to care." Ribas began telling Bushaw about his wife and how there was no passion in their marriage. Bushaw told him to "follow his heart." These types of conversations did not make her uncomfortable because she felt like they had a friendship, but she did admit it had crossed some inappropriate lines at times.

After the meeting, Ribas and Bushaw were on the first floor of the DCS Seattle office when Ribas saw an attractive woman and told Bushaw she had to contact her. Bushaw said no and he "kind of joked it off" and that was the end of it.

Bushaw stated she had nothing to do with Ribas bringing Hathaway up from Belltown and making her a Program Manager in March 2009. Bushaw did not know what Hathaway's qualifications were and again stated that she had nothing to do with the hiring process. Bushaw was tasked with taking Hathaway under her wing and showing her around. Soon, others were beginning to question Bushaw about Hathaway. She was uncomfortable and did not want to be thrown in the middle of anything so she backed off a little from helping Hathaway.

Bushaw said that after Hathaway was moved from Belltown, she became closer to Ribas and his wife and they were together nearly every weekend. She recalled a particular Tuesday during the summer when both Hathaway and Ribas took the day off and spent it on his boat.

In August 2009, Hathaway's birthday, Bushaw went out to dinner in Tacoma with Hathaway, Ribas', his wife, and some other friends of Ribas' wife. She reported no issues during this outing.

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

CONFIDENTIAL DOCUMENT
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070009

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 10 of 39

Bushaw explained that it seemed that whenever she met up with Hathaway, Hathaway would always be with Ribas and his wife.  Bushaw would go along but would always be on her best behavior and would hold back her uncomfortableness [sic].

Bushaw explained that there were a lot of things that Hathaway had shared with her that she probably should not have shared.  Bushaw was aware of an investigation concerning Hathaway's job sparked by an anonymous letter questioning her qualifications and background.  Hathaway confided in Bushaw that she believed Gourley wrote the letter.  Gourley had been very vocal about her own temporary position and possibly began to feel threatened by Hathaway.

In October 2009, there was a big retirement party for the Administrator at the Belltown CSO.  Ribas was in attendance as well as Gourley.  Gourley told Bushaw that she had tried talking to Ribas during the event but that he was ignoring her.  Bushaw approached Ribas and told him that Gourley was trying to talk to him and he replied, "I don't want to fucking talk to her. I hate her."  Ribas and Gourley did not end up talking during the party.  Afterward, Ribas gave Bushaw a hug and a kiss on the cheek.  She did not think anything of the kiss, believing that it was perhaps a cultural kiss as Ribas was Latin.

During the office remodel, Bushaw was working out of the Kent welfare office for part of October, all of November, and a week in December 2009.  In November, Bushaw's boss, Mitchell, told her that Ribas received an anonymous complaint that Hathaway and Bushaw were not at their offices and he wanted them back in Olympia.  Bushaw explained that there would be no way that a complaint could have been made as she was out-stationed at the Kent office and no one there knew her schedule to be able to make a complaint.  Bushaw told Mitchell that if she could show her an actual complaint, she would accept it and go back.  At this point, Bushaw told Mitchell about the issues she had with Ribas and said she did not want to go back.

The following day, Mitchell told Bushaw that she needed to act on what she told her.  This scared Bushaw because she did not want to get anyone in trouble.  Together, they decided to file a complaint internally with CSD Human Resources to keep rumors down.  Being scared about the process, Bushaw contacted "Tom" at the Employee Assistance Program and asked for advice.

In the meantime, Mitchell filed a complaint higher up with DOP personnel.  Bushaw met

Information contained in this report is solely based on witness statements and documents obtained in this investigation.  All comments are attributed to the specific witness indicated and have not been independently verified as factual.  We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070010

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 11 of 39

with Myron Toyama on November 17, 2009 to discuss everything that happened. After being out-stationed to Kent, Bushaw realized she was less stressed and that she did not want to return. She also explained that during this process, Hathaway had been out-stationed in Tacoma and Bushaw helped her prepare to apply for a new position that she got. Bushaw reached her breaking point when Hathaway received a higher-up job while she was "being yanked back out to Olympia."

Bushaw believes that Ribas' behavior towards her affected her ability to perform her job. Other than Mitchell, Bushaw did not talk to any supervisor about these issues for fear of what could happen to her and her career. She stated, "All I want to do is elevate in my career," and "this is not where I plan to stop."

Bushaw witnessed retaliatory acts in other circumstances and cited the incident between Gourley and Ribas. She explained that Gourley and another temporary worker, Kim Shidell, who Ribas also stated he "fucking hated," were the first two to be "booted back to the field" while Hathaway was promoted. Bushaw herself has not felt any pressure or retaliation directed towards her.

Bushaw believes that Hathaway's promotion was based on Hathaway's relationship with Ribas. She also believes that Henrie also benefited from a relationship with Ribas. She became Office Chief of Communications shortly after Ribas became Director. Ribas would always tell Bushaw how smart Henrie was and how much he liked her.

Ribas would tell Bushaw about another worker, Jenny Graham, "If she wasn't so ugly, he'd love to fuck her." He made this comment once or twice. To her knowledge, Ribas did not approach Graham or make comments directly to her.

Since Hathaway confided in Bushaw, she knew that Hathaway and the Ribas' would often sleep in the same bed together and that Hathaway had seen Ribas nude. They would text or talk all day even while working in the same building. Hathaway would sometimes drive his personal car and had an extra key. Bushaw never saw them acting sexually towards each other.

When Bushaw took the Lead Work DJA position, Ribas promised to make it permanent but never did. She was bumped out of the position due to reorganization of the work units.

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 12 of 39

When asked about a possible solution, Bushaw again stated she does not want to get anyone in trouble but she does not want to go back to being under his wing. She is scared that if he returns, he would hinder her career in the long run.

People have approached Bushaw, asking her if she had heard anything with regard to the investigation as they assume she is friends with Ribas.  She has heard numerous rumors and speculation and people are trying to get information out of her.

Bushaw explained that on December 7, 2009 when Ribas was moved, she found out that his wife removed her as a friend on Facebook and also deleted photos of her.  She said that Hathaway had not been deleted.  Bushaw and Hathaway have maintained a friendship but Bushaw does not discuss Ribas or the case with Hathaway.

_Rebecca Henrie; Chief of Communications_

Henrie was interviewed on January 25, 2010 by Investigator Sebastian.  The interview was recorded.  She has been in her current position since October 2008 and with DSHS since July 2002. Henrie has received training in departmental policies, defining and addressing sexual harassment and discrimination.  She believes that expectations concerning ethics are quite clear.

Henrie has not observed any potential behaviors contrary to the policies on the part of management or leadership, nor has anyone approached her about such violations. Henrie has heard rumors but nothing specific or that she is personally aware of.  Henrie does not feel as if these rumors have risen to the level of having a detrimental impact within the Community Services Division.

_Jennifer Martinez; Administrative Assistant 4/Information Technology Specialist 3_

Martinez was interviewed on January 25, 2010 by Investigator Sebastian.  She had been an Administrative Assistant/Confidential Secretary to the Director for about four years.  Currently, she is working as an Information Technology Specialist 3 for the last year and a half.  She has been with DSHS since 2001.  Martinez has received training on the department's policies pertaining to sexual harassment, discrimination, and

Information contained in this report is solely based on witness statements and documents obtained in this investigation.  All comments are attributed to the specific witness indicated and have not been independently verified as factual.  We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

CONFIDENTIAL DOCUMENT
© 2009 – Emphasis Technology, Ltd

Khaleghi v. DSHS
02070012

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 13 of 39

workplace ethics.

Martinez has been the recipient of behaviors contrary to the policies. Her director, Ribas, made numerous comments to her. At one time, prior to his promotion to Director, he asked her if it was okay to rub her down in pink frosting and lick it off her body. This happened while they both worked for John Clayton. He would also comment that her skirts could be shorter or that he would not mind if she crawled under his desk that way.

Ribas would refer to Martinez and other females as "Hey, Princess."

Martinez said that Ribas' behavior began the day he began in the department and continued after he was promoted and she began to work for him. Prior to his promotion, they would flirt and he would ask her out. When she found out he was married, she told him to leave her alone. Martinez says they had a blowout and did not speak again until he became her boss; she told him he could not talk to her that way again. He agreed but it still happened. Martinez explained that because she did not "play his game" Ribas treated her like dirt and made some perverted comments.

When Martinez first learned Ribas was going to be her boss, she approached Dori Shoji about their history. Shoji told her to "make it work."

Martinez said that some of his behaviors were witnessed by a former employee, Thuch Mam, who would encourage Martinez to tell someone about Ribas.

Martinez left her position as Ribas' Confidential Secretary because she could not stand working for him any longer. Ribas did not stand in her way of transferring jobs but he also did not make it easy for her.

Martinez did not know if she witnessed his inappropriate behaviors with anyone else and called him "sneaky."

Martinez felt her job was impaired because of Ribas' behaviors toward her. She explained she did her job very well until Ribas came aboard and began criticizing her work, calling her stupid, and would curse.

Martinez stated Ribas would publicly belittle her abilities in front of others. During a

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070013

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 14 of 39

monthly regional administrators meeting, he waved a piece of paper in her face, asking, "Hey, Martinez, what the fuck is your problem?" She recalled he said "god-damn motherfucker." Martinez said she "lost it" and told him, "You know the next time one of your friends dies of fucking cancer, you tell me how you feel, you piece of shit," and she walked out the door. She said that some of the regional administrators could have heard this interaction at her desk.

Martinez says that Ribas was always hollering and screaming and using dirty words, saying "get that mother-f-er on the phone", and calling women, "Princess" or "Sweetheart."

Ribas wrote Martinez up for being unprofessional in an email. Martinez explained she had been emailing a former coworker and used the word "butt" to make fun of herself. Ribas met with Martinez and Kandy Pierson from Personnel. Martinez told Pierson that Ribas flies to Spokane to meet his girlfriend, calls female staff "Princess," and walks around the office using the f-word.

Shortly after the regional administrators meeting and the email comment, Martinez was tired of it all. Since she was not comfortable talking to Pierson, she went to Shoji and Schalliol to ask for assistance and file a complaint. Martinez said her complaint was ignored and "poo-poo'd" after they said they would help her line up some other jobs. One job Martinez was told she would be lined up with was with Christie Fredrickson but Fredrickson did not know anything about it.

Martinez had taken some time off to recuperate from an illness when Ribas called her at home and told her when she goes back to work she has a new job [Martinez' current IT position].

Martinez explained that Ribas would go to Eastern Washington on business but would extend the trip for personal reasons.

Martinez said that Ribas never touched her and they never had physical contact. She would never let him get near her like that.

Ribas never offered Martinez promotions or advancements in exchange for a physical relationship.

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070014

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services.
Page 15 of 39

Ribas commented once that "us brown people need to stick together." He did not appreciate her telling him that the right person should get the job.

_Tina Hatley; Provider Line Administrator_

Hatley was interviewed on January 25, 2010 by Investigator Sebastian. The interview was recorded. She has been in her current position since November 2009 and has 21 years total with DSHS. Hatley has received training and reviewed policies on sexual harassment, discrimination, and ethics.

Hatley has observed behaviors she feels are contrary to the policies but fears if she goes into a lot of detail, there will be severe retaliation to her.

Hatley observed age discrimination as well as hiring preference based on personal relationships.

Hatley explained that Hathaway was hired into a job that had no posting. She believed Hathaway had corrective action issues, and possibly other issues which Hatley was not aware of, when Hathaway received her promotion. And by her own admission, Hathaway was close friends with Ribas. Hatley stated she many not have been aware of all of the information concerning Hathaway, however. Hatley would hear Ribas say, "Love you," to Hathaway after leaving her module. She observed them giving each other very close hugs.

Hatley explained that if someone was a known colleague of Ribas or had a personal relationship with him, they would tend to have access to more information.

Hatley's director felt she did not possess the skills required for her position so her position and that of another would be merged. Hatley's office chief, Rendon, indicated to her she was doing exceptional work. Hatley would be moved into a position of equitable standing. The person hired, Mitchell, however, had less experience than Hatley and had been hired and coached by her as well. Hatley was excluded from conversations by the Director and then asked why she was not communicating.

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technology, Ltd

Khaleghi v. DSHS
02070015

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 16 of 39

Hatley spoke to a personnel investigator about her issues and concerns but was told
that management could move her position with no decrease in her status.

Hatley described the hiring practices and said that young, peppy, and thin females
tended to be eligible for more benefits and there was a tendency to hire young people
and girls. Hatley would hear that the Director would socialize with certain people
outside of work but never observed this firsthand.

Hatley fears that if the Director returns to his position, there will be a lot of retaliation, a
continuance of favoritism, and unfair hiring practices.

*Marijo Olson; Chief of Field Services*

Olson was interviewed on January 26, 2010 by Investigator Sebastian. The interview
was recorded. She has been in her current position for about two years and prior with
DSHS from 1985 to 2000. Olson has received training on sexual harassment,
discrimination, and ethics policies.

Olson has heard about the allegations and issues involving transparency in hiring, but
none of it was brought directly to her. She explained that the situations were typically
where someone was interested in a job but someone else got the position. These
individuals would comment to Ribas and post comments on the website.

Olson said that the situation is being addressed and is improving. The administration
has made an effort to emphasize fair hiring and diversity.

Concerning assertions of inappropriate behavior, Olson has only heard hearsay and no
one has complained directly to her. She was aware of the complaint made against
Ribas but the assertions were not made to her.

Olson said that there are individuals that report through her chain of command that
have changed jobs or were in jobs she was not aware of until it already happened.  As
an example, Olson explained that Hathaway, who was in her chain of command,
showed up one Monday working in Policy. Olson was not part of Hathaway's hiring
process. She added that it has become increasingly typical to go outside of the

Information contained in this report is solely based on witness statements and documents obtained in this
investigation. All comments are attributed to the specific witness indicated and have not been
independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 -- Emphasis Technography, Ltd

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 17 of 39

hierarchy of the command.

Olson was told afterward that the arrangements with Hathaway were made through Bushaw and Ribas, as she knew both of them personally and out of work.

Olson and Ribas have a long-term professional relationship but Olson is not part of the younger staff that has relationships outside of work. Olson believes that Ribas picked up a lot of friends and developed relationships throughout his career and that led to what she calls his "inner circle." Olson is not aware that anyone believes that these relationships may be inappropriate for the workplace.

Olson said that Ribas is at the crux of making arrangements. People ask him for things and say they or their friends need something and if he is convinced of that, it just happens.

Olson explained that when she worked at CTED, she was aware of Ribas and they tried to hire him several times but he was not interested in the jobs offered to him. Olson said he is an outstanding person and amazing manager but they never socialized outside of work except for once. Ribas and Olson and their spouses had dinner to celebrate Obama's election.

Olson said that Ribas does not engage in sexual misconduct. She explained that one aspect of his personality is that he is overly sensitive and sympathetic to women in distress. She has observed that some women who work for her will go directly to him. They would display extreme stress and sometimes cry. She explained that Ribas could not "stand up to that" and would come up with offers to make them feel better, such as a better or permanent position, promotion, or to report directly to him.

Olson believes that Ribas wants to be around people who "tell him really good news." She said that if people fall into one of two categories, they had more access to him than others. This could be perceived by some staff as not equal. Olson said this preference was not based on race, sex, or wanting sex but empathy or sympathy toward women. She has never seen him to be sympathetic toward men.

Ribas had his favored group of people and the group he did not like. Olson believes that Mike Midkiff felt as if his employment rights were violated and that he was one

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 ~ Emphasis Technology, Ltd

Khaleghi v. DSHS
02070017

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 18 of 39

person Ribas did not like.  Olson explained that Midkiff was not a good manager but that Ribas did not violate his nor anyone else's rights.

There were some individuals that Ribas "was really after" but based on their performance, they could not be disciplined or terminated.  Ribas would confront Olson and Olivas about twice monthly about these individuals but they told him they could not do anything about it.  If they did, the individual would file a discrimination complaint and would win.

Olson believes that having an outside investigator to get as close to the truth is a possible solution to the current issues.  She added that the issues about Ribas hiring attractive women are not true.  She explained that she and Wolke were the ones who approached Riedel and asked her to work for them, not Ribas.

*Rena Milare; IT Administrator*

Milare was interviewed on January 26, 2010 by Investigator Sebastian.  The interview was recorded.  She has been in her current position, on and off, for about 11 years and with DSHS for 29 years.  Milare has received training and is aware of policies concerning sexual harassment, discrimination, and workplace ethics.

Milare was acting Human Resources Chief from mid-February 2009 to the end of November 2009.  During that time, Hatley contacted Milare about a specific complaint she had. Milare said Hatley contacted her not only as the acting HR Chief, but also as someone she could talk to about these issues as they had had a working relationship for many years.

Hatley's specific issues concerned actions being taken to move her from a team lead position to a position in Region 5 because Ribas did not like her and wanted her out. She felt that Ribas brought people in to override her authority and undermine her ability to do her job.

Hatley went to Milare and wanted to know what her options were as an employee. Milare told her that because of their long working relationship, she did not feel she could give her objective advice and told her to contact Human Resources.  Milare did

Information contained in this report is solely based on witness statements and documents obtained in this investigation.  All comments are attributed to the specific witness indicated and have not been independently verified as factual.  We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 -- Emphasis Technography, Ltd

Khaleghi v. DSHS
02070018

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 19 of 39

not follow up on this issue.

Milare's staff had come to her with questions pertaining to hiring practices, specifically
to people being appointed to positions outside of the hiring guidelines, non-open
recruitments, and salary. Some of the complaints were looked into and were elevated to
the Assistant Secretary's office.  Milare explained that there would be times when the
wrong position number would be indicated or there would be the need to do some
technical cleanup around a request and her staff would assist the Office Chief on fixing
the problem.

Milare never directly contacted Ribas but would have contact with other Directors.  She
said that Ribas preferred to work with Milare's direct supervisor.

Milare explained that people approached her to discuss their problems in working with
Ribas and his management team.  Mostly, they did not agree with some changes that
had been made.  She could not recall specific individuals and they did not approach her
in her capacity as the acting HR Chief.  Other concerns that had been shared were
Ribas' undue attention to some personnel, specifically young women.  She did not hear
about any of this attention turning into a relationship.  Milare did not feel that Ribas'
behavior violated the sexual harassment policies.

Milare believes that if Ribas came back to work, there would be a level of retribution.
She said that Hatley and Shanafelt would both be adversely impacted if Ribas returned.
She explained that Ribas had demanded that Shanafelt be fired because Ribas did not
like him.  She never saw any documentation pertaining to Shanafelt's performance.

*Dori Shoji; Senior Policy Advisor*

Shoji was interviewed on January 26, 2010 by Investigator Sebastian.  The interview
was recorded.  She has been with the ESD office for about eight years.  Shoji has
received training in policies pertaining to sexual harassment, discrimination, ethics, and
proper workplace behavior.

Martinez approached Shoji soon after Ribas became interim Director and voiced her
concerns over the way he was treating her and said that she did not want to work for

Information contained in this report is solely based on witness statements and documents obtained in this
investigation.  All comments are attributed to the specific witness indicated and have not been
independently verified as factual.  We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technology, Ltd

Khaleghi v. DSHS
02070019

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 20 of 39

him any longer.  Martinez told Shoji that Ribas often yelled, screamed, and swore at
her, and did this in front of other people on at least one occasion.   She also told Shoji
that Ribas was critical of her work and would express that in a nasty, overt manner.

Shoji shared Martinez' concerns with Schalliol in Human Resources and asked if there
was anything they could do.  Martinez also shared additional information with Schalliol
about Ribas.  Shoji was not present.

A temporary position was found for Martinez in Economic Services in the Operation
Support Division but the new Director in that unit "put the kibosh" on it and Martinez was
not transferred; she has since been working in a different area of the administration.
Shoji was not involved with the reassignment of Martinez.

Shoji was aware that Shannon Wallace took a temporary position in Ribas' division but
was not happy and went back to her original position.

Shoji knew of a complaint that Ribas supposedly hired a friend of his wife and that
Schalliol had looked into that.

Shoji said that there had been tension between herself and Ribas when she was acting
Director. She believes that he was resentful against her because she did not give him
the job he wanted.  She felt as if he used his current position to undermine her and that
impacted her ability to do her job at times.

Shoji believes that Ribas should not be retained in his current position.


*Allen Shanafelt; Program Manager*

Shanafelt was interviewed on January 26, 2010 by Investigator Sebastian. The
interview was recorded.  He has been in his current position since about 1992 and with
DSHS for about 31years.  Shanafelt has received training and reviewed the policies
pertaining to sexual harassment and workplace ethics.

Shanafelt said there had been problems concerning the CSD leadership ever since he's
been here; he lost count of the Directors after 13 or 14 and he said that things are

Information contained in this report is solely based on witness statements and documents obtained in this
investigation. All comments are attributed to the specific witness indicated and have not been
independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Case 3:10-cv-05360-BHS   Document 23-2   Filed 02/10/11   Page 26 of 73

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 21 of 39

always changing. He said people do a lot of complaining because of the changes but
he does not get that and "always laughs" because, "Without change," he says, "there is
not any growth." He says he just sees things differently.

Shanafelt said that Ribas had walked by his cubicle and asked him, "What are you
doing? You look way too comfortable. I thought you had a bad back?" Shanafelt said
he was stretched out and showed Ribas the cushion he used for his back. He said that
Ribas probably would not have said this except "there was a couple of women there to
sort of show off for." He did not feel as if Ribas' comments were made in a derogatory
manner because of his disability.

According to Shanafelt, Ribas had humiliated him in front of others on other occasions.
Shanafelt explained that a few weeks before Christmas, he received a heads-up from
his supervisor about a priority assignment. The request was for Shanafelt to change
something on the ACES letter that had to do with financial information. He explained
that he did not know anything about ACES and his supervisor knew that. Shannon
Gordon and Alice Adams were also working on it as well. Shanafelt was unprepared
and had no foundation on what they were talking about and explained he was not a
financial person but he "gave it my best shot." The following day, Ribas fumed at him in
front of other staff.

Shanafelt has a large accumulation of email from Ribas showing the kind of verbiage
that felt like abuse. He would never know when he came to work if there would be a
red flag from Ribas. Ribas was not always clear about what he needed or direction
came from a different supervisor. If Shanafelt approached him for clarification, Ribas
would get nasty and ask, "How come you can't do independent, quality work without
being shown what to do?"

Shanafelt described Ribas as very bright and knowledgeable but also a real controller.
He said that people that have won Ribas' confidence are "part of the game," and Ribas
keeps himself well-protected. Shanafelt has gotten to the point where he does not have
much faith in anybody and does not put his energy into the job. He feels like he is
bordering on having to choose between being insubordinate or buying into the unethical
stuff.

Shanafelt said he believed it is unethical to be someone's reference and also be on the

Information contained in this report is solely based on witness statements and documents obtained in this
investigation. All comments are attributed to the specific witness indicated and have not been
independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

CONFIDENTIAL DOCUMENT
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070021

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 22 of 39

interview panel for that person.  He said that happened to him once and he excused himself from the interview.

Shanafelt said that things need to change.  People need to take a close look at why they are in their jobs and what they want to be doing.  He wants others to think about how harmful their words can be and that everyone needs to set a good example and be a good model.

Shanafelt explained that work is great now and he looks forward to coming in. Shanafelt agreed to furnish copies of the relevant emails to the investigators.

*(Nothing was received from Shanafelt subsequent to this interview.)*

### Michael Hart; Regional Administrator in Region 6

Hart was interviewed on January 26, 2010 by Investigator Sebastian.  The interview was recorded.  He has been in his current position since December 2009 and with DSHS for about 20 years.  Hart has reviewed the policies pertaining to sexual harassment, discrimination, ethics in the workplace, and similar policies.

Hart is not aware of activities or behaviors that would be contrary to those policies nor has anyone approached him with concerns about policy violations.  He denied that anyone has brought forth a complaint.

### Kjersten Riedel; Workforce Manager

Riedel was interviewed on January 26, 2010 by Investigator Sebastian.  The interview was recorded.  She has been in her current position since December 2008 and with DSHS since 2002.  Riedel has received training on the department's policies pertaining to sexual harassment and workplace ethics.  She is not aware of any behaviors that have been contrary to these policies nor has anyone complained to her as such.

Information contained in this report is solely based on witness statements and documents obtained in this investigation.  All comments are attributed to the specific witness indicated and have not been independently verified as factual.  We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070022

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 23 of 39

_Diana Harder; Confidential Secretary_

Harder was interviewed on January 27, 2010 by Investigator Sebastian.  The interview
was recorded.  She has been in her current position since October 2008 and with
DSHS for 15 years.  Harder has received training in policies pertaining to sexual
harassment, discrimination, ethics in the workplace, and similar policies.

Harder is not aware of activities or behaviors that would be contrary to those policies
nor has anyone approached her with concerns about policy violations.

Harder described the general working environment in her immediate work area as
"good."  She offered that she worked well with Ribas and that he treated her with
respect and she never had issues with him or any of the chiefs.

Harder was asked her opinion about the current issues involving Ribas.  She said it is
"BS" and that people are making untrue allegations for their own gain and to better their
position. She does not believe that anything inappropriate has happened.

_David Rendon; Chief of Programs and Policies_

Rendon was interviewed on January 27, 2010 by Investigator Sebastian.  The interview
was recorded.  He has been in his current position since May 2008 and with DSHS for
31 years.  Rendon has received training in policies pertaining to sexual harassment,
discrimination, ethics, and proper workplace behavior.  He is not aware of activities or
behaviors that would be contrary to those policies.

Rendon addressed concerns from staff about some hiring that occurred within the last
year.  He explained the hiring process to them, what happened, and why.  Rendon said
the issue revolved around an imminent hiring freeze and their need for someone.
Hathaway was appointed to the temporary, acting position of WorkFirst Program
Manager just prior to the hiring freeze.   A communication error on his part had
originally led his staff to believe Hathaway had been hired as an administrator.

Rendon did not believe that the decision to hire Hathaway was made by any one single
individual.  He had approached Ribas about filling the position before the freeze and

Information contained in this report is solely based on witness statements and documents obtained in this
investigation.  All comments are attributed to the specific witness indicated and have not been
independently verified as factual.  We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070023

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 24 of 39

Ribas let him know about Hathaway.  Due to time restraints, Rendon did not have a lot of time to recruit and with Ribas' permission, he hired Hathaway.

Rendon did not know how Ribas knew of Hathaway.  Rendon was unsure if Ribas had mentioned or if Rendon had assumed Hathaway had been having issues with domestic violence.  She did not express those concerns to Rendon and did not seek his assistance.

Rendon added that he has not observed anything that he would deem inappropriate in Ribas' behavior and describes him as passionate.

### Vicki Hobbs; Statewide Administrator

Hobbs was interviewed on January 27, 2010 by Investigator Sebastian.  The interview was recorded.  She has been in her current position since April 2009 and with DSHS since about 1986.  Hobbs has received training in policies pertaining to sexual harassment, workplace ethics, and proper hiring practices.

Hobbs is not aware of activities or behaviors that would be contrary to those policies. No one has approached her with concerns about improper hiring practices or certain personnel decisions.   Hobbs denied any issues involving her senior management.

Hobbs stated that Hatley did not bring any issues or concerns to her attention nor did Hatley complain about her work status or situation in the workplace.

### Gwen Willingham; Human Resource Manager

Gwen Willingham was interviewed on January 27, 2010, at 1:25 p.m. at the ESA offices in Olympia, Washington. Gwen is a Human Resource Manager assigned to the Executive Division, Human Resources Division. She has been in this position for approximately three to four years and has 14 years of service with the State of Washington. Upon introductions, she indicated she was not comfortable with a recording of her interview; therefore, this is an investigator's summarization of the interview. Willingham recalled an employee of CSD, Tina Hatley, approached her in late September or early October, to the best of her

Information contained in this report is solely based on witness statements and documents obtained in this investigation.  All comments are attributed to the specific witness indicated and have not been independently verified as factual.  We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

CONFIDENTIAL DOCUMENT
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070024

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 25 of 39

recollection, with questions concerning rights in her position, specifically rights within the Washington management service. She recalls that Hatley told her there was a job announced for another management position which she did not apply for and after the specific job had closed, she learned that her work unit and the work unit in which that position was in would be consolidated and there was a possibility that her position would be eliminated. Willingham counseled her with regard to Policy 18.58. She indicated her goal here was to provide information to the employee so appropriate decisions could be made.

Willingham was asked if she recalled any concerns regarding sexual harassment or protected class discrimination during the conversation with Hatley. She recalls that Hatley discussed that she was concerned with treatment in the workplace on a more general sense than a specific sense. Her recollection is that Hatley mentioned that the positions in CSD were given to younger and more attractive employees. Based on this information, Willingham referred the information to the Investigations Unit. She also informed Hatley that an investigator would contact her. Willingham sensed that Hatley was not willing to share a lot of information with regard to this situation.

Willingham was asked if she recalled any mention by Hatley of issues involving the senior leadership in the CSD. Willingham indicates that Hatley may have shared with her, to the best of her recollection that the senior management and younger or more attractive employees would socialize after work. Hatley was not included in this socialization. Based on information told to her by Hatley, Willingham felt there was enough information to refer this concern along to the Investigation Unit and did so. She also spoke with Rena Milare, the then-HR Chief, and advised her of the conversation.

Willingham offered Hatley the opportunity to recontact her should additional information be needed. She believes that there was no follow-up from Hatley to her. She does believe that Hatley did speak with an investigator, however.

Willingham [inaudible] indicated is her effort to make the employee whole and find a workable and reasonable alternative to the problem. She believed that this was resolved with a reassignment.

Willingham could furnish no further information specific to the Hatley complaint. With regard to other complaints or issues along a similar line being brought forward, she

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 — Emphasis Technography, Ltd

Khaleghi v. DSHS
02070025

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 26 of 39

indicated that in her role as an HR Manager, she is constantly talking with staff, admitting these conversations on the form of questions or hypotheticals. She has no specific recall of any concerns brought to her, at least which would require referral or action on her part.

### Bill Moss; Director for Home and Community Services

Moss was interviewed on January 27, 2010 by Investigator Sebastian. The interview was recorded. He has been in his current position for about four years and with DSHS for about 20 years. Moss has received training in policies pertaining to sexual harassment, workplace ethics, and proper workplace behavior.

Prior to the interview, Investigator Sebastian showed Moss an email that mentioned a conversation Moss and Ribas had. Moss stated that was the first knowledge he had of the email.

Moss had received a call from Ribas about Moss' regional administrator, Greta Lent. Some of Ribas' Community Service administrators had complained about her in regards to a redesign they were working on. Moss told Ribas he would look into it. He stated he felt Ribas' phone call was appropriate and he appreciated it.

Moss spoke with Lent and his assistant director, Marker. Lent stated she had not been involved in any of the CSD meetings as Ribas said she had. She did indicate concerns about how the redesign was going to impact Aging Adult Services clients. Moss did not take the issue any further. He called Ribas and told him they were good. Moss did not hear anything further and assumed the situation had been resolved.

Moss explained that Lent is an exceptional regional administrator and believed her when she said she had not been involved. He best characterized the situation as a difference of opinion about how to best serve the clients and that Ribas had probably been following up on information he got from his staff.

Moss added that Ribas seems to be a pretty solid manager and well-intentioned. He has not witnessed any inappropriate behaviors from Ribas during the meetings they attended.

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070026

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 27 of 39

_Betsy Hathaway; Social and Health Program Consultant-Region 5 Tacoma_

Hathaway was interviewed on January 28, 2010 by Investigator Sebastian.  The interview was recorded.  She has been in her current position since November 2009 and with DSHS for about 12 years.  Hathaway has received training in the department's policies pertaining to sexual harassment and workplace ethics.

Hathaway is not aware of any behaviors, either directly or through other employees, of potential actions that may be contrary to departmental policies.  No one has approached Hathaway or said anything to her in that regard.

Hathaway denied any issues involving senior leadership or with management.

Hathaway explained her move from Belltown was at her request due to a personal situation she needed to get away from.  The situation did not involve Washington State employees and did not occur within the confines of her employment.  She was not comfortable discussing the situation with her supervisor, Ketchum, because they had a friendly relationship. She did not discuss this with anyone else within the agency.

Hathaway was asked how she went about asking to be relocated.  Bushaw, a friend of Hathaway's, was telling her about her job as a WorkFirst Program Manager and Hathaway became interested as she had experience as a WorkFirst Program Specialist.  She contacted Hart who then spoke with Hobbs about the situation. Hathaway understood the position was to be temporary and not likely to lead into anything permanent.

Hathaway and other temporary workers were told by Ribas and Rendon to start looking for other positions as due to the budget crisis, they may need to let some temporary workers go.  Hathaway said she saw the posting for her current position, applied, went through a couple interviews, and "luckily got the job."

Hathaway was asked if she had asked for Ribas' assistance in either one of her positional moves.  She did say she spoke with him about moving from Belltown to Olympia and that he was the one who referred her to Hart.  Ribas had been concerned about the situation she had been in.  Hathaway said he tries to help out employees as

Information contained in this report is solely based on witness statements and documents obtained in this investigation.  All comments are attributed to the specific witness indicated and have not been independently verified as factual.  We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technology, Ltd

Khaleghi v. DSHS
02070027

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 28 of 39

much as possible. She said she shared in detail the nature and scope of her problem with Ribas.   Ribas did not make any promises to Hathaway.

After she began her new position, Hathaway began to hear rumors that she got her job because she was friends with Ribas' wife. Hathaway admitted she and Mrs. Ribas are friends. These comments made her job uncomfortable, however the comments did not limit her ability to perform her job nor did she have to take time off because of them. Hathaway has no idea why anyone would have started the rumors.

Hathaway is not aware of any rumors or comments regarding her current position in Region 5. She said she loves her new job and the folks are pleasant. She explained she knows people in Region 1 and that her mother works there as well, so she has heard the rumors about Ribas. She heard that he overspent on the budget, that Mitchell was upset because her position did not become permanent, and that Hathaway was in some sort of inappropriate relationship with him.

Hathaway heard the source of these rumors was Bushaw. When she asked Bushaw about the rumors, Bushaw denied knowing anything. But Hathaway believes Bushaw is indeed the source because she was upset about not getting a raise and had not been promoted out of her position. Bushaw had told Hathaway about four or five times that she would "sue the Department for sexual harassment if I don't get a raise."

Hathaway does not believe Bushaw has ever been subjected to sexual harassment as she never witnessed anything, nor has Bushaw shared information with her. In the fall of 2009, Bushaw made this threat in front of Stephanie Nielsen, who works across the street as a Program Manager.

These comments are disturbing to Hathaway who feels she took this new position as a fresh start and this whole thing is unfortunate. She admitted that she spends time with Ribas and his wife outside of work but there is nothing inappropriate. She believes that because Ribas is young, attractive, personable, and smart that he is a target.

Hathaway said there is no truth to any of the rumors. She believes that Bushaw reacted on impulse; Hathaway wants Ribas to go back to his job. She does not want to see anyone lose their job or to get hurt.

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

CONFIDENTIAL DOCUMENT
© 2009 – Emphasis Technography, Ltd

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 29 of 39

_Carla Reyes; Regional Administrator, Region 3_

Reyes was interviewed on January 28, 2010 by Investigator Sebastian. The interview
was recorded. She has been in her current position since March 2009 and with DSHS
since 1997. Reyes has received training on the department's policies pertaining to
sexual harassment and workplace ethics.

Reyes said there had been some investigations in her region but she is not aware of
any policy violations with regard to sexual harassment or work ethic.

Bushaw worked for Reyes but did not bring any concerns to Reyes. Reyes said they
talked about Bushaw's advancement opportunities but never anything about
inappropriate behaviors.

_Sharon Gourley; Social Service Supervisor, Social Worker 4 with CSD, Bremerton_

Gourley was interviewed on February 2, 2010 by Investigator Sebastian at the Tacoma
regional office. The interview was recorded. She has been in her current position since
October 2009 and prior with DSHS for about 18 years. Gourley has received training
and has reviewed the policies on sexual harassment, workplace ethics, and appropriate
behaviors in the workplace.

Gourley has not observed any behaviors that would be contrary to the Department's
policies nor have any behaviors been directed toward her.

Gourley has had communication difficulties with management. She explained when
she was a WorkFirst Coordinator in Region 5, a non-permanent position, she received
positive feedback from management. Her current job, however, was going to become
permanent and the Department was going to post it. She was then informed that she
would be going back to her previous position in Region 4 and that someone else from
Headquarters would be taking her position in Region 5.

Gourley was told by HRS that the position had been filled permanently. She then
spoke to her Regional Administrator and Hatley about a possible position in

Information contained in this report is solely based on witness statements and documents obtained in this
investigation. All comments are attributed to the specific witness indicated and have not been
independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technology, Ltd.

Khaleghi v. DSHS
02070029

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 30 of 39

Headquarters. Ribas, Rodriquez, and Gourley's Regional Administrator in Region 4
met and offered to let Gourley become the Program Manager in Headquarters, the
position vacated by the person who had taken Gourley's job.

Gourley said the job was good but she was a little uncomfortable as she did not apply
for it. She had been upset because she was bumped in her previous job by someone
who should not have been able to bump her.

Gourley explained that the Deputy, Mercado, was nasty to her and spoke in a
demeaning manner. She did not feel as if she had been harassed or threatened. She
described Mercado as not having people skills.

The atmosphere in Headquarters was a little tense and not a very easy place to work.
Gourley said she kept to herself most of the time. She described Rendon as being
kind-hearted to her and that she avoided Ribas as he had a lot on his plate, unless she
had Personnel issues to discuss with him.

During Gourley's tenure as Program Manager, Hathaway was assigned to the unit as a
Program Manager. Gourley said that Hathaway "just appeared" in the position and that
some of Gourley's job duties went to her. Gourley was then informed that Hathaway
would be taking over.

Gourley began to trail another worker and had a few assignments. There had been a
lot of anger surrounding Hathaway because she was not qualified for the job.
Hathaway would often arrive late and rarely come in on Mondays. Gourley spoke to
Mitchell about it. Gourley felt that if the Department got rid of her and kept Hathaway,
she would "file something."

Gourley did not know any details about Hathaway except that she "had a direct line to
Leo." Gourley "tested" her out in conversation and told her something in a joking
manner and the next day Ribas knew what Gourley had said.

Gourley knew Hathaway and Ribas were friends and had a relationship but she could
not judge what it was. There were a lot of rumors and suspicion because Ribas
surrounded himself with pretty girls.

Information contained in this report is solely based on witness statements and documents obtained in this
investigation. All comments are attributed to the specific witness indicated and have not been
independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 31 of 39

Gourley believed Ribas and Hathaway saw each other outside of work. Again, Gourley
purposely told Hathaway something in a joking manner around 4:00 when everyone
was leaving for the day. The following morning Ribas again knew what Gourley had
said. Gourley believed that Hathaway had seen and spoken with Ribas after work
hours.

### Glen Christopherson, Human Resource Director

Christopherson was interviewed on February 02, 2010 in Olympia by Investigator
Sebastian and Intern Niemi. Christopherson acknowledged receiving various emails
from "Wiley Coyote" concerning the present investigation. He also assigned the internal
Investigation Unit to assist with the investigation of this matter. Christopherson has no
direct knowledge of the incidents described apart from his role as Human Resources
Director. Christopherson agreed to furnish the "email header" files from the subject
emails to the Investigation team for analysis.

The email header files were subsequently received and reviewed by Frank Sebastian.
The subject emails were generated outside of the State of Washington network.

### Gerald Ketchum; WorkFirst Program Specialist

Ketchum was interviewed on February 4, 2010 by Investigator Sebastian at the
Belltown CSO. The interview was recorded. He has been in his current position for
about seven months and with DSHS for 24 years. He has received training on the
policies on sexual harassment, workplace ethics, and proper hiring procedures.

No one within the last two years has brought issues concerning sexual harassment to
Ketchum's attention, nor has he witnessed any such behaviors.

Ketchum has witnessed questionable hiring practices concerning Hathaway. Ketchum
was her supervisor when she was removed from the office and given a position in
Olympia. Ketchum said it had been Ribas' decision to remove Hathaway without any
formal posting because they were friends. Ribas went over management heads to put
Hathaway in a promotional position.

Information contained in this report is solely based on witness statements and documents obtained in this
investigation. All comments are attributed to the specific witness indicated and have not been
independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

CONFIDENTIAL DOCUMENT
© 2009 -- Emphasis Technology, Ltd

Khaleghi v. DSHS
02070031

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 32 of 39

Hathaway had been a WorkFirst Program Specialist for Ketchum.  The position she
took was an upgrade to WorkFirst Program Manager.  The new job was a "giant leap"
according to Ketchum and had not been posted or advertised.  Ketchum complained
about this to his Administrator, Dalton. Dalton spoke to Hobbs who said it was a done
deal.

Hathaway had told Ketchum she was a personal friend with Ribas and his wife.  He also
observed her talking to Ribas during work time on her personal cell phone. When he
asked two of her co-workers, they verified Ribas and Hathaway talked to each other all
the time on their cell phones.  There would normally be no reason for a Program
Specialist and the Director to have workplace conversations. Ketchum had not been
aware of their relationship until he witnessed the phone calls.

About five days before Hathaway left, Ketchum had taken the first step in disciplinary
action against her for poor attendance.  He set up a corrective action plan that went into
the Supervisory file but was not placed in her personnel file.

Hathaway had told Ketchum she was taking the new position because of personal
issues that she did not divulge and that the new job would help her deal with them.
Ketchum was very offended, as other workers with personal issues do not get positions
created for them. He did not receive a two-week notice from Hathaway and within a
week she was gone.

Hathaway's prior position remains vacant and there is a question if it will be filled.
Ketchum explained, however, that if it had been RIF-ed, Hathaway would not have
been subject to potential staff reductions due to her seniority.

Ketchum felt that Ribas' actions were incredibly inappropriate and said one cannot jump
over everyone's head to do a friend a favor.

_Leo Ribas; Director for Community Service Division_

Information contained in this report is solely based on witness statements and documents obtained in this
investigation.  All comments are attributed to the specific witness indicated and have not been
independently verified as factual.  We offer no warranty as to the factual accuracy or authenticity of any
information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070032

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 33 of 39

Ribas was interviewed on March 4, 2010 by Investigator Sebastian and Intern Niemi at the offices of Emphasis Technography in Sumner, Washington. The interview was recorded. He has been in his current position for about two years and with DSHS for 16 years. He has received training regarding the policies concerning sexual harassment, proper workplace conduct, and proper hiring procedures.

Ribas is aware of complaints brought forth against him but does not believe his behaviors were contrary to the Department's policies.

Ribas explained there may have been some anger due to reorganizations the department underwent, layoffs, and no salary increases. Some issues of professional gain also may have led to the complaint against him.

According to Ribas, Hatley is an example of someone who is making complaints because they feel unfairly impacted by the changes. Her position in Headquarters had been eliminated not long ago but, as Ribas explained, she was put in another position with similar pay and closer to her home.

Bushaw is another example of someone being frustrated by the circumstances. Ribas described her as very smart and accomplished with great skills but with the current situation, he was unable to give her or anyone a salary increase regardless of how well she or anyone performs. Bushaw had not received a raise in three years but based on her performance, Ribas believes she should have received one. Bushaw had tried to pursue opportunities to earn more money over the last few years and had shared with Ribas that she pursued employment opportunities elsewhere.

Ribas was not aware of any interpersonal difficulties between himself and Bushaw or Hatley. No one expressed to him that they were uncomfortable with his behavior around them or any female staff. No one complained to Ribas about behaviors toward staff due to age or physical disabilities. Ribas has not made any comments that he prefers younger, "preppier" workers nor has he discriminated against anyone because of their disability.

During the interview, Ribas shared his hiring data representing every hire he approved for management positions for either Washington Management Services or exempt positions. In his two years for Community Services Division, he has hired 41 women

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 — Emphasis Technography, Ltd

Khaleghi v. DSHS
02070033

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 34 of 39

and 30 men and most of his hires were 40 years old and above.

Ribas said that he compiled the hiring data because of the complaint. On November 18, 2009 Hutson informed him that "Susan" his secretary, had received an anonymous letter stating that Ribas only promotes young women. The letter also implied he engaged in inappropriate relations with Mitchell, Henrie, and Riedel. Hutson did not share the letter with Ribas but he nonetheless felt compelled to do some research over his appointments and provide some contextual background as to the reason behind the letter.

Investigator Sebastian informed Ribas that in addition to the above described letter, there had been other anonymous letters. Ribas did not know who would have sent them.

When asked, Ribas stated he did not socialize or engage in any inappropriate relationships with any staff members. He explained that he has worked for the same division for 16 years and he has a history with many people he has worked with, despite his best efforts to separate work life from personal life. His interaction within his chain of command always remains appropriate even if it is not work related. Ribas added, however, "All we do is talk about work anyway."

Ribas was asked to describe Hathaway's career path within the last year or so. In early 2009, Hathaway approached Ribas as she was facing personal issues and asked to be temporarily relocated. Ribas said there was nothing unique about her request and they have taken actions like that in the past. Gourley was one such example of where arrangements were made to offset or mitigate some personal circumstances. In Gourley's case, Ribas needed help and talked to the Regional Administrator about it. The drive to Headquarters would be closer for Gourley instead of her returning to Seattle. Ribas made it clear to Gourley that this would be temporary.

Ribas told Hathaway he would speak to his staff and someone would contact her. He also shared with her he had a few vacancies in the WorkFirst unit; his Administrator just accepted a regional administrator job and he had that vacancy. He asked Hart, who manages administrative functions for Community Services Divisions, to work out a solution. Hart spoke with the Regional Administrator in King County and they worked out a temporary arrangement with Hathaway. This position had not been competitive

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technology, Ltd

Khaleghi v. DSHS
02070034

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 35 of 39

and Ribas stressed this was temporary in nature and Hathaway was not put in her own position. She was purposely placed as a double-fill behind a permanent employee. Ribas said that she had the skills and minimum requirements to do the job.

Hathaway received an increase in pay but was placed at the bottom of the pay range for that position.

Ribas was not aware that Hathaway received the first step in a disciplinary action for poor attendance five days before her promotion. He was also unaware if a two-week notice had been given to her employer. He assumed those details had been worked out between Hathaway, Hart, and the CSO Administrator where she worked.

Four months into Hathaway's employment, the budget situation worsened. Rendon and Ribas informed staff in acting positions, including Hathaway, Kozak, and Gourley, that their chances of becoming permanent at Headquarters would not be feasible.

Hathaway had applied for and received an acting Trainer position in the Call Center. He was unsure if that was a higher or lower position. He knew she interviewed twice and that there was a competitive move for it.

Sometime in 2009, "Susan" received a letter questioning Hathaway's employment in Headquarters.  The letter was given to HR Director, Christopherson, and the matter was investigated by Schalliol and Shoji.

Ribas knew Hathaway outside of work and explained she was his wife's friend. Ribas said that Hathaway never stayed the night at his house but she did go out for dinner and drinks with him and his wife. Hathaway also went boating with Ribas and was at their house for Seafair weekend along with about 100 other people including Bushaw, whom Hathaway invited, Riedel, and Henrie with their husbands.

Ribas has called Hathaway socially on per personal cell phone about once or twice a week but they usually ended up talking about work. He said he also called about five to eight other coworkers on a social basis within the same timeframe. Ribas again explained that because of his work history, some coworkers have become friends. He would often call to just say hello and check on one another.

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070035

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 36 of 39

Ribas did not recall being in a Belltown bar within the last year with CSO coworkers.

Ribas did not recall making derogatory or disparaging comments when communicating with coworkers.  He did not comment to another employee that "us brown people need to stick together."

Ribas has used the word "sweetheart" but "not in an offensive manner." He has not called anyone "Princess."

Ribas did not recall using profanity or swear words but does try his best not to around staff; if he did, it would not have been offensive to those he was around.

Ribas did not make a comment to someone about wanting to lick frosting off of them if they complete a job. He also denied telling a coworker if they finished an assignment he would lick her.

Ribas has not received any anonymous emails or emails from an unidentified sender complaining about his behavior.

Ribas was asked if he yelled or swore at his coworkers.  Ribas answered that he sometimes got upset but did not yell or curse at anyone.  He has not called a coworker a piece of shit or stupid.

Ribas has the authority to hire and fire as he an appointing authority.  Every time he appoints somebody it goes through the Assistant Secretary for endorsement and signature approval.  Ribas also has the authority to promote and demote staff but he has not abused that power in any way.

Ribas was asked what an appropriate resolution to this complaint would be. He explained that it is an unfortunate situation.  He has worked for 15 years to get to where he is at and now he has to battle issues related to his reputation and character.  He added he is proud to work in a system that enables people to make complaints and investigates them but he is 100 percent sure the allegations are false and he did not violate policy.  He believes the issue of anonymous complaints needs to be addressed.

Ribas thinks that the complainant should be asked if they want to go to another place in

Information contained in this report is solely based on witness statements and documents obtained in this investigation.  All comments are attributed to the specific witness indicated and have not been independently verified as factual.  We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

CONFIDENTIAL DOCUMENT
© 2009 — Emphasis Technography, Ltd

Khaleghi v. DSHS
02070036

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 37 of 39

the organization, not as a reward but to ask them if that is part of their choice.

Ribas stated that he is very well aware of the consequences should he act inappropriately in the workplace and he would not risk losing everything he has for these issues.

Following the interview with Ribas, he offered an email dated December 01, 2009 to Try Hutson, detailing the demographics of his promotional staff appointments. The email is appended as Appendix 27.

After Leo Ribas departed from his interview, he telephoned Cathy Niemi to provide additional information he felt he forgot to provide when he was asked him if he ever demoted anyone. Ribas recalled that he reallocated 157 supervisors to front line eligibility personnel. He also demoted the Region 1 administrator in Spokane.

*Thuch Mam (former DSHS employee), 360-464-2012*

On March 25, 2010, Intern Cathy Niemi contacted Mam by phone at her current workplace. She was advised of the nature of this investigation. Mam acknowledged her awareness of the relevant DSHS policies. Mam stated she did not personally witness any behaviors contrary to those policies. Mam stated Jennifer Martinez had confided in her about the behaviors Martinez had experienced from Leo Ribas.

EMAIL and INTERNET ANALYSIS

The Investigation Team received copies of Leo Ribas' state-provided email account traffic and Internet log traffic from his state-owned computer. The email accounts were analyzed utilizing forensic software from AccessData. 46,705 email messages; 16,736 documents; and, 1,020 graphics were found in the active and archival accounts. A cursory review was completed by visual review and "key-word" searches. No activities outside of the Acceptable Use Policy were found.

An analysis summary of files contained on the supplied optical media is appended as Appendix 28.

Information contained in this report is solely based on witness statements and documents obtained in this investigation. All comments are attributed to the specific witness indicated and have not been independently verified as factual. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein.

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technology, Ltd

Khaleghi v. DSHS
02070037

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 38 of 39

The email and internet traffic of other employees was not reviewed.

## DOCUMENT REVIEW - HATHAWAY

Documents with regard to the promotion of Betsy Hathaway were received and reviewed. These documents consist of appointment letters and salary history.

Hathaway maintained a salary of $4114.00 per month, effective March 01, 2008. Effective with her transfer to Olympia (CSD Headquarters) on March 01, 2009, her salary was increased to $4610.00 per month. This salary was approval was initiated by Leo Ribas. Her salary was increased to $4653.00 per month with her promotion and relocation to the Tacoma office.

The referenced documents are appended herein as Appendix 29.

## DISCLAIMERS

The information contained in this report is solely based on witness statements and documents reviewed in this investigation. We offer no warranty as to the factual accuracy or authenticity of any information or statements offered by the witnesses described herein. No opinions or conclusions with regard to policy are implied or offered. We reserve the right to supplement or amend these findings should viable new evidence become available.

> This is an electronic courtesy version of this document.
> Only the original containing inked signatures is considered valid.

Frank Sebastian                                Shannon Givens
Investigative Principal                        Project Investigator

Cathy Niemi
Investigative Intern

## APPENDICES

1 – Email messages from "Wiley Coyote" and "Shannon Smith"

**CONFIDENTIAL DOCUMENT**
© 2009 -- Emphasis Technography, Ltd

Khaleghi v. DSHS
02070038

REPORT of INVESTIGATION
Case ID: ET101678
Department of Social and Health Services
Page 39 of 39

2 – Internal investigation documents
3 – DSHS Policies 18.64 and 18.66.
4 -- Recorded interview transcript – Dasha Mitchell
5 -- Recorded interview transcript – Brent Low
6 – Recorded interview transcript – Stacey Bushaw
7 – Recorded interview transcript – Rebecca Henrie
8 – Recorded interview transcript – Jennifer Martinez
9 – Recorded interview transcript – Tina Hatley
10 – Recorded interview transcript – Marijo Olson
11 – Recorded interview transcript – Rena Milare
12 – Recorded interview transcript – Dori Shoji
13 – Recorded interview transcript – Allen Shanafelt
14 – Recorded interview transcript – Michael Hart
15 – Recorded interview transcript – Kjersten Riedel
16– Recorded interview transcript – Diana Harder
17-- Recorded interview transcript – David Rendon
18– Recorded interview transcript – Vicki Hobbs
19– Interview summary – Gwen Willingham
20– Recorded interview transcript – Bill Moss
21– Recorded interview transcript – Betsy Hathaway
22– Recorded interview transcript – Carla Reyes
23– Recorded interview transcript – Sharon Gourley
24– Interview summary – Glen Christopherson
25– Recorded interview transcript – Gerald Ketchum
26– Recorded interview transcript – Leo Ribas
27 – Email from Ribas to Hutson – 12-01-2009
28 – Computer media analysis summary
29– Salary documents – Betsy Hathaway

**CONFIDENTIAL DOCUMENT**
© 2009 – Emphasis Technography, Ltd

Khaleghi v. DSHS
02070039

**EXHIBIT 13**

My name is Dariush Khaleghi.  I was born and raised in Iran and that is my ethnicity and cultural background, as well as national origin. I have come to the USA as an immigrant refugee in 1986. I have attended University of Washington, Portland State University, and Pacific Lutheran University.  I have obtained two masters and working on my Ph.D. currently.  I have held management positions both at private and public sectors.  At the public sector, I have held executive positions with the Washington State Human Rights Commission both as Deputy Director and Interim Director.

I was hired by the Economic Services Administration (ESA) of the Department of Social and Health Services (DSHS) on July 16, 2008 as the Director of the Operations Services Division (OSD). The position of OSD Director is responsible for the planning, budgeting, purchasing, contracting, performance management, quality, and all operational aspects of the administration in support of Division of Child Support (DCS) and Community Services Division (CSD) with a total budget of more than two billion dollars and FTEs of more than 150 professional staff.  ESA is led by an Assistant Secretary and a team of three directors, including the OSD Director that report to the Assistant Secretary.

I believe that while at the ESA, I have been discriminated against, treated differently, and was subject to a hostile work environment based on my national origin and ethnicity by the ESA Assistant Secretary (AS), Mr. Troy Huston, Mr. Leo Ribas the Community Services Division (CSD) Director and Mr. David Stillman the Division of Children Support (DCS) Directors.  Furthermore, Mr. Troy Huston the AS continuously made decisions that eroded my role as an equal director in the administration, favoring and preferring Mr. Leo Ribas and Mr. Stillman, the CSD and DCS Directors.  During my short employment at the ESA, I made plea for fair and equitable treatment.  I notified Mr. Troy Hustson of the treatment I was subject by other directors and psychological and organizational isolation, rejections, and lack of cooperation I was receiving.  Mr. Hutson, the AS, not only failed to correct the discrimination and harassment and the hostile work environment I was experiencing, he blamed me for the lack of cooperation with the directors and questioned my integrity of decisions and actions.  He furthermore solicited criticism about me from others including my direct reports, leading to loss of organizational authority as a director, loss of managerial influence and decision making abilities, and limiting my leadership and influence on my team and other divisions.  I, furthermore, will show that I was retaliated against when I reported a potential hostile work environment based on sexual harassment by being reprimanded and questioned regarding the request for an investigation to mitigate any risk to the employee and the administration..  And, finally after only four months in this position, a few hours after I notified my boss that I have filled an EEOC charge against him, I was terminated in retaliation.

### Hostile Work Environment Based on National Origin

July 16 2008

 I began my work at the ESA having to deal with a high-level Chief at the DCS, Mr. Adolfo Capastani, who had used slander and misleading characterization to Mr. Hutson regarding me to deter Mr. Hutson from hiring me. Mr. Capastani had, previously, worked for the Washington State Department of Veterans Affairs (WDVA).  While at the WDVA, Mr. Capastani had held the position of Chief of Communications and had developed a close friendship with Mr. John Lee.  Mr. Capastani had left the WDVA before I was hired to that agency in 2004.  I had met Mr. Capastani in a couple of occasions while he visited Mr. John Lee the WDVA Director at the WDVA agency. During the 2007 and 2008, I began receiving prank and hoax calls from an individual for an extended period of time.  Being an Iranian-American, I began to feel afraid for myself and my family's safety and security.  The relationship between Iran and the US at the time had been extremely strained during this period.  As a result of my request to investigation, the WDVA HR

and the State Patrol were engaged and it was determined that the culprit to these disturbing phone calls was Mr. Adolfo Capastani who used state resources to call sometime multiple times a day to create an intimating environment for. I did not press charges against Mr. Capastani as I was advised by the WDVA Deputy Director, Alfie Alvarado, and the Director, John Lee, to not do so due to the political backlash that it may entailed for the governor as both Mr. Capastani and I held high positions in the respective agencies we were worked for. The WDVA HR Manager at the time, Ms. Lisa Benavidez, was the HR representative in charge of handling this issue with the DSHS human resource. I was assured by Ms. Benavidez that the issue had been taken care of I did not have to worry about further annoying calls.

After Mr. Capastani, now, the Chief of Communications of the DCS within the ESA who directly reported to Mr. David Stillman and was a very influential executive at the DCS became aware that I had been hired as the OSD Director, had taken the opportunity to blemish my character with slander and fabricated lies to halt my hire to the ESA. As a result of Mr. Capastani's actions, Mr. Hustom called me and asked that I delay my start date by two weeks for him to look into the allegations made about me by someone who worked for the WDVA. My start date was delayed by two weeks, as a result. During these two weeks, I had to stay home anxiously, waiting for the issue to be resolved. To shed some light to this issue, I requested that Mr. John Lee, the Director of the Department of Veterans Affairs (DVA), to intervene as he was aware of the previous issues related to the calls Mr. Capastani had made. Finally, after Mr. Lee and Mr. Huston had discussed the issues, I was notified by Mr. Hutson that I could begin my employment at the ESA on July 16th, 2008 as it was found that Mr. Capastani had mislead Mr. Hutson with lies and untrue statements. It is significant to emphasize that Mr. Stillman, the DCS director, and Mr. Capastani had a close relationship and Mr. Capastani continued to provide Mr. Stillman's coverage when he was out of the office. Although I had to experience all these hardship and difficulties neither Mr. Stillman or Mr. Huston the Assistant Secretary ever addressed the issue with me after my hire or made any effort to close the issue to ensure that I was not at risk of any other mishap from Mr. Capastani. Mr. Capastai's continuing playing a significant leadership at the DCS and ESA clearly was a message that nothing had changed and neither Mr. Stillman nor Mr. Hutson had taken any corrective action to protect me against potential discriminatory actions and a hostile work environment that could ensue.

### On going discrimination till my Termination

As the operations support director, one of the key requirements and expectations of my job was to work and support the DCS and CSD divisions. During my short four months at the ESA, Mr. Stillman, the Division of Child Support (DCS), Director and Leo Ribas the Community Services Division (CSD) Director rejected all my effort to be a part of the directors' team. As the operations support director, I was expected to work cooperatively with the directors to be successful. Not only all my efforts to cooperate were rejected by both directors, I was subject to discrimination and hostile work environment. The directors continuously criticized my efforts to cooperate and complained to my boss in my absence. They refused to meet with me to discuss and solve on-going issues between the OSD and the divisions. In fact, I was rejected, isolated and was being subject to rumors and pressures. I had ESA employees, including the HR Chief, Kandy Pierson, approaching me and warning me that the directors were working together to get rid of me. Mr. Jeff Willis the OSD Facilities Chief warned me that a manager from CSD stated that the big divisions were working together to crush me. Arjeen Travis, the OSD Electronic Benefits Team Administer, approached me a few times and warned about the directors plotting to pressure me to get fired. Per her recommendation I approached Kathlyeen Brockman, the DSHS Administration Director, to seek input and help and discuss the disadvantages I was experiencing with the directors and Mr. Hutson. These rumors finally become reality when Mr. Hutson instead of correcting the hostile environment

began criticizing me for not working cooperatively with other two division directors. When on one occasion, I asked him to be more specific about the issues the directors were concerned about; he stated that the directors were complaining about my attitude or approach. Something about me he stated that was not quite fitting. And when I asked him to be more specific, he stated that the directors let him know that I hung up the phone on one occasion and walked off a meeting in another. I did let him that both claims were incorrect and untrue. It became very clear to me that Mr. Hutson had taken a position against me and although I shared with him the issues and the rumors and the need for his intervention and coaching, I was denied any further assistance and were constantly reminded that it was my job to build the partnership. I appealed to him, furthermore, to make sure that he talk to me about the issues brought to his attention before convicting me of false accusation and inflammatory comments that by the directors. In my meetings with Mr. Hutson, I compared my situation with Dr. King dealing with an institutionalized discrimination and injustice.

Mr. Troy Hutson, my boss, not only did not take any action to help me with the situation he began blaming me and criticizing me for the issues I was facing for the harsh and isolated work condition. He himself began treating me differently by directing me not attend certain meetings that he originally expected me to attend (i.e., Pay and Compensation meeting with the DSHS Executive team) because HR was one the key functions I managed. When I attended one where he was present, he asked me to leave. In other meetings with the other directors (i.e., Priorities Of Government meetings), he took other directors but not me. When I was scheduled to attend a DSHS-level meeting, he said directors do not need to go. Later, I found out that he took Mr. Ribas with him. Note in the attached email from me to Mr. Hutson that despite being invited to an important Native Indian and was asked for feedback and input, I was unsure that Mr. Huston would want me there and therefore, I had to ask to make sure it was ok for me to be to attend with the other directors in that meeting. Other directors never had to ask to attend any meetings. Please, see attached Oct 13th email; exhibit 1.

It was not only about attending the meeting that I began experience a different treatment. Mr. Hutson began undermining my authority where he never did with the other directors. On Sep 11, I was notified that my executive assistant, Diana Harding, had been taken away from me and was transferred to the CSD to directly report to Mr. Leo Ribas the Director. In the course of this transition, I was not consulted nor was I asked about the impact of such change to me and my organization. Feeling frustrated and baffled, I sent the attached email to Mr. Hutson requesting him to include me in the decisions that impact my staff and to treat me with respect. My authority and leadership was being diluted by these actions my staff were talking to me about whether I was an equal player at the ESA like other directors. In the email, I addressed Mr. Troy, "I want to maintain my trust and credibility with my people if I want to be an effective leader." Please, see email dated Sep 11; exhibit 2.

On Monday Sep 15th facing continued degrading actions from the directors and Mr. Hutson and feeling discriminated and hopeless about my situation and my team's struggle, I send them the following email. In the note, I tried to encourage my team and division to be resilient and withstand the difficulties and storms coming from other divisions and the rumors about what would happen to me. I concluded letting them know that, "Don't let any words of discouragement, apathy, and hopelessness invade your souls and inhibit your progress." I was feeling worn down myself. Please, see attached email; exhibit 3.

Oct 9

The directors had a meeting where I was not present and colluded and pushed for some of their management staff to receive raises and promotions. Being the OSD Director in charge of HR, I was notified by my HR Chief about the situation. My Office Chiefs also wanted me to make sure that

the directors were not intending to compromise the HR process we were working on to give their managers a raise. I knew that if this happened and the targeted managers received raises and promos, as the OSD director I would be in a great disadvantage as I was not willing to do the same for my managers without a fair and equitable process. As a result, I sent a note to Mr. Hutson and Roxie Schalliol, his Special Assistant, appealing for a fair and transparent process and not using the director's meeting as an opportunity to further erode my capacity as a leader by promoting or giving raises to the managers in other divisions without implementing the complete HR process. Please, see attached email; exhibit 4.

Oct 11

Knowing that many decisions are being made for me and my team without my involvement and unsure that my organization would be treated fairly in the RIF process, I sent an email to my boss and asked him to clarify what the upcoming layoff process and FTE cuts meant to the ESA. After he responded to the email, I highlighted his emphasis on use of the data, more collaboration, and more accountability from all to ensure that I communicated and appealed to his sense of fairness to treat everyone with equity. Please, see attached email dated Oct 11; exhibit 5.


Oct 21

Being concerned about the cooperation I am receiving from other directors, I sent an email to Mr. Leo Ribas, the CSD Director, asking him to allow me to assist him in any ways he may need even facilitating meetings and offered all my team members to do the same. I requested that he allow me to attend his management meetings to learn about his business to help and improve our partnership and cooperation. Feeling stressed and anxious with mounting pressure, I forward the email to my Mr. Huston to show that I am trying my ultimate best to build partnership and cooperate with other two directors,  In the same email I did let him know that I am willing to extend my help in any venue I could. I closed the email by appealing Mr. Hutson sense of fairness and justice one more time to see whether he could help resolve the differential treatment I was receiving form the directors. I never received any reply from Mr. Ribas or Mr. Hustom. My anxiety kept growing knowing that lack of feedback and any corrective action from Mr. Hutson and the pressure I was under from the other directors would certainly harm my job and my health. Please, see attached email dated Oct 21; exhibit 6.

In a response to my email, I received a copy of an email sent to my administrative assistant from Mr. Leo Ribas's executive secretary, Ms. Harder, in that my request to attend a CSD management meeting was rejected.. As an operations support director, it was expected and also necessary to know about other divisions' internal workings. Continuing feeling marginalized and discriminated, I sent an email to Mr. Hutson to address this issue. In that note, I expressed how I felt I was being treated by the two division directors. I stated to him that I have had a difficult time to penetrate divisions to be of any help and service. In that note, to clarify my feelings and frustration and how I felt isolated, alienated, and discriminated, I compared my condition in this administration as similar to now President-Elect Obama trying to break in a privileged system. I also appealed to him to be patient with me and my team. Please, see email to Mr. Hutson, dated Oct 21 2008; exhibit 7. In the same documented email (please, see exhibit 7), Mr. Hutson brief reply was, "I understand", validating my experience of injustice, hostile work environment and discrimination I was feeling, yet failing to take any corrective action to remedy the situation or improve the hostile working condition I was subject to. He even failed to offer any guidance or coaching where it is expected from a manager.

Nov 6

As it became a pattern, I was notified by one of employees that there was going to be a reorganization that would impact my division. Although a division director and an appointed authority, I learned that I would not involved in issues that impacted my organization. I became aware that I was being treated differently from other directors by Mr. Hutson. I would not be consulted on the reorganization either. As a result, I send Mr. Hutson an email requesting some clarification. I also made him aware that people were experiencing great anxiety and that was diminishing their effectiveness. I restated that Mr. Hutson had set trust and transparency as the key values central to his leadership and work at the ESA. I was feeling extreme anxiety knowing that if the rumors were true and I was not involved yet again in another decision that had to do with me and my division, that I would further have lost my leadership credibility and management influence not only with the ESA, but certain with my staff. Please, see attached email dated Nov 6; exhibit 8. In response to my email, Mr. Hutson, stated verbally that there was no reorganization.

Nov 11

The rumors to the reorganization were true. In our Tuesday Director's meeting where we were expected to complete an assignment regarding a list of positions that we were planning for FTE reductions, I was surprised with a reorganization plan that was presented by Mr. Hutson. The reorganization was labeled, "Operations Services Division Decentralization". Please, note that I was the director of this organization that was being decentralized, yet neither was involved nor I was aware of such plan. According to this reorganization, Mr. Hutson, has removed three of the OSD core functions (Quality Assurance, Electronic Benefits Team, and Contracts) from the Operation Support Division and moved them to CSD and DCS divisions. In response to my question about transparency and using the FTE reduction assignment as a pretext to remove more of the OSD and give them to other divisions without my knowledge, Mr. Troy Huston's public response was that he was disappointed that I got emotional about this issue. This was another reference to one of my personal characteristics that had a cultural overtone. I felt that this was another opportunity for Mr. Hustosn to humiliate me in the presence of other directors knowing very well the working environment I was subject to. His decision to reorganize had a disparate impact on my role as a director and leader. Due to this reorganization, I would have substantially less responsibilities and management oversight of key organizations like Quality Assurance that had monitoring, compliance, and auditing role over other divisions. As stated previously, Mr. Huston was very aware how other directors have been treating me and his assertions further isolated me from the team I was expected to be a part of.

**Nov 13**

A couple of days after the director's meeting where Mr. Troy discussed the reorganization, he requested to meet with me in the morning. During the conversation he discussed the fact that he and I were not good match and exact fit. I reminded him of the fact that diversity of people and ideas were critical to business success. Not having had any guidance, direction, or assistance during my employment at the administration and believing that I have lived in hostile work environment, I became nervous about what his intents were. I asked him to be more specific about his statement, so I could understand what he meant. He was not able to quite articulate what he exactly meant. Being of Iranian origin and having being treated differently for the last few months, I felt my anxiety and stress visibly increasing. He asked me to think about how I was feeling about working with him and for the ESA and get back to him and have a conversation the Monday after.

**Nov 17**

Mr. Huston I met around 11am again. He asked me how I felt about working for him, the ESA and my job with the administration. I replied that all was well and I had many accomplishments to be

proud of in a short period of four months. I reiterated that I had built a strong team that was united to help him achieve his vision. He stated that he has been thinking about how he feels about us not being a good fit together. He also added that he feels that my people's loyalty to me would compromise their loyalty to him. The notion of loyalty has a different cultural connotation for me coming from a county that bribing and unethical behaviors may arise from blind loyalty. I did not feel comfortable with Troy's statement. I, however, reiterated that my team and I were committed to him and the administration. He then asked to meet with my team the next day and after which he would make up his mind about his relationship with me. I continued to feel partly confused and partly living in suspense of what Mr. Huston was trying to accomplish. He asked me what we should discuss in the Monday meeting. I said I could begin with reasserting my team's commitment to him and then he could take it from there and have a conversation with the team. This on-going suspense about our relationship, loyalty, and being a good fit continued to exasperate the differential treatment and hostility I was experiencing. It was as if Mr. Huston was torturing me psychologically and mentally without exactly telling me what is thinking although the signs were becoming more obvious. Although I was very aware of my contributions and accomplishments, I felt hopeless about my future in the organization.

Nov 18

Mr. Hutson attended my management team meeting. I the presence of all my Office Chiefs, I reiterated my team's and my commitment to him and the administration and gave the floor to Mr. Huston. He asked the Chiefs about an OSD meeting that we had and used some of the comments that the team had made to carry a conversation. In response to Mr. Hutson, the OSD team unanimously reiterated how united and committed OS team was. They also emphasized that they stood behind Mr. Huston and I as a united and cohesive team in support of the aministration. At the last minute, before he left, he stated to my management team that he was going to think about his relationship with me and making some decisions. He did not specify any details. I felt humiliated in front of my management team not knowing what the veiled threat-like comment meant. Most of my team members were surprised, confused, and worried about Troy's comment and how he treated me before he left. This had never been done to any of other directors at least publicly. I later was notified by some of Chiefs, Greg Beck the ESA CTO and Babs Roberts, the Fiscal Office Chief, that Mr. Huston has been engaged in conversation about me that elicited more fear and anxiety among my Chiefs. An atmosphere of extreme anxiety and fear was evident. The questions about me, making them very concerned about what would happen to me despite all the successes the team had acheived in such short period of time. Each of this members of my management team can testify to the fact that I had been treated unfairly, unequally, and discriminatory when compared to the other two directors and the act of public humiliation and provoking fear and stress by Mr. Hutson engaging my staff about me were retaliatory and intimating, creating a hostile working environment for me.

As my fear, worries, and stress mounted, I felt that I have been subject to discrimination and treated differently by Mr. Huston, Mr. Ribas, and Mr. Stillman, I decided to file a complaint with the EEOC and notify Mr. Hutson, the Assistant Secretary, and the DSHS HR department. Early morning, on Nov 18th, I notified Mr Hutson, and the DSHS HR department of the charges and my intended legal actions against him and the two division directors.

**Nov 19**

8:30 am

I received a note from my Chief Technology Officer, Greg Beck, that in our Executive Management Meeting held on the previous day of Nov 18th, Mr. Huston had announced that I was leaving ESA

and Barbara Bascko, my employee would be acting as the Interim Operations Services Director, in my position. I did reply to him that I was not aware of any changes and that was the first time that I had heard about this. As it was becoming more evident, Mr. Huston had made yet another decision without my full knowledge and confirmation to not only terminate me, but also announce a replacement for me. **Please, see attached email dated Nov 19th; exhibit 9.**

## Retaliation for filing an EEOC complaint

10:00am                                    ( please, see  Exhibit  10 , 11 )

Receiving the notification charges against him, Mr. Huston approached me in the hall way and as I was talking to another employee and directed me to go to talk to him regarding the situation. Getting caught off guard in the hallway and being concerned about retaliation, I stated that if this is about the claim against him that I filed I may need to have my attorney present for any conversation that may have adverse impact on me. My boss got upset and stated now things will change.

11:30am

My boss, Troy Huston, walked into my office with Mike Hart the CSD Infrastructure Manager who worked directly under the Mr. Leo Ribas, the CSD, Director, and in a cold and cruel manner terminated me. He stated that now that I was not going to talk to him, he had decided to terminate me and I had one hour to clear my stuff. I replied ok and began to pack up my belongings surprised and shocked and speechless of how I was so I retaliated against. This was the first time ever in my life I was being treated with so much indignity and disrespect. There was no HR involvement or anyone who could explain to me my employment rights upon termination etc.   ( please, see Exhibit # 12)

## Retaliation for Reporting an allegation of Sexual Harassment to My Boss

Week of Sep 18

I was approached by Deana Scott a female employee who worked as an administrative assistant at the Community Services Division where Mr. Leo Ribas was the Director. She approached me to discuss the new condition she was facing and how that change could harm her job and career at the ESA. Ms. Scott alleged that Diana Harder the new executive secretary to Leo Ribas, the CSD Director, was her previously her supervisor. She stated that her job could be at risk because Ms. Harder may have had a personal relationship with the Mr. Leo Ribas, the CSD Director. Ms. Scott stated that she did not have a positive working relationship with Ms. Harding. Ms. Scott alleged that, now, that Ms. Harding was the executive assistant to Mr. Ribas, and they may have carried a personal relationship, Ms. Harding would retaliate against her and she would be adversely impacted by this new arrangement. She stated that she came to me because she did not trust the management team and was concerned about retaliation. Having HR as one of the functions I supervised I felt obligated to get some more clarification before contacting my boss and the HR Chief. I asked her what she meant by personal relationship between Ms. Harding and Mr. Leo Ribas. She alleged that while working for Diana Harder she had witnessed a specific occasion where Diana had stated while she was present that she witnessed the closeness of their relationship and once overheard that Ms. Harding was preparing a room at her house in Olympia for Mr. Ribas to stay overnight, so that he did not have to drive back and forth to Seattle everyday. She was visibly shaking and expressing extreme fear and anxiety regarding her future. I stated that I would look into this and will get back to her and that she should not worry about retaliation for sharing her concerns with me. As a result, I approached Troy Hutson, my boss to get some background about Mr. Ribas and Ms. Diana Harder who worked together at Mr. Huston's office for a few months together. Additionally, I was going to share my concern as Mr. Ribas was an executive and a plan of an investigation to confirm or dispel the allegation would be a prudent course of action.

When I discussed these issues with Mr. Huston, my boss, I was actually chastised for bringing the issue up to him and not directly to Mr. Ribas to handle. I explained to Mr. Hutson that it would be unethical and maybe illegal for me to go the person who was a party in this claim directly and have him handle the situation without the HR involvement and following the due process. Mr. Hutson was upset that I even mentioned a potential investigation. I left in indignation knowing well that this would be another opportunity for the directors and Mr. Hutson to question my integrity and my position as the director in charge of HR function.

Later that day, Mr. Huston approached me and shared with me that Mr. Ribas had worked as his acting special assistant with Ms. Harder at his office, the Office of Assistant Secretary. He stated Mr. Ribas and Ms. Harder often joked around and there was not anything wrong with the comment that Ms. Harding had made regarding preparation of a room for Mr. Ribas. In fact, he reiterated that I needed to let Mr. Ribas to handle this. He also questioned whether or not the approach I had taken had to do anything with sudden transfer of Ms. Harder from my office to Mr. Ribas's office. He questioned that whether I was trying to get back at Mr. Ribas for taking Diana Harder from my office without my knowledge or involvement. I reminded him that I thought he had transferred Ms. Harder and not Mr. Ribas. I, additionally, reminded him that he needed to be more cautious about issues relating to sexual harassment and hostile work environment. Not interested in my perspective, he directed me to talk to Mr. Ribas and let him handle the situation. When I shared the allegation made by Ms. Scott with Mr. Ribas, he got so furious to tell me that, although he wishes for to conduct the investigation, my being there was not working for him before he hung up the phone on me. I knew that involving Mr. Ribas in this manner would have retaliatory consequence for me. And, as I was aware of the close relationship between Mr. Huston and Mr. Ribas, I had to make sure that Mr. Huston was aware that investigating any allegation of misconduct or potential sexual harassment and hostile work environment would protect him and the administration. To prove my point and avoiding retaliatory actions from Mr. Hutson, I first contact Mr. Glen Christopherson, the DSHS HR Director, for further advice. I stated that both Mr. Hutson and Mr. Ribas were quite upset and I did not know how to proceed with the investigation and was worried about the consequences. He recommended that I talk to Mr. Huston again and if he was consented to look into this further that Mr. Christopherson himself would help with the investigation. Out of fear of retaliation, I did not contact Mr. Hutson and requested that Mr. Christopherson to keep the matter confidential.

To make sure that Ms. Scott would receive some relief and feedback from me, I contacted our HR Chief to address the issue with her and make sure that Ms. Scott would feel safe to bring to our attention should an adverse action was taken against her by Mr. Ribas. There was never an investigation. To close the loop with Mr. Huston and emphasize the importance of prompt and remedial work that needs to be done when allegations of potential sexual harassment and hostile work environment were raised I did sent him excerpts from the EEOC website on Sep 18th to reiterate how critical it was that allegations that may lead to sexual harassment and hostile work environment cases be investigated promptly and thoroughly. Please, see attached email to Mr. Hutson dated Sep 18th, exhibit 10.

The following are a couple of more examples of offensive behaviors exhibited by Mr. Huston. I did not ask him to stop as he was my boss and I feared retaliation. These examples, however, give a context to why Mr. Hutson may not have seen any issues in Ms. Scott making allegation against Mr. Ribas.

I found the following two cases offensive and culturally inappropriate from a person in Mr. Hutson's position. In one of our director meetings, where at least seven senior managers were present, Mr. Ribas mentioned that he had to shave quickly in the morning to be able to make the meeting. Someone stated that there were no razor cuts on his face if he really was rushing. In

response, Mr. Hutson stated that, "we were assuming that Mr. Ribas was talking about shaving his face, using a sexually distasteful tone." Everyone laughed and Mr. Hutson stated that this was not something that he wanted Robin (referring to his boss Ms. Robin Arnold-Williams) to have found out, jokingly". I found his comment offensive and distasteful.

In another occasion, In Sep, while driving to the Little Creek Casino to attend a Native American Indian event, looking a female passing by, Mr. Hutson asked me what I thought about beautiful women. I felt very uncomfortable with this question because of my cultural background and religion. Feeling that I obligated to respond, I replied that I had a beautiful wife at home and was not in any need to consider or look at someone else. In response, he stated that it was normal for men to look at beautiful women because they carried genes and seeds. I found his comments offensive for a married man with a family and felt strange and changed the subject.

DK0174

**EXHIBIT 14**

## Khaleghi, Dariush (DSHS)

**From:** Khaleghi, Dariush (DSHS)
**Sent:** Tuesday, October 21, 2008 2:50 PM
**To:** Hutson, Troy A (DSHS)
**Subject:** FW: DK - RA Meeting

Hello!

In good faith, I am doing everything I can to penetrate and be of service.  Have not formally been invited to any of David's management meetings.  And, if you observe below, you note that somehow I feel like Obama trying to break in a privileged system.  I am not complaining.  Will keep moving forward till they see my value add.  Till then please be patient with me and my team.

Rgds, dk

---

**From:** Cloutier, Kim (DSHS)
**Sent:** Tuesday, October 21, 2008 2:30 PM
**To:** Khaleghi, Dariush (DSHS)
**Subject:** FW: DK - RA Meeting

FYI

---

**From:** Harder, Diana (DSHS)
**Sent:** Tuesday, October 21, 2008 2:29 PM
**To:** Cloutier, Kim (DSHS)
**Subject:** DK - RA Meeting

Kim,
Per our phone conversation regarding DK attending the RA meeting:  Not at this time, Leo has a full agenda.

*Diana Harder*, Confidential Secretary
Community Services Division
360/725-4887  360/725-4904 - Fax
MS: 45440
hardedx@dshs.wa.gov

DK0134

11/18/2008

**EXHIBIT 15**

**From:**          Ribas, Leo (DSHS)
**Sent:**          Thursday, October 23, 2008 5:42 PM
**To:**            Stillman, David (DSHS/DCS); Hart, Mike J (DSHS/ESA)
**Subject:**       FW: EBT unit

---

**From:** Ribas, Leo (DSHS)
**Sent:** Thursday, October 23, 2008 5:41 PM
**To:** Hutson, Troy A (DSHS)
**Subject:** RE: EBT unit

I will do the entire work for 3 FTEs instead of 5 and would allow OS to count the savings as part of their administrative reduction. The workload is simply not there regardless of the length of the email.

Don't take my word - here are two people you can ask in confidence. Mike Hart and Jeff Willis (both used to work under Arjean in the EBT unit) - They used to fight over work because there is never enough to go around.

The other issue to think about is supervisory ratios. In this case is 4 to 1 which is very common throughout OS - Compare that with the ratio in field offices, even though today we are still very top heavy.

---

**From:** Hutson, Troy A (DSHS)
**Sent:** Thursday, October 23, 2008 1:26 PM
**To:** Ribas, Leo (DSHS)
**Subject:** FW: EBT unit

FYI!

---

**From:** Khaleghi, Dariush (DSHS)
**Sent:** Thursday, October 23, 2008 1:09 PM
**To:** Travis, Arjean (DSHS); Roberts, Babette (DSHS)
**Cc:** Hutson, Troy A (DSHS)
**Subject:** RE: EBT unit

Thanks Arjean! You and your team are doing a phenomenal job. My interest was to know a bit more about your unit.

Troy,

I asked Arjean to provide me some basic data on the resource capacity/demand requirements for her unit just to make sure I understand it. I believe she has done a great job describing the resource structure and how they are utilized to get the job done. Thought maybe of interest to you as well. Please, let Arjean or I know should you have any questions.

Thanks, dk

---

**From:** Travis, Arjean (DSHS)
**Sent:** Thursday, October 23, 2008 10:13 AM

1

Khaleghi v. DSHS
02060251

**To:** Roberts, Babette (DSHS)
**Cc:** Khaleghi, Dariush (DSHS)
**Subject:** EBT unit

Babs and DK,
Here are some history statistics to share with both of you.

In 2000, the EBT/EFT unit consisted of 10 staff.
Of those 10 staff, 5 FTE's were totally eliminated and work was consolidated and absorbed within the remaining staff.
FTE positions that were **eliminated** consisted of:
1. EBT Project Director
2. Statewide EBT Lead trainer
3. Statewide EBT trainers
4. EBT Secretary position
5. EFT Customer Service representative

Today, we have only 5 positions to absorb the workload:
1. EBT/EFT Administrator
2. EBT/EFT Program Manager
3. EBT Program Manager
4. EBT Fiscal Program Manager/Retailer and Financial Institution Service representative
5. EBT Security Officer and EBT Program Manager

**Within these 5 positions, USDA-FNS funds 50% of the total Administrative cost of these 5 staff for administering this program for food benefits. So, the state does not fund 100% of FTE Administrative cost for the EBT unit.**

With the elimination of 5 vital position within EBT unit, the workload of those positons were redistributed and absorbed by the 5 remaining staff with added responsiblities of yearly statewide Group Home;/Drug and Alcohol treatment facilities' audit and statewide EBT Security audits as mandated by USDA-FNS.
Our added workload also consists of many Projects that is either driven through mandate by Executive Leaders or for enhancements to improve service to our customers (CSD, DCS, DFI, HCS, clients, etc).

The upcoming projects that are in the horizon, consists of:
1. **Tribal FS Eligibility project** - EBT unit will provide all set-up, equipment, bulk card inventory, EBT and EBT/Barcode training to all tribal staff and have one full-time staff to be stationed on-site 2 months prior and 2 months post "go-live" after implementation per tribal request of pre/post implementation support.
2. **Card Swipe Reader project** - EBT unit will develop and design project plan and implementation, pilot project testing, statewide training, equipment distribution, installation, and dessimination of the current CAPS machines. This project will require one full-time and possible one-part time staff for the period of 10/01/08 - 06/30/09..
3. **InfoManager/DataWarehouse** - EBT unit is working with JPMorgan on the project plan for implementation of the InfoManager/Data Warehouse application provide by JPMorgan EFS. This application will enhance the State's ability to extract 5 years worth of history data and assist in early fraud detection of clients and retailer/merchants. This project involves IT folks for network configuration and IP address changes, implementation set up, statewide training for staff, and on-going training. This project will require one full time staff to implement the project, provide statewide trainining as needed, as well as monitor and maintain all on-going changes to this application.
4. **WSEA RFP** - EBT unit is required to develop and write our next Request For Proposal for EBT services with the Western States EBT Alliance. This is very time consuming. WSEA has been involved in teleconferences and meetings in writing and developing the RFP since January 2008. Once the RFP is published, then 3 full time stafff will be involved in evaluating and scoring the bidders of the RFP through April 2009.
5. **EBT Disaster Services** - EBT unit is responsible to develop, design, and write a statewide EBT disaster plan. USDA-FNS mandates that each state provides yearly updated plans as well as disaster testing for distribution of EBT cards and services during a disaster. This is an on-going project that one staff is assigned to full time.
6. **Branded Debit Cards** - EBT unit is still conducting on-going research on possible conversion of TANF, GA, REFUGEE, and CEAP cash programs to be converted to a branded debit card. This would save the State the Cost-Per-Case-Month charges of $0.96 for every single case in delivery of the cash benefits through the current EBT cards. If DSHS was to approve of this conversion, this project will be significant as not only statewide training will need to be conducted but training for all DSHS clients will need to be conducted.

Overall, not only has EBT unit consolidated and absorb 5 other FTE positions duties and functions, the remaining 5 staff have gained additional duties and responsiblities as well as monitoring, managing, and implementing Projects.

2

I hope this helps gives a better understanding of what we do. Please let me know if you require additional information on the EBT unit's day-to-day job functions and responsibilities or other statistical data that I can obtain for you. Thank you!

**Arjean Travis, EBT/EFT Administrator**
**ESA Operations Support**
**724 Quince St. SE, 3rd floor**
**Olympia, WA. 98504**
**(360) 725-4550**
**(360) 725-4577**
**Email: traviay@dshs.wa.gov**

3

**EXHIBIT 16**

**Khaleghi, Dariush (DSHS)**

| | |
|---|---|
| **From:** | Khaleghi, Dariush (DSHS) |
| **Sent:** | Friday, November 07, 2008 10:31 AM |
| **To:** | Hutson, Troy A (DSHS) |
| **Subject:** | OS Reductions |

Good Morning Troy!

We have identified 18 positions to both take care of the FTE overage issue we have at OS and the 5% reduction for the next binum.  The team work well together to close this gap.  In terms of double fills we will have a few remaining.

Just to give a heads up!  Thought was a good news to share.

dk

DK0130

11/18/2008

**EXHIBIT 17**

## PHASE I

- As I was talking on the phone with a colleague (Shannon Wallace) on June 17 or 18, the subject came up of the two people who had been selected for the ESA Deputy and OSD Director. I did not know the first name (Jim Crabbe) but when she mentioned who was being selected for the OSD position, I made the comment to her: "I hope they did good reference checks"........She asked me why and I explained that folks that I knew who had worked for/with him had conveyed concerns to me, etc. She insisted that I needed to relay these concerns to Troy but I told her I did not want to because the decision had already been made, etc.
- Troy called me (airport June 19---on way to Yakima) and asked me about the concerns. I tried to avoid answering him but he pressed and I told him it was just a passing comment I had made based on concerns about his management style that had been expressed to me by folks who worked with/for him in the past. I told him my comment didn't really matter since he had already made a hiring decision and had done reference checks, etc., and that if HE was satisfied, what I thought did not matter.
- The next day when I returned from Yakima, at my request I met with Troy to clarify the issue and inform him of what had happened (phone issue) to make sure he understood that it had been addressed by David Stillman seven months earlier. He admonished me for having done it, and I told him I had understood my mistake and that it had not, and would not, happen again. I also apologized for the confusion I had caused him. He had already found out about the issue and was not happy, but he appreciated my honesty and for coming to see him to clear things up. He asked me if there was going to be a problem and I told him that I would vow to work cooperatively and professionally with Mr. Khaleghi at all times, which I did. He thanked me, told me he was counting on me, and I left.
- On June 24, an announcement about the hiring(s) was posted on iESA.

## PHASE II

- Mr. Khaleghi arrived to ESA in early/mid-July. Upon his arrival I sent him a welcoming e-mail letting him know that my staff (Facilities) was available to help him with any issues to get settled, etc. He responded back with appreciation and stated the he felt "blessed by everyone's goodwill and support....."

- I did not work with or for Mr. Khaleghi. He worked in another building for a different division within the administration and was my supervisor's peer.

- During the four months he was here I had very minimal interactions with him.

- We exchanged a total of five e-mails, all very pleasant, cordial and professional.

- We spoke briefly on the phone on two occasions as a follow up to the e-mails.

Khaleghi v. State
01030018

- I never met with him individually. On September 4, I participated in a meeting about leased facilities with David Stillman, Connie Ambrose, Jeff Willis and Mr. Khaleghi, which lasted about 45 minutes.

- At the invitation of David Stillman, Mr. Khaleghi helped serve at the DCS staff appreciation breakfast on October 28, along with CSD director Leo Ribas.

- He also was a guest at the DCS Leadership Team meeting and luncheon on November 5.

- I last briefly spoke to him via telephone on November 18, to make sure he had received a DVD he had requested at the Leadership meeting November 5. He stated he had, thanked me for following up with him, and said "God Bless."

- At the end of that day (November 18), upon his return from ESA Management meeting, David Stillman relayed information that Troy Hutson had announced Mr. Khaleghi would be leaving ESA. A brief announcement was posted the next day (November 19) about this on iESA for all staff.

- I have not seen, nor spoken to Mr. Khaleghi since.

- On November 20, I received a brief e-mail from Troy Hutson thanking me for a news story I had sent him the day before and stating: "Also, my apologies since it turns out you were right all along!"-----Assuming pertaining to my statement about Mr. Khaleghi's references. I responded with letting Mr. Hutson know that no apology was necessary, that I still felt bad regarding how all of this started back in June and that I felt that I had personally let him down then. No further response or discussion resulted.

- **I never spoke to Mr. Hutson about Mr. Khaleghi at any time during his four-month tenure with ESA or since his departure.**

## OTHER POINTS

- As an immigrant myself with a similar family story to Mr. Khaleghi's, I am extremely sensitive to people's national origin and ethnic backgrounds.

- I pride myself on having one of the most culturally and ethnically diverse units within DCS.

- One of my staff has the responsibility for maintaining our building's Diversity Calendar at my request and with my full support.

Khaleghi v. State
01030019

- Given that <u>all</u> of our minimal interactions were respectful, cordial and professional, along with these particular circumstances, I am very offended that this allegation would be made against me.

- Feel free to talk to my peers, colleagues, and subordinates about my professionalism with, and commitment to, diversity.

- Furthermore, and I say this without any reservation, I <u>never</u> heard or saw anyone make <u>any</u> comments or engage in <u>any</u> behavior that ever referred to Mr. Khaleghi's national origin or ethnicity in any way. This includes before he arrived to ESA, while he was here, and after his departure. If had, I would have reported it.

**EXHIBIT 18**

## OS TASK LIST
### 2008

| TASK NAME | LEAD | DUE DATE | STATUS 1 | PRIORITY? |
|---|---|---|---|---|
| **E-MAPS** | | **ESA** | | |
| Poverty and Hunger in Washington State – Publish Report - New! | Carol Welch/Seema Gupta/Jialing Huang | 8/31/08 | Green | Medium |
| Data Dictionary for Public Assistance Data – Make user-friendly- New! | Janet Hazelton/Lance Krull | 9/30/08 | Green | Medium |
| ESA Guide to Contracting- New! | Janet Hazelton/Dorie Keeley | 11/30/08 | Green | Medium |
| DCS Tribal SEO Performance Measures- New! | Steve Lin/Bryan Enlow | 7/31/08 | Closed | Medium |
| ESA Executive Data Dashboard- New! | Carol Welch/Steve Lin | 12/31/08 | Green | Medium |
| Child Support Schedule Worksheet Analysis for Fed. Compliance- New! | Ken Forgy | 12/31/08 | Green | High |
| Young and Incarcerated Fathers Project for WAPA | Ken Forgy | 8/31/08 | Green | Medium |
| Briefing Book 2008 | Sarah Kollin | 12/1/08 | Green | Low |
| Bright Start Grant - Phase I (Genetic testing at 15 hospitals) | John Hoover | 7/31/08 | Closed | High |
| Bright Start Grant - Phase 2 (Genetic testing at 14 additional hospitals) | John Hoover | 7/31/09 | Green | High |
| Bright Start Web-Based Intake System | Dan Slipakit/Richie Heng | 8/01/08 | Closed | High |
| E-referral Process – grant application for Year 2 | Carol Welch | 8/29/08 | Closed | High |
| E-Referral Process Improvement Grant | Sarah Kollin | 8/30/11 | Green | High |
| CSD Data Dashboard New Format and Enhancements- New! 7/28/08 | Kent Meneghin/Richie Heng/Steve Lin | Ongoing enhancements | Green | Medium |
| SEO Custom Dashboard Enhancements | Bryan Enlow/Steve Lin | Ongoing enhancements | Green | Medium |
| DCS Performance Dashboard | Bryan Enlow/Steve Lin | Ongoing enhancements | Green | Medium |
| Predictive Modeling: Contempt; Cost Avoidance; Arrears Stratification | Carl Formoso/Qinghua Liu | 9/30/09 | Green | Low |
| Cash/IRS Audits - DCS | Theresa Murphy | 11/21/08 | Green | High |
| Data Reliability Audits of Federal Incentive Measures - DCS | Theresa Murphy | Quarterly | Green | High |
| OCSE-157 Federal Report Data and Reporting Review to Incorporate Required Federal Audit Programming Changes | Ken Forgy/Theresa Murphy/Dean Lean | Ongoing | Green | High |
| WorkFirst GMAP in DataView | Sarah Kollin/Jialing Huang | 7/14/08 | Closed | High |
| Self-Sufficiency GMAP | Sarah Kollin/Qinghua Liu | Fall 2008 | Pending | High |
| Geo-mapping Population, Client and Employee Data | Jialing Huang | Ongoing | Green | Low |
| Research Support – Data Share/Institutional Review Board/Contracts | Sarah Kollin/Janet Hazelton | Ongoing | Green | High |
| Refugee and Immigrant Assistance Participating Performance Report System | Thuy Ha/Mile Wulfekuhle | Ongoing enhancements | Green | High |
| Digital Library - DCS | Dan Slipakit/Janet Hazelton | Ongoing enhancements | Green | Low |
| E-MAPS IT Network System Security, Upgrades, Inventory, Maintenance | Brett Kollin/Tom Phan/Ken Forgy/Dan Slipakit | Ongoing enhancements | Green | High |

| TASK NAME | LEAD | DUE DATE | STATUS[1] | PRIORITY[2] |
|---|---|---|---|---|
| **FISCAL** | | | | |
| **2008 Supplemental Decision Packages** | | | | |
| Complete WARP packets for Supplemental | Laura Watson | 4/22/08 | Closed | High |
| **Allotments & Spending Plan** | | | | |
| Revise M01 Administrative Allotments – Rework WARP | Babs Roberts | 4/22/08 | Red[a] | Medium |
| WorkFirst Spending Allotments – Rework WARP | Babs Roberts | 4/22/08 | Red | Medium |
| **09 Administrative and Regional Allotments** | | | | |
| Begin work with CSD and DCS MT | Loan Tran / Ginger Stewart | ongoing | Green | High |
| Finalize ESA IT Spending Plan | Greg Beck / Directors | 5/30/08 | Green | High |
| Finalize Alterations Budget | Alterations Committee | 5/30/08 | Green | High |
| Compile regional and HQ requested budgets | Ginger Stewart / Loan Tran | 5/30/08 | Green | High |
| Complete salary projection | Ginger Stewart / Loan Tran | 5/30/08 | Green | High |
| Present to Directors for review and recommendations | Babs Roberts | 6/15/08 | Green | High |
| Final presentation / decision re: allotments | Directors / Babs Roberts | 7/1/08 | Green | High |
| Complete WARP Update | Ginger Stewart / Loan Tran | 10/31/08 | Green | High |
| **Budget Building** | | | | |
| 07 – 09 Biennial Budget | Babs Roberts / Laura Watson | 8/26/08 | Green | High |
| Develop Policy List | Directors / Babs Roberts | 4/30/08 | Closed | High |
| Determine Budget Structure Changes | Directors / Babs Roberts | 4/29/08 | Closed | High |
| Cabinet review of PL Lists – final EMT decision | DSHS EMT | 5/13/08 | Red[b] | High |
| Draft PL Decision Packages to MT for review | Laura Watson / Loan Tran | 5/30/08 | Red[c] | High |
| Review Carry Forward level estimates | Babs Roberts / Laura Watson | 5/30/08 | Green | High |
| Final Activity Inventory Changes to ESA MT | Babs Roberts | 6/17/08 | Green | High |
| Facility / Relocation estimates | Ginger Stewart / Loan Tran | 6/30/08 | Green | High |
| Lease Model Review | Ginger Stewart / Loan Tran | TBD | Green | High |
| Final ML decision packages to ESA MT | Laura Watson / Loan Tran | 7/15/08 | Green | High |
| Final PL decision packages to ESA MT | Laura Watson / Loan Tran | 7/22/08 | Green | High |
| Caseload forecast review | Laura Watson | 8/15/08 | Green | High |
| 09 Supplemental Budget | Babs Roberts / Laura Watson | 10/14/08 | Green | High |

a Packages submitted on time. OFM was not able to review for the current fiscal month and has returned the packages asking they be updated for the current fiscal month and changes recently made to the WF Spending Plan.

b Meeting with Cabinet not yet completed – CBO still meeting with Administrations. ESA's list was submitted on time.

c Slippage on Cabinet meeting means this timeline will not be possible. Revised timelines will be developed.

| Task Name | Lead | Due Date | Status [1] | Priority [2] |
|---|---|---|---|---|
| Draft Supplemental Items to ESA MT | Laura Watson / Loan Tran | 9/19/08 | Green | High |
| Final Supplemental Items to ESA MT | Laura Watson / Loan Tran | 11/1/08 | Green | High |
| Caseload Forecast Review | Laura Watson | 10/6/08 | Green | High |
| FFY 09 Food Stamp Admin Budget | Laura Watson | 8/15/08 | Yellow | High |
| Begin reviewing Outreach, NutEd, & FSET contractor budgets | Wendy Armstrong | 6/15/08 | Yellow | High |
| Develop FS Admin Budget – to CSD Director for approval | Wendy Armstrong | 7/31/08 | Yellow | High |
| Finalize FS Admin Budget – input into FPRS | Wendy Armstrong | 8/14/08 | Yellow | High |
| **County Child Support Program Budget** | | | | |
| Letters sent | Gail Early | | Closed | Medium |
| Budget Review & Approval | Gail Early | 8/30/08 | Green | High |
| Monitoring / training visits – Pros Atty 10 to 12 Cty | Gail Early | 9/30/08 | Green | Medium |
| Court Commissioner billing methodology Sample Rate | Gail Early | 6/30/08 | Green | High |
| Court Commissioner Training and setup – new method | Gail Early | 12/31/08 | Green | Medium |
| **Fiscal Year Close Activities** | | | | |
| Fiscal Year Close Training | Ginger Stewart | 5/6/08 | Closed | Medium |
| COA Restructure re: re-org – P4 changes | Ginger Stewart | 5/31/08 | Green | High |
| Interagency Accounts Payable/Receivable | Ginger Stewart | 7/31/08 | Green | High |
| SFY08 final deadline for accruals | Ginger Stewart | 7/31/08 | Green | High |
| Review / Projection for TANF, CCDF, SSBG prior to close | Sally Barber | 7/31/08 | Green | High |
| Sub-recipient Reporting | Donna Lavergne / Wendy Armstrong | 7/31/08 | Green | High |
| DCS Receivable calculations to Office of Accounting Services | Loan Tran / Kathy Payne | 7/31/08 | Green | High |
| Final projection re: TANF and CCDF prior to close of federal fiscal year | Sally Barber / Wendy Armstrong | 9/15/08 | Green | High |
| Fiscal Year Closed | Ginger Stewart | 9/1/08 | Green | High |
| **Other Fiscal** | | | | |
| Disaster Flood 2007 – track related costs | Ginger Stewart | ongoing | Green | Low |
| Grant Management – IVD | Kathy Payne | 7/31/08 | Green | High |
| July 08 | Kathy Payne | 7/31/08 | Green | High |
| October 08 | Kathy Payne | 10/31/08 | Green | High |
| January 09 | Kathy Payne | 1/31/09 | Green | High |
| April 09 | Kathy Payne | 4/30/09 | Green | High |
| Grant Management – TANF | Sally Barber | | | |
| July 08 | Sally Barber | 7/31/08 | Green | High |

Khaleghi v. State
01111591

| Task Name | Lead | Due Date | Status[1] | Priority[2] |
|---|---|---|---|---|
| October 08 | Sally Barber | 10/31/08 | Green | High |
| January 09 | Sally Barber | 1/31/09 | Green | High |
| April 09 | Sally Barber | 4/30/09 | Green | High |
| Grant Management – CCDF [d] | Wendy Armstrong | | | |
| July 08 | Wendy Armstrong | 7/31/08 | Yellow | High |
| October 08 | Wendy Armstrong | 10/31/08 | Yellow | High |
| January 09 | Wendy Armstrong | 1/31/09 | Yellow | High |
| April 09 | Wendy Armstrong | 4/30/09 | Yellow | High |
| Grant Management – Food Stamp [e] | Wendy Armstrong | | | |
| July 08 | Wendy Armstrong | 7/31/08 | Yellow | High |
| October 08 | Wendy Armstrong | 10/31/08 | Yellow | High |
| January 09 | Wendy Armstrong | 1/31/09 | Yellow | High |
| April 09 | Wendy Armstrong | 4/30/09 | Yellow | High |
| WF Spending Plan Monitoring | Wendy Armstrong | Monthly | Green | Medium |
| Time and Effort Certifications | Laura Watson | 4/30/09 | Green | High |
| Revise (as necessary) PACAP for SFY09 | Ginger Stewart/Kathy Payne | 7/1/08 | Green | High |
| CCDF Clean-up FY 08 | Ginger Stewart / Loan Tran | 4/30/08 | Red [f] | High |
| Provider 1 – Provider Payroll | Wendy Armstrong | TBD | Red [g] | High |
| Finalize changes to PACAP | Ginger Stewart / Loan Tran | 4/30/08 | Closed | High |
| Develop and implement process and training re: travel and purchase card use | Ginger Stewart | 5/31/08 | Green | Medium |
| Review and analyze RMTS CSO audits and make recommendations regarding needed training and changes | Duane French / Ginger Stewart | 7/1/08 | Green | Medium |
| Develop and begin implementation RMTS training for CSOAs | Ginger Stewart | 6/30/08 | Green | Medium |
| FTE Exercise w/ Central Budget Office | Babs Roberts / Roxie Schalliol | TBD | Red | Low |
| Briefing Book Expenditure Sections | Laura Watson | 10/1/08 | Green | Medium |
| Budget Notebook Development | Laura Watson | 1/9/09 | Green | High |
| Tribal negotiations | Sally Barber | 4/30/08 | Yellow | Medium |
| Tribal eligibility determination project | Babs Roberts | 8/29/08 | Yellow | High |
| eJAS AWRs | | | | |
| - changes to support services obligations | Babs Roberts | 8/1/08 | Green | Low |
| - changes to account coding for WorkFirst | Sally Barber | 5/30/08 | Closed | Medium |

d Grant Management for CCDF is in Yellow status due to the higher than anticipated workload associated with continued support of CCDF and DEL.

e Grants Management for Food Stamp admin funds is in Yellow status due to the higher than anticipated Child Care workload. The same staff person does both programs. Additional resources will be required to bring this to green.

f This is going to be an ongoing item as cost allocation does not allow us to turn off the grants mid month; therefore clean up will be required every month.

g This item in Red status due to the workload associated the staff person assigned this is also responsible for child care and Food Stamps.

| TASK NAME | LEAD | DUE DATE | STATUS[1] | PRIORITY[2] |
|---|---|---|---|---|
| - changes to account coding for FSET | Wendy Armstrong | 5/30/08 | Closed | Medium |
| ACES Chart of Account Changes | Laura Watson | 5/30/08 | Closed | High |
| **Contract renewal (over 300)** | | | | |
| Contract Training | Dorie Keeley | 6/30/08 | Green | Low |
| Contract renewal for state fiscal year based contracts | Dorie Keeley | 6/30/08 | Green | High |
| Contract renewal for federal fiscal year based contracts | Dorie Keeley | 9/30/08 | Green | High |
| **EBT** | | | | |
| Review Deliverables – Contracted Vendor re: Re-procurement | Arjean Travis | 4/25/08 | Green | High |
| Group home audits | Arjean Travis | 12/31/08 | Green | Medium |
| King County Recovery Center (R4) | Reginald Wright | 01/16/08 | closed | Medium |
| NW Indian Treatment (R6) | Reginald Wright | 01/31/08 | closed | |
| Seadrunnar Forest Park (R4) | Reginald Wright | 02/07/08 | closed | |
| Teen Challenge (R4) | Reginald Wright | 02/29/08 | closed | |
| Pioneer DOSA West (R4) | Reginald Wright | 03/06/08 | closed | |
| Genesis House (R4) | Reginald Wright | 03/13/08 | closed | |
| Perinatal (R4) | Reginald Wright | 03/17/08 | closed | |
| Teen Challenge (R4) | Reginald Wright | 03/18/08 | closed | |
| Pam (R5) | Reginald Wright | 03/26/08 | closed | |
| Perinatal (R5) | Reginald Wright | 04/03/08 | closed | |
| Teen Challenge (R5) | Reginald Wright | 04/16/08 | closed | |
| Center for Alcohol (R1) | Reginald Wright | 04/21/08 | closed | |
| Isabella House (R1) | Reginald Wright | 04/22/08 | closed | |
| Sparc (R1) | Reginald Wright | 04/23/08 | closed | |
| Sun Ray Court (R1) | Reginald Wright | 04/24/08 | closed | |
| Pioneer Center East (R1) | Reginald Wright | 04/25/08 | closed | |
| Evergreen (R3) | Reginald Wright | 05/07/08 | closed | |
| Soundview (R3) | Reginald Wright | 05/08/08 | closed | |
| Pioneer Center North (R3) | Reginald Wright | 05/09/08 | closed | |
| Outward Bound (R6) | Reginald Wright | 05/19/08 | closed | |
| Cedar View (R6) | Reginald Wright | 05/20/08 | Green | |
| Drug Abuse (R6) | Reginald Wright | 05/21/08 | Green | |
| Lifeline (R6) | Reginald Wright | 05/22/08 | Green | |
| Clallam County (R6) | Reginald Wright | 06/02/08 | Green | |
| Riel House (R2) | Reginald Wright | 06/16/08 | Green | |
| James Oldham (R2) | Reginald Wright | 06/17/08 | Green | |
| Casita Del Rio (R2) | Reginald Wright | 06/18/08 | Green | |

| TASK NAME | LEAD | DUE DATE | STATUS [1] | PRIORITY [2] |
|---|---|---|---|---|
| Teen Challenge (R1) | Reginald Wright | 06/19/08 | Green | |
| Christine Minard (R4) | Reginald Wright | 06/26/08 | Green | |
| Design, development, and writing of EBT Disaster Plan | Valerie Vertz | 09/30/08 | Green | Medium |
| Farmers Market Technology (SSB 6483) | Desmond Boucher | 06/30/08 | Green | Medium |
| Future Vision of ACES Project | Arjean Travis | 06/30/08 | Green | Medium |
| EBT Contract Extension Proposal | Arjean Travis | 12/31/08 | Green | High |
| Tribal Eligibility determination | Arjean Travis | 8/29/08 | Green | High |
| EBT Vendor adds new CSO/Region for PG tribe | EBT Team | TBD | Green | |
| Order EBT Card Stock/EBT Client Training Materials | EBT Team | TBD | Green | |
| Order CAPS Machine | EBT Team | TBD | Green | |
| Assignment of new Web Admin User IDs | EBT Team | TBD | Green | |
| Assignment of new Users Profile and Roles | EBT Team | TBD | Green | |
| Conduct EBT Training | EBT Team | TBD | Green | |
| Conduct EBT Web Browser training for financial and support staff | EBT Team | TBD | Green | |
| Conduct Process and Procedure training | EBT Team | TBD | Green | |
| Conduct EBT Barcode training | EBT Team | TBD | Green | |
| Conduct CAPS Operator and Card Issuance Clerks training | EBT Team | TBD | Green | |
| On-going training support | EBT Team | TBD | Green | |
| **HR & OD** | | | | |
| WMS Cap | Roxie Schalliol | 12/31/07 | Red | Medium |
| Hiring Protocol | Roxie Schalliol | 6/20/08 | Yellow | High |
| **Certified Public Manager Scholarship (CPM)** | Pat Seigler | | Green | Medium |
| 2007 cohort candidates -- monitor progress | Pat Seigler | 3/31/09 | Green | |
| 2008 cohort -- determine new candidates | Pat Seigler | 7/31/08 | Green | |
| **Staff Development & Training Team** | | | | |
| Phase I | Bill Callahan | 1/31/08 | Red [h] | Low |
| Phase II | Bill Callahan | 3/31/08 | Red [i] | Low |
| Tuition reimbursement | Pat Seigler | 6/30/08 | Green | Low |
| Admin 15.15 Policy Training | Pat Seigler | TBD | | |
| **Fill CSD positions** | Ilene Le Vee | | | |
| Director | Kjerstin Riedel | 2/29/08 | Closed | |
| Policy Chief | Kjerstin Riedel | 3/31/08 | Closed | |

[h] Target dates were missed due to lack of an Organizational Development Manager in HR & OD. A new date of 9/30/08 has been set by the OD team.

[i] Target dates were missed due to lack of an Organizational Development Manager in HR & OD. A new date of 9/30/08 has been set by the OD team.

| TASK NAME | LEAD | DUE DATE | STATUS[1] | PRIORITY[2] |
|---|---|---|---|---|
| **ITS** | | | | |
| Classification & Pay – proposals for the 2009 – 11 Collective Bargaining | Kandy Pierson | 12/31/09 | | |
| LEAN Outcomes | Kandy Pierson | 5/31/08 | | Medium |
| LEAN Outcomes | Kandy Pierson | 4/30/08 | Yellow | |
| LEAN Team Facilitation | Kjerstin Riedel | 5/31/08 | | |
| LEAN Process | Kandy Pierson | 2/29/08 | | |
| LMS Implementation | Pat Seigler | 12/31/08 | Red[j] | Medium |
| HR & OD Website | William Dooley | 4/31/08 | | |
| 2008 Public Service Recognition Week (May 5 – 9) | Duane French | 5/9/08 | Closed | |
| OS Director | Roxie / Kjerstin | 7/1/08 | Green | High |
| Deputy Assistant Secretary | Roxie / Kjerstin | 7/1/08 | Green | High |
| Field Operations Chief | Kjerstin Riedel | 3/3/08 | Closed | |
| ProviderOne | Greg Beck | 12/1/08 | Yellow | Medium |
| ACES Visioning | Greg Beck | 7/1/08 | Green | Low |
| SB 1848 – Date share to identify state of residence | Andy Alxrd | 11/30/07 | | |
| SSB 5244 – Child Support changes from DRA | Wally McClure | 10/1/08 | Green | Medium |
| SSB 5093 – Children's medical changes | Scott Reese | 1/1/09 | Green | Medium |
| SSB 5093 – On-line medical application | Scott Reese | 7/1/08 | Green | Medium |
| Provider Payroll | Scott Reese | 5/8/09 | Green | Medium |
| Section II 903 Process (Consulting with DIS – on-going work) | | 6/30/08 | Closed | |
| Flood lessons learned (ISSD/ITS technology focus) | Lonnie Paul | 3/31/08 | Closed | |
| DSHS Enterprise System Governance | Greg Beck | 4/11/08 | Green | Low |
| NAFS/Career Services | Scott Reese | | Yellow | |
| **OFFICE OF QUALITY ASSURANCE (QA) (UPDATED 7/10/08)** | **BARBARA BUCSKO** | | | |
| TANF / WorkFirst – Work Participation Verification (DRA of 2005) | Diana Leach | 06/30/11 | Green | Low |
| Monthly case reviews (QA) | Diana Leach | 06/30/11 | Green | Low |
| Monthly results review committee meetings (All Partners) | Diana Leach | 09/31/11 | Green | Low |
| Internal Control Workgroup | Diana Leach | 09/31/11 | Green | Low |
| Exception Reporting Workgroup | Shayne Frost | 06/30/11 | Green | Low |
| Develop revised review process in conjunction with Partners | Diana Leach | 10/01/08 | Green | Low |

[j] Target date was changed to reflect LMS Implementation by the entire Administration. Significant increase in price per user.

| TASK NAME | LEAD | DUE DATE | STATUS[1] | PRIORITY[2] |
|---|---|---|---|---|
| Child Care and Development Funds QA Review (IPIA of 2002) | | | | |
| Phase I – Federal Reviews / Reporting (Cycle 1) IPIA Reviews | | | | |
| Working Connections Child Care | Shayne Frost | 06/12/08 | Closed | |
| Children's Administration Child Care | Shayne Frost | 06/12/08 | Closed | |
| Seasonal Child Care | Shayne Frost | 06/12/08 | Closed | |
| Final report and corrective action plan to DEL | Barbara Bucsko | 06/12/08 | Closed | |
| Phase II – State Child Care Reviews of IPIA error cases | Barbara Bucsko | 06/12/08 | Closed | |
| Working Connections Child Care (SAO) | Shayne Frost | 07/30/08 | Green | Low |
| Phase III – Child Care and Attendance Record Reconciliation | Shayne Frost | 07/01/09 | Green | Low |
| Phase IV – Federal Reviews / Reporting (Cycle 2) (FFY11) | | | | |
| Working Connection Child Care | Shayne Frost | 06/30/11 | Green | Low |
| Children's Administration Child Care | Shayne Frost | 06/30/11 | Green | Low |
| Seasonal Child Care | Shayne Frost | 06/30/11 | Green | Low |
| Final report and corrective action plan to DEL | Barbara Bucsko | 07/01/11 | Green | Low |
| Basic Food Program Quality Control (USDA) | | | | |
| Monthly reviews | Lori Hart | 09/30/11 | Green | Low |
| Monthly results review committee meetings | Carolyn Horlor | 09/30/11 | Green | Low |
| On-going reports of performance | Lori Hart | 09/30/11 | Green | Low |
| Monthly federal reports | Lori Hart | 09/30/11 | Green | Low |
| Tribal Basic Food Program QC Coordination | Carolyn Horlor | 09/30/11 | Green | Low |
| Disaster Food Stamp Program Audit | Barbara Bucsko | 05/30/08 | Closed | Low |
| Annual USDA/FNS Audit of Statistical Sample | Cheryl Talmage | 09/30/08 | Green | Low |
| Annual SAO Audit | Barbara Bucsko | 07/30/08 | Green | Low |
| Annual USDA/FNS SAOR/ME | Art Fredrickson | 07/30/08 | Green | Low |
| Basic Food Management Evaluation FFY 08 – CSO Reviews (USDA) | | | | |
| Kennewick (Region 2) | Art Fredrickson | 10/24/07 | Closed | |
| Capitol Hill (Region 4) | Art Fredrickson | 12/12/07 | Closed | |
| Kelso (Region 6) | Art Fredrickson | 04/24/08 | Closed | |
| Federal Way (Region 4) | Art Fredrickson | 03/04/08 | Closed | |
| Pierce South (Region 5) | Art Fredrickson | 04/09/08 | Closed | |
| Alderwood (Region 3) | Art Fredrickson | 05/21/08 | Closed | |
| Spokane Valley (Region 1) | Art Fredrickson | 06/20/08 | Closed | |
| Shelton (Region 6) | Art Fredrickson | 08/12/08 | Closed | |
| Spokane Southwest (Region 6) | Art Fredrickson | 09/23/08 | Green | Low |
| Basic Food Management Evaluation FFY 09 – CSO Reviews (USDA) | | | | Low |

| TASK NAME | LEAD | DUE DATE | STATUS[1] | PRIORITY[2] |
|---|---|---|---|---|
| Annual Plan due to USDA/FNS for approval | Lori Hart | 07/10/08 | Closed | Low |
| Moses Lake (Region 1) | Art Fredrickson | 10/13/08 | Green | Low |
| Wapato (Region 2) | Art Fredrickson | 11/10/08 | Green | Low |
| Everett (Region 3) | Art Fredrickson | 01/08/09 | Green | Low |
| Sunnyside (Region 2) | Art Fredrickson | 02/02/09 | Green | Low |
| Belltown (Region 4) | Art Fredrickson | 03/03/09 | Green | Low |
| Okanogan (Region 1) | Art Fredrickson | 04/21/09 | Green | Low |
| Chehalis (Region 6) | Art Fredrickson | 06/03/09 | Green | Low |
| White Center (Region 4) | Art Fredrickson | 07/07/09 | Green | Low |
| Lakewood (Region 5) | Art Fredrickson | 08/11/09 | Green | Low |
| Basic Food – Focused Accuracy Reviews – 100 cases x 2 per month (CSD) | Lori Hart | 09/30/09 | Green | Low |
| WASHCAP Annual Survey (CSD) | Shayne Frost | 02/28/09 | Green | Low |
| Medicaid Payment Error rate Measurements (PERM) – Cycle 1 (FFY 08) | | | | |
| **(HHS)** | | | | |
| Medicaid Payment Error Rate Measurement (Phase II) State Reviews | Maria Thompson | 07/29/10 | Green | Low |
| On-going reports of performance | Maria Thompson | 07/29/10 | Green | Low |
| Monthly review committee meetings | Maria Thompson | 07/29/10 | Green | Low |
| On-going monthly reviews – State | Lori Hammons | 07/29/10 | Green | Low |
| Submit final report | Barbara Bucsko | 07/01/09 | Green | Low |
| Calculate error rates and compile findings | Maria Thompson | 06/29/09 | Green | Low |
| On-going reports of performance | Maria Thompson | 05/29/09 | Green | Low |
| Monthly results review committee meetings | Maria Thompson | 05/29/09 | Green | Low |
| Monthly reviews | Lori Hammons | 05/29/12 | Green | Low |
| **(HRSA)** | | | | |
| Medicaid/SCHIP Reviews | Lori Hammons | 09/30/11 | Green | Low |
| Ongoing monthly reviews and reports of performance | Maria Thompson | 09/30/11 | Green | Low |
| Medicaid Payment Error Rate Measurement (PERM) – Cycle 2 (FFY11) | | | | |
| **(HHS)** | | | | |
| Monthly reviews | Lori Hammons | 08/29/12 | Green | Low |
| Monthly results review committee meetings | Maria Thompson | 08/29/12 | Green | Low |
| On-going reports of performance | Maria Thompson | 08/29/12 | Green | Low |
| Calculate error rates & compile findings | Maria Thompson | 08/29/12 | Green | Low |
| Submit final report | Barbara Bucsko | 08/31/12 | Green | Low |
| Medicaid Eligibility Quality Control Waiver Project FY 08 (MEQC) (HHS) | | | | |
| Annual Plan to HHS/CMS for FFY 08 | Barbara Bucsko | 09/30/07 | Completed | |
| Children's Medical (Project 45) Income Ongoing Monthly | Janice Shineman | 09/30/08 | Green | Low |
| Children's Medical SSN in ACES (P45A) Ongoing Monthly | Janice Shineman | 09/30/08 | Green | Low |
| Resource eligibility for active Medicaid clients with property (P54) | Janice Shineman | 06/30/08 | Green | Low |

| Task Name | Lead | Due Date | Status[1] | Priority[2] |
|---|---|---|---|---|
| Medicaid recipients that require a Social Security Number (P55) | Janice Shineman | 07/01/08 | Green | Low |
| Medically Needy cases eligible for spend-down (P56) | Janice Shineman | 09/30/08 | Green | Low |
| Hospice (P57) | Janice Shineman | 09/30/08 | Green | Low |
| Medicaid Eligibility at SSI Termination (P58) | Janice Shineman | 07/31/08 | Green | Low |
| SSI-related Disabled Adult Children (DAC) (P59) | Janice Shineman | 09/30/08 | Green | Low |
| Medicaid Developmental Disabilities waiver (P60) | Janice Shineman | 09/30/08 | Green | Low |
| Final Report for FFY 2008 | Janice Shineman | 09/30/08 | Green | Low |
| Annual Plan 2009 Request to HHS/CMS | Barbara Bucsko | 09/30/08 | Green | Low |
| SAO Audit of MEQC | Barbara Bucsko | 09/30/08 | Green | Low |
| RASC – QA Statewide (ESA) | Carolyn Horlor | 06/30/08 | Completed | |
| Tribal Support for Medicaid and Basic Food Implementation (ESA) | Carolyn Horlor | 09/30/08 | Green | Low |
| Quality Assurance Management Information System (Barcode) Updates (QA) | Dennis Goldsby | 09/30/08 | Green | Low |
| Telework Pilot (ESA) | Barbara Bucsko | 09/01/08 | Green | Low |
| Equipment Needs Assessment with ITS (QSD) | Kathy Lichtblau | 06/30/08 | Completed | |
| Safety Plan for Lacey QA staff (ESA) | Carolyn Horlor | 06/01/08 | Green | High |
| Implement Staff Survey Corrective Action Plan (QA) | Barbara Bucsko | 09/30/08 | Green | Low |
| **WE** | | | | |
| Port Angeles (Maintenance issues) | Jeff Willis | 12/31/08 | Red | High |
| Auburn | Jeff Willis | 6/30/08 | | Medium |
| Chehalis (Flood repairs) | Jeff Willis | 1/31/08 | Completed | High |
| Renton Relocation | Jeff Willis | 6/30/08 | Green | Low |
| **Forks** | | | | |
| Demo Old Building | Jeff Willis | 1/11/08 | Completed | Low |
| Move to new building | Jeff Willis | 8/1/08 | | Medium |
| Computer security – recovery & destruction | Todd Fiering | 1/31/08 | Completed | High |
| Computer replacement / facility (technology) planning | Todd Fiering | 3/31/08 | Completed | High |
| Lessons Learned – ITS | Lonnie Paul | TBD | Completed | Low |
| Kennewick Relocation/Lease Renewal | OLF/CSD/Jeff Willis | 11/30/08 | Red | High |
| Ellensburg to Temporary site | OLF/CSD/Jeff Willis | 05/01/08 | Completed | High |
| Ellensburg Relocation – Permanent site | Jeff Willis | 6/30/08 | | High |
| Region 6 Move to Point Plaza 3 | Jeff Willis | 6/30/08 | | High |
| Lakewood | Jeff Willis | 6/30/08 | | High |
| CVI relation project | Jeff Willis | 1/31/08 | Completed | Medium |
| Ballard (Close North Seattle Frank Chopp Building) | Jeff Willis | 12/31/08 | Red | Low |

| TASK NAME | LEAD | DUE DATE | STATUS [1] | PRIORITY [2] |
|---|---|---|---|---|
| Lease Renewals – Tickler System | Val Ivey | 06/30/08 | Green | High |
| Work Environment - Web Site Updates | Val Ivey | 07/31/08 | Green | Medium |
| Tracking Tool availability - Facilities | Val Ivey | 07/31/08 | Green | Medium |
| Vision Planning – Future Facilities sites | Jeff Willis | 08/31/08 | Green | Low |
| | | | | |
| **OS DMS Project** | | | | |
| Charter | Babs, Greg, Jeff | 6/30/08 | Green | Medium |
| Migrate personnel documents | Babs/DCS | 12/31/08 | Green | Medium |
| DSHS Sustainability (on-going work) | Val Ivey | 12/31/08 | Green | Medium |
| RASE Coordination – CSD | Mike Hart | 05/14/08 | Completed | Medium |
| RASE – OS/Fiscal | Ginger Stewart | 05/14/08 | Completed | Medium |
| Emergency Management Planning | Val Ivey | 07/31/08 | Green | High |
| Risk Management/Incident Reporting Quarterly Reports | Val Ivey | 03/30/08 | Green | Medium |
| Evacuation Planning – QA Annex | Val Ivey | 06/30/08 | Green | High |
| OAS moves to CV2 | June Simpson | 05/31/08 | Completed | Medium |
| Beautification Committee | June/Val | 08/31/08 | Green | Low |
| Building Re-Signage for CV1 and CV2 | June Simpson | 08/31/08 | Green | Low |
| | | | | |
| **AUDITS SAO FY 08** | | | | |
| TANF | Jeff/Mensah | 11/30/08 | Green | Low |
| Child Care | Jeff/Mensah | 11/30/08 | Green | Low |
| Food Assistance | Jeff/Mensah | 11/30/08 | Green | Low |
| Child Support | Jeff/Mensah | 11/30/08 | Green | Low |
| ACES | Jeff/Mensah | 11/30/08 | Green | Low |
| E-JAS | Jeff/Mensah | 11/30/08 | Green | Low |
| Medicaid | Jeff/Mensah | 11/30/08 | Green | Low |
| Furniture upgrades – OAS, CSD | June Simpson | 06/30/08 | Green | Medium |
| CV1 CSD build out – additional WF staff | June Simpson | 06/30/08 | Green | Medium |
| CV1 CSD – Recovering Cube Walls (55 cubes) | June Simpson | 06/30/08 | Green | Medium |
| Public Disclosure/Torts Quarterly updates | Mensah | 06/30/08 | Green | Medium |
| CSD/ESD Lease cost determination – WF sites | Val Ivey | 06/30/08 | Green | High |
| Internal Investigation assistance | Mensah | 12/31/08 | Green | Low |
| Special projects/Requests | Mensah | 12/31/08 | Green | Low |
| | | | | |
| **OTHER** | | | | |
| | | | | |
| | | | | |

1 **STATUS:**

    Green                On target; no implementation issues

    Yellow            Project target, budget, or other issues at some risk

    Red                 Missed project target, budget, or other major area and/or high risk of doing so

    Closed            Project complete

2 **PRIORITY:**

    High              Significant impact on clients/staff or budget; health/safety issues, etc.

    Medium        Business processes; moderate impact on clients/staff or budget

    Low               On-going activities; low impact on clients/staff

**EXHIBIT 19**

**Bucsko, Barbara (DSHS)**

| | |
|---|---|
| **From:** | Khaleghi, Dariush (DSHS) |
| **Sent:** | Wednesday, September 10, 2008 12:55 PM |
| **To:** | Beck, Greg (DSHS); Bucsko, Barbara (DSHS); Harder, Diana (DSHS); Khaleghi, Dariush (DSHS); Pierson, Kandy (DSHS); Roberts, Babette (DSHS); Schalliol, Roxie (DSHS); Welch, Carol; Willis, Jeff (DSHS) |
| **Cc:** | Hutson, Troy A (DSHS); Hagen, Karen; Schalliol, Roxie (DSHS); Shoji, Dori (DSHS) |
| **Subject:** | Succession planning - identifying future leaders and two other items |

1. I would like for each of us identify one or two people who demonstrate leadership talent and the capacity to lead the future!
I would like us to think about how we want to develop these folks through strategic and practical job experience. For instance, I would like them to come to our management meetings and participate in the conversations, although the decisions will stay with the Chiefs and I. Would be great if we cascade this down and up in the organization. Leaders are farmers of hope! This will be a great opportunity for all of us. Diana, please, add to our meeting agenda.

2. Breakthrough performance systems: First, let me thank Babs for the idea that is simple and we in fact implemented this at Intel. It is pretty simple, everyone of us needs to know what the three to five values we add to the organization are and how we would know we are successful in delivering those values/services and doing our jobs. Diana, please, add to our meeting agenda.

3. Karen and I have been working on an agenda item for Troy's management meeting that you have some ownership of. I would like to make sure you are aware of it and have data to present. These are core operational issues/action plans and do not have direct dealings with the divisions in terms of their policies, services, etc.

First, let me thank Karen for titling this, "No Surprises" agenda item. There many not be any topics to discuss under each line item, then, we just say nothing and pass. All these are ESA-wide. Feel free to add and make them better.

1. HR (i.e., the status with requests from the DSHS headquarters, double fill list, exemption requests, grievances, etc.) These are ESA-wide. **Owner Kandy**

2. **Risk Management**: (i.e., Public disclosure requests, Audits, DSHS Survey Action Plan, etc) **Owner: Roxie**

3. **Fiscal** (supplemental budgets, FTEs, budget variances, etc) **Owner: Babs**

4. **Facilities/Leases** (i.e., present the new tracking system, functions, vendor diversification action plan, exception requests,..) **Owner: Jeff**

5. **IT** (i.e., IT Governance topics, etc..) **Owner: Greg**

6. **QA/E-MAP** (share data and other things need to happen): **Owner: Barbara/Carol**

This is just the beginning of a new process. We'll get better as we move forward. Please, use data and let it do the speaking.

Your input will be appreciated.

thanks, dk

Thanks, dk

Khaleghi v. State
01070061

## Bucsko, Barbara (DSHS)

| | |
|---|---|
| **From:** | Khaleghi, Dariush (DSHS) |
| **Sent:** | Friday, October 10, 2008 9:33 AM |
| **To:** | Beck, Greg (DSHS); Bucsko, Barbara (DSHS); Khaleghi, Dariush (DSHS); Pierson, Kandy (DSHS); Roberts, Babette (DSHS); Schalliol, Roxie (DSHS); Welch, Carol; Willis, Jeff (DSHS) |
| **Cc:** | Hutson, Troy A (DSHS); Schalliol, Roxie (DSHS); Cloutier, Kim (DSHS) |
| **Subject:** | OS Performance Report |
| **Attachments:** | OSD Performance.ppt |

Good Morning!

Please, see the attachment. I have put together a simple ppt for our meetings with the directors and Troy. I will work with each of you to complete the performance indicators and targets. We will coordinate it with Roxie as a part of Troy's office. I would like to go to the meetings and have data and reports for everyone to see where we are and where we are trying to go.

I broke the presentation by OS functions (i.e., HR, IT, etc.) and for each function suggested a set of five categories that we need indicators for (i.e., Operations, Customer Service, Quality, Team Performance, etc). When we have the indicators, we'll set targets to show the trends.

Please, let me know if you have any questions.

Rgds, dk

1

Khaleghi v. State
01070062

# OSD Performance

Oct 2008

Vision: Stronger ESA

Khaleghi v. State
01070063

# OS Functional Performance

- HR
- IT
- Budget
- QA
- E-Map
- Facilities

*Vision: Stronger ESA*

Khaleghi v. State
01070064

# HR Performance Against Targets (PATs)

■ Top Success Indicators for

1. Operations

  1. (i.e., Vacancy Rates)     On Target

2. Customer Service

3. Quality

4. Budget

5. Team Performance

  1. (i.e., 100% active PDPs)

*Vision: Stronger ESA*

Khaleghi v. State
01070065

# IT Performance Against Targets
## (PATs)

- **Top Success Indicators for**

  1. Operations

     1. (i.e., System Availability)    On Target

  2. Customer Service

  3. Quality

  4. Budget

  5. Team Performance

     1. (i.e., 100% active PDPs)

*Vision: Stronger ESA*

Khaleghi v. State
01070066

# Budget Performance Against Targets (PATs)

- **Top Success Indicators for**

  1. Operations
     1. (i.e., 0 audit findings)        On Target
  2. Customer Service
  3. Quality
  4. Budget
  5. Team Performance
     1. (i.e., 100% active PDPs)

*Vision: Stronger ESA*

Khaleghi v. State
01070067

# QA Performance Against Targets (PATs)

■ Top Success Indicators for

1. Operations
   1. (i.e.,?)     On Target
2. Customer Service
3. Quality
4. Budget
5. Team Performance
   1. (i.e., 100% active PDPs)

*Vision: Stronger ESA*

Khaleghi v. State
01070068

# E-MAP Performance Against Targets (PATs)

- Top Success Indicators for

1. Operations
   1. (i.e., On-time development of data sets)   On Target
2. Customer Service
3. Quality
4. Budget
5. Team Performance
   1. (i.e., 100% active PDPs)

*Vision: Stronger ESA*

Khaleghi v. State
01070069

# Facilities Performance Against Targets (PATs)

- Top Success Indicators for

  1. Operations
     1. (i.e., All facilities have )   On Target

  2. Customer Service

  3. Quality

  4. Budget

  5. Team Performance
     1. (i.e., 100% active PDPs)

*Vision: Stronger ESA*

Khaleghi v. State
01070070

## Bucsko, Barbara (DSHS)

| | |
|---|---|
| **From:** | Khaleghi, Dariush (DSHS) |
| **Sent:** | Thursday, October 09, 2008 2:20 PM |
| **To:** | Hutson, Troy A (DSHS); Shoji, Dori (DSHS) |
| **Cc:** | Beck, Greg (DSHS); Bucsko, Barbara (DSHS); Khaleghi, Dariush (DSHS); Pierson, Kandy (DSHS); Roberts, Babette (DSHS); Schalliol, Roxie (DSHS); Welch, Carol; Willis, Jeff (DSHS) |
| **Subject:** | Monthly Accomplishment Reports |

Good Afternoon Troy and Dori,

We just began collecting monthly accomplishments to share with you. Some of the items may be valuable to share with Robin for the purpose of the debrief. I do not have everyone's yet. But this is a good start. Will take care of editing as well.

Thanks, dk

## IT

1. ACES completed a successful Disaster Recovery Exercise.
2. Over the last 12 months ACES has achieved more than 99.98% system availability. Of more than 3900 hours of scheduled availability, ACES has been down for 30 minutes.
3. Over the last 9 months eJAS has achieved 100% system availability. Of more than 5000 hours of scheduled availability, eJAS has not had any outages.

## QA

At the request of CSD, the Operations Support, Office of Quality Assurance is conducting focused accuracy audits of 400 basic food cases from all 5 Community Services Offices in Region 5 with a shared goal to increase payment accuracy. This "find and fix" exercise started with a sample drawn for allotments over $200 with a focus on the 5 most common error elements: 1) earned income, 2) unearned income, 3) shelter, 4) household composition and 5) utility deductions. The focused sample was issued September 29 and as of today (Oct 9, 2008), 300 of the 400 cases have been completed with results shared with local office staff for corrective action. QA is partnering with CSD to identify root causes, training needs and best practices.

In September 2008, Quality Assurance staff audited:

54 Child Care attendance records (Child Care subsidy)
231 Food Stamp cases (Quality Control)
318 Food Stamp cases (focused accuracy)
198 Medicaid and SCHIP cases
150 WorkFirst cases (participation validation)
50 TANF Career Services (employment validation)
-----------------------
**1,252 Total Audits**

In an effort to improve accuracy results using the telephone rather than in-office client eligibility interviews, Washington is partnering with the State of Pennsylvania (ranked #5 nationally in payment accuracy) who is sharing successful efforts undertaken there. PA is sending a DVD about interviewing to compliment materials already shared via email. All materials from PA have been shared with CSD Basic Food Program staff. Staff from the Office of Quality Assurance participated with the Department of Early Learning in the hiring process for DEL Child Care Subsidy staff. Announcements should be coming soon for two vacant positions filled in DEL.

Khaleghi v. State
01070071

The Office of Quality Assurance successfully passed the statistical audit by USDA/Food and Nutrition Services of the Basic Food Program sample. Statistician, Clay Jones, USDA/FNS, was in Olympia September 23 and 24th conducting the on-site audit. No new issues were identified and the audit went well. ACES will promote systems fixes in January and April 2009 to fix an issue discovered in the 2007 audit. Good news!

**E-MAP**

- E-MAPS wrote a grant to conduct data analysis focused on arrears stratification. By studying the underlying causes of arrears growth and providing debt categories that may be linked to different root causes; we hope to provide caseworkers with methods to tailor approaches and actions. The following announcement was sent out from the federal Office of Child Support Enforcement:

  Under Priority Two—"Using Business Intelligence/Data Analysis to Improve Performance" (three 17-month grants):

  - Washington - "Arrears Stratification in Washington State: Developing Operational Protocols through Longitudinal Analysis in a Data Mining Environment" - A total of $103,448 (began September 30, 2008)

- Passed Data Reliability Audit at 95% for Child Support, which is a prerequisite for earning the financial incentives on the federal performance measures. E-MAPS has an internal self-assessment/audit team that provides focused analyses on the data reliability of the federal performance measures, particularly the two components of the paternity establishment percentage. They provide data coding clean-up lists to the field and have provided training to the field. E-MAPS is also working with SEMS on eliminating the issue with duplicate cases.
- British Columbia Child Support director and staff met with E-MAPS and DCS regarding our research activities and performance metrics on October 7, 2008.
- California is sending representatives to look at E-MAPS to get information on setting up a research entity similar to E-MAPS November 3-4, 2008.

Khaleghi v. State
01070072

**Vision**
Stronger ESA

**Mission**
Customer Success

**Key Value**
Model the Way

**Team Motto**
Your Success is Our Passion!

# The OS Leadership Powerhouse

### Monday, October 6, 2008

**Actions Required (AR)**

| Agenda Topic/ Time Allotment | Action | Owner | Deadline | Status | Comments |
|---|---|---|---|---|---|
| Recognition/Appreciation/Thank you 10 minutes | Starting each meeting on a positive note | ALL | | | |
| Task Lists 20 minutes | Send out all the yellow and red actions | All | Every powerhouse meeting | | Need specific discussion reg RTMS |
| Weekly deliverables 10 minutes | Set up a meeting to finalize the ROCs for OS | Kandy/All | 10/10/08 Team Accomplishments due to DK 10/15/08 PDF Due | | |
| Enhancing Team Knowledge 5 minutes | | ALL | | | |

**Team's Guiding Principles**
- Be open and honest
- Do the right thing for the Team

Rhaleghi v. State
01070073